UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
----------------------------------------------------------------x
JOSEPH COOPER

                                        Plaintiff,


        VS.                                             Case 3:14-cv-04152-B D




BRODERICK STEVEN "STEVE" HARVEY
.
                                        Defendant
----------------------------------------------------------------x

# EXPERT REPORT OF
## OF MICHAEL A. EINHORN, Ph.D.,

## ON BEHALF OF PLAINTIFF




**July 10, 2015**




*Subject to change as additional information becomes available*

Def.'s APP 001

*Michael A. Einhorn, Ph.D.* *Case 3:14-cv-04152-B D*

## 1. INTRODUCTION

1.1)I have been asked by Plaintiff Joseph Cooper, by and through his attorney J. Michael Weston, for my professional valuation of damages that resulted from a breach of contract and tortious interference with business relations related to the actions of Steve Harvey.

1.2)Plaintiff Joseph Cooper is a video producer who taped and secured distribution rights for a collection of Steve Harvey comedy videos that were recorded in 1993-1994 at the Steve Harvey Comedy Club in Dallas, Texas. The comedy material is adult fare in language and subject matter. As used in this report, "adult fare" does not refer to anything that might be considered pornographic.

1.3)Defendant Steve Harvey is a prominent comedian who is now the host of the *Steve Harvey Morning Show* (reaching over sixty radio markets), the *Steve Harvey Talk Show* (on television in fifty states and the District of Columbia), and is the host of syndicated television shows *Family Feud* and *Celebrity Family Food.* Mr. Harvey is also an author whose books have been made into movies. Prior to his committing to a prime time audience, Mr. Harvey performed a number of adult comedy acts throughout the U.S. and released an adult DVD *Still Trippin'* in as late as 2008

1.4) Plaintiff contends that he entered with the Defendant a video contract under which the plaintiff videotaped about 120 hours of Mr. Harvey's nightclub routines, in anticipation of releases at some later time.

1.5) I am advised that Plaintiff has now a history of attempting to create products from the videotapes of Mr. Harvey that resulted in delays by Mr. Harvey. I am also advised that Plaintiff believes that Mr. Harvey agreed to pay $5,000,000 for a buyout of Plaintiff's rights in the videos.

1.6) Plaintiff contends that Harvey interfered with the release of the first of five contracted videos in the year 2014 by inducing Music Video Distributors, Inc. to refuse to enter into a contract that Mr. Cooper had negotiated for the purpose of distributing to interested retailers the DVD volume *Live, Raw, & Uncensored;* four later sequels were planned. The DVDs were to be derived from videotaped performances of Steve Harvey at the Steve Harvey Comedy Club in Dallas.

1.7)I am advised that Mr. Harvey's actions are unlawful and have occurred largely because of his change in his professional image that had become more family-friendly.

1.8)I have been asked to estimate the damages suffered as a consequence of breaches of contract and unlawful interference with a proper business relationship.

1.9)I am not related to any party in this lawsuit, nor do I have any financial interest in this case other than my hourly fees. I am paid for my services in report-writing at a rate of $400 per

Def.'s APP 002

hour, and for testifying at a rate of $500 per hour.  My compensation is not contingent upon the outcome of this case.

1.10)  My assumptions, methodologies, and calculations are based on current knowledge and professional methods consistent with the standards of the economics profession.

## 2.  STATEMENT OF QUALIFICATIONS

2.1)  As an economist (Ph.D. Yale 1981), I have worked since 1997 in the area of media and intellectual property.   My *curriculum vita is* attached hereto as Appendix A.

2.2)  From 1997 to 2000, I worked as a staff economist at Broadcast Music, Inc. ("BMI"). BMI is a collecting agency that licenses performance rights in music to major broadcasters, including television networks, local stations, cable companies, and radio stations. Negotiating license fees for musical compositions generally involves some means of acknowledging the value of the intellectual property to the user.   It also involves institutional knowledge of television, radio, movies, and cable programming.

2.3)  From July 2000 to the present date, I have served as a testifying economist in court cases involving the valuation of the intellectual property owned by musicians, songwriters, music publishers, record labels, artists, photographers, actors, cartoonists, television producers, cable companies, and radio stations. A complete list of my testifying engagements is included in my attached *curriculum vitae*.

2.4)  I have written 38 professional articles in the area of copyright and intellectual property in law journals and periodicals.  I have delivered 36 professional lectures or CLE seminars related to these topics. I am also the author of the book *Media, Technology, and Copyright: Integrating Law and Economics* (Edward Elgar Publishers). I testified as an expert at deposition and/or trial on damages for copyright infringement in the cases of *Fitness Quest, Inc. v. Universal Music Publishing Group, Inc., et al.* (N. D. Ohio, 2004), *Bridgeport Music et al. v. Estate of Christopher Wallace, et al.* (M.D. Tenn., 2006), *Turino et al. v. Island Def Jam, et al.,* (C.D. Cal., 2006), *Bridgeport Music Inc. v. Smelzgood Entertainment, et al.*  (M.D. Tenn., 2007), *TMTV Corp. v. Mass Productions, Inc.*  (D.P.R., 2009). *Malibu Textiles v. Carol Anderson, Inc.* (S.D.N.Y, 2008), *Serendip LLC, et al. v. Franchise Pictures LLC, et al.*, (C.D. Cal., 2009), *Chris Lester v. U2, Apple Computer, and Universal Music* (C.D. Cal., 2009), *Kilter, Inc. v. Avon Corporation,* (S.D.N.Y., 2011), *Rafael Vergara Hermosilla v. The Coca Cola Company*, (S.D. Fl., 2011), *Dan Marino v. Usher, et al.,* (E.D. Pa., 2013), *Lessem v. Taylor,* (S.D.N.Y. 2012).

2.5)  My analysis of copyright damages in *Bridgeport Music et al. v. Estate of Christopher Wallace, et al*., was upheld on appeal by the Sixth Circuit Court of Appeals.  Defendants did not challenge my expert analysis of damages in *Bridgeport Music Inc. v. Smelzgood Entertainment, et al.* in an appeal on other matters to the Sixth Circuit Court of Appeals.  In no matter has my expert analysis ever been disqualified or limited by any court with regard to a matter of economic analysis.

Def.'s APP 003

*Michael A. Einhorn, Ph.D.*                                        *Case 3:14-cv-04152-B D*

3. **SUMMARY OF CONCLUSIONS**

*As I believe that the distribution contract implicated a collection of five DVDs in total, I estimate that Mr. Cooper may have lost the opportunity to earn in the area of $2,671.310*

4. **DOCUMENTS REVIEWED**

Second Amended Complaint and Jury Demand,  *Cooper v. Harvey*

Licensing and Distribution Agreement, Joseph Cooper and Movie Video Distribution, entered January 20, 2014

Wikipedia Article, *Steve Harvey*

5. **LOST SALES RESULTING FROM BREACH OF CONTRACT AND TORTIOUS INTERFERENCE**

5.1)  As a matter of law, I am advised that Plaintiff is entitled to recovery of amounts that would have been earned had the contested DVD/BluRaybeen released per the 2014 distribution contract.

5.2)  To do this analysis, it would be appropriate to calculate plaintiff earnings based on an estimated amount of DVD sales.  It would be appropriate to determine this estimate from the sales records of DVDs from comparable comedy shows sold on DVD.

5.3)  I am advised that at the time of this report, Mr. Harvey has not turned over any related information and documents that Plaintiff has requested.

5.4)  It is then appropriate to determine expected sales based on comparable market benchmarks.

5.5)  To determine a suitable list, I  reviewed a number of candidate shows on which Steve Harvey appeared.  The most practical choice was the video *Still Trippin'*, which Mr. Harvey released in the year 2008.   The online store Amazon.com describes *Still Trippin*' as follows.

"Steve Harvey once again commands the stage in his 90 minute stand-up comedy concert I'm Still Trippin'. Harvey kept it clean and family friendly in his last comedy special Don't Trip: He Ain't Through With Me Yet. Not easy for one of the Original Kings of Comedy, but then Harvey's versatility is precisely why he's in a class of his own. In I'm Still Trippin' Harvey never misses a beat and no topic is off limits. Harvey takes you on a ride through his personal experiences as it pertains to his family, work and traveling. Filmed in New Jersey to a full house, his energy and comedic timing are second to none. This comedic performance is sure to become an instant classic." http://www.ebay.com/itm/Steve-Harvey-Still-Trippin-2008-DVD-New-/291456752150;     http://www.amazon.com/Steve-Harvey-Still-Trippin/dp/B001B73PQC

4

Def.'s APP 004

*Michael A. Einhorn, Ph.D.*                                   *Case 3:14-cv-04152-B D*

5.6) On a five star scale, reviews of the DVD were generally favorable.

| | |
|---|---|
| <u>5 star</u> | <u>54%</u> |
| <u>4 star</u> | <u>13%</u> |
| <u>3 star</u> | <u>8%</u> |
| <u>2 star</u> | <u>11%</u> |
| <u>1 star</u> | <u>14%</u> |

The release averaged 3.8 out of 5 on Amazon.

5.7) Unlike much of Harvey's later work the material in <u>*Still Trippin'*</u> is adult-oriented charged with raw language, sexual innuendo, and racial fare.  This is substantiated by some number of reader reviews that found the tape too hardcore.

9 of 10 people found the following review helpful

By Denise D. Blanks on October 15, 2010

I thought this video was "clean" like "Don't Trip..." I was wrong! Not into all the cussing stuff -those days are over for me. If you are thinking this video is like the first one, IT'S NOT! I gave it away!

7 of 8 people found the following review helpful

By Pandoras' Box on December 9, 2008

I was very disappointed with this dvd. I wish I wouldn't have spent my money on it. I almost fell asleep trying to watch this dvd. He only had 1 really funny joke. I listen to his show every morning driving to work. The majority of the jokes he has already said on his radio show. It did not tear my mouth out. I think that Mr. Harvey is a very talented guy, but this dvd did not do it for me and I was quite disappointed in it. He never did finish his last joke. It was a waste of my money. If you want to rent it and watch it or watch a friends dvd, then I would suggest you to do that before actually purchasing a copy for your self to keep.

2 of 2 people found the following review helpful

By Jose Lopez on April 21, 2011

Steve Harvey seems like a Nice and Intelligent person,kind of like Bill Cosby(Almost),He is not hilarious,especially in this long and at times boring stand up.I don't care if someone curses or not,I found the ghetto wedding bit funny and his talk about His sons wanting Dread Locks or tattoos etcera.However when he got political and his reasoning was he voted just to vote for someone skin's color made him as "Ig-Nant" as he says as the next person or more,I "Hope" He does not vote for the same mistake again based on one's skin,If it were about that I would have never voted for anyone who did not have my name or similar or skin tone.

Def.'s APP 005

*Michael A. Einhorn, Ph.D.* *Case 3:14-cv-04152-B D*

1 of 1 people found the following review helpful
By George T. Mcdonald on June 3, 2013

I chose this because my husband likes Steve Harvey. This was from SH earlier days and was racially insensitive, so even my husband did not watch most of it.

1 of 1 people found the following review helpful
By lildee on October 16, 2012

The product quality was great, as for the DVD it's self just ok not really impressed with the contients. totaly for adults that might enjoy 4 letter words.

1 of 1 people found the following review helpful
By Lisa Marie on May 15, 2013

Come on Steve. I was hoping for variety. You certainly don't need to be vulgar to be funny or entertaining.

1 of 1 people found the following review helpful
By Kindle Customer on February 20, 2013

The quality was very poor. I wanted to send it back but I had already opened and he wasn't funny either.

5.8)   This adult material is very relevant to this case as Mr. Cooper's video material was similarly themed for adult audiences.   As much of Harvey's other later releases are more family-friendly, it is then proper to advance *Still Trippin'*  as the best possible benchmark for a comparable work that Mr. Cooper had attempted.

5.9) Sales totals for *Still Trippin'* were not immediately available from any public source. To estimate sales for the DVD,  I directed Nash Information Services to provide a best estimate of this total.

5.10) In the course of its engagement, Nash used the Internet Archive (archive.org) to find historical Amazon sales ranks for the title. The website had ranks and pricing information for 21 dates, ranging from November 13, 2008 (shortly after the release of the title) to September 14, 2014. While Amazon may have stopped selling the title, *Still Trippin'* may still be available from                 some                 third-parties                 vendors.

5.11) For each sales rank on Amazon, Nash was able to determine some neighborhood items in the rankings for which daily sales were available. Based on this comparison, it was possible to

6

*Michael A. Einhorn, Ph.D.*                                          *Case 3:14-cv-04152-B D*

estimate the sales total for each date where a rank was available.  Sales totals per day ranged from a high of 5.23 sales in December, 2008, to a low of 0.19 sales in September, 2014.

| Date | Amazon Sales Rank | Daily Sales at Amazon.com |
|------|------|------|
| 11/13/2008 | 551 | **3.97** |
| 12/4/2008 | 2157 | **4.02** |
| 12/12/2008 | 2143 | **4.30** |
| 12/16/2008 | 2079 | **5.23** |
| 12/21/2008 | 2274 | **3.97** |
| 12/24/2008 | 2361 | **1.73** |
| 2/2/2009 | 566 | **4.04** |
| 2/7/2009 | 712 | **3.44** |
| 2/15/2009 | 828 | **2.03** |
| 4/7/2009 | 2311 | **1.84** |
| 8/6/2009 | 4651 | **1.86** |
| 5/6/2010 | 7365 | **1.74** |
| 6/17/2012 | 9757 | **2.55** |
| 7/31/2012 | 7975 | **2.67** |
| 10/7/2012 | 16410 | **1.79** |
| 1/29/2013 | 22817 | **1.32** |
| 5/30/2013 | 28423 | **1.17** |
| 9/2/2013 | 10426 | **2.10** |
| 9/15/2013 | 21475 | **1.39** |
| 8/29/2014 | 60447 | **0.66** |
| 9/14/2014 | 84555 | **0.19** |

5.12) From very limited information, I estimated that Amazon accounts for 4.17% of sales of titles released by African American comedians. This estimate was drawn from information related to sales of Kevin Hart's *Laugh at My Pain.*  Of total retail sales made of 208,324, Mr. Hart sold 8099 (or 3.9 percent) through Amazon.

5.13) By adjusting for Amazon's market share for these titles, I was able to derive an estimate for daily sales for *Still Trippin'* across the United States. For example, if Amazon is selling five units per day, then the nationwide total would be expected to be approximately 128.2 units per day                                    across                               the                                   U.S.

5.14) For intermediate dates where sales ranks were not available for the DVD, I calculated the daily nationwide sales estimates for the title by interpolating the daily sales from available endpoints on each interval.

5.15) I estimate that *Still Trippin'* sold 99,452 units since 2008.  I shall use this amount as the benchmark total for prospective units that could have been sold for the first DVD in *Live, Raw, & Uncensored.*

Def.'s APP 007

*Michael A. Einhorn, Ph.D.*                                            *Case 3:14-cv-04152-B D*

## 6.  DAMAGES FROM LOST ROYALTIES

6.1) Per the terms of the Distribution Agreement entered in January, 2014 between Joseph Cooper and Music Video Distributors, Inc., Mr. Cooper was to receive a royalty of 75 percent of all sales of distributed works;  the royalty base was wholesale revenues less production costs incurred by MVD (at §3a).

6.2) I estimated revenues based on a wholesale price of $8.25 per unit, which is specified in the Licensing and Distribution Agreement between Mr. Cooper and Music Video Distributors (at §3a). The unit expenses for a full color DVD release are $0.62.[1]  This leaves a net price of $7.63 per unit.

6.3) Per the terms of the contract, MVD was permitted to deduct as a cost an amount of no more than $1000 to recover costs of authoring and encoding (at §5).  Less a $1000 deduction, net profits from the sale of Mr. Cooper's first DVD are $757,819.

6.4) At 75 percent, Mr. Cooper's share of this total is $568,364.

6.5) The contract also specifies that various retailers may deduct certain charges without any prior written approval from MVD.   Per the terms of the contract, these retail charges were to be deducted from royalty payments due Mr. Cooper.

6.6) While the eight specified charges are quite varied, two are fairly transparent. Amazon.com specifies a 7 percent deduction from ongoing purchases,  while Best Buy specifies an amount no less than 5 percent. (at §6d)  I shall use a percentage of 6 percent of sales for retail deductions chargeable from Mr. Cooper's.

6.7) The remaining net royalties due Mr. Cooper from missed sales of *Live, Raw, & Uncensored are $534,262.*

*6.8) As I believe that the distribution contract implicated in total a collection of five DVDs that were to be derived from Mr. Cooper's videotapes,  I estimate that Mr. Cooper may have lost the opportunity to earn in the area of $2,671.310*

**This analysis does not take into account sales made at the Steve Harvey website or through the Steve Harvey fan club.**

---

[1]http://www.dupeshop.com/pricing/duplication-pricing-reg-dvd-cases.htm

Def.'s APP 008

*Michael A. Einhorn, Ph.D.*                                      *Case 3:14-cv-04152-B D*

## 7. ADDITIONAL CONSIDERATIONS

7.1)  Economics is the social science that seeks to describe the factors that determine the production, distribution, and consumption of goods and services.  When doing an economic evaluation, it is necessary to utilize accepted procedures and sources that are deemed reliable per the techniques of the economics profession.

7.2)   One premise of an economic evaluation of benchmarks is to be able to compare things that are similar, and possibly interchangeable.  In this report, even though it was released in 2008, I believe that Mr. Harvey's video *Still Trippin'* is the best comparable product with the videotapes owned by Mr. Cooper.

7.3)  In applying sales numbers from 2008 to the contested year (2014), I came across considerable changes in Mr. Harvey's popularity since the release of *Still Trippin'*.  Relying on the information provided in the Wikipedia.org article on Mr. Harvey, I noted that Mr. Harvey had not yet begun his presence on television in the year 2008.  Since then, he has become the host of *Family Feud,* the *Celebrity Family Feud*, and the *Steve Harvey Television Show*.  He has also hosted a number of prominent award ceremonies.  I have not been able to quantify the value of this considerable expansion in Mr. Harvey's national popularity.

7.4) Since 2008, Mr. Harvey has won the following awards and honors:

- 2011: BET Humanitarian Award - 2011 BET Awards
- 2013: Favorite New Talk Show Host - 39th People's Choice Awards
- 2013: Star on the Hollywood Walk of Fame
- Two-time winner: NAACP Image Awards Outstanding News/Talk/Info Series (as host of Steve Harvey - 2014, 2015)
- 2014: Daytime Emmy Award for Outstanding Game Show Host
- 2014: Daytime Emmy Award for Outstanding Talk Show Informative (as host of Steve Harvey)
- 2015: East 112th Street in Cleveland renamed Steve Harvey Way
- 2015: NAACP Image Awards Outstanding Host - Talk/Reality/Variety/News/Information
- 2015: Daytime Emmy Award for Outstanding Talk Show Informative (as host of Steve Harvey)

7.5) Mr. Harvey has also written a New York Times bestseller, *Act Like a Lady, Think Like a Man*, which has been made into two successful movies, *Think Like a Man* and  *Think Like a Man Too.*

7.6)  I believe that these factors establish a growing popularity of Steve Harvey in the national consciousness, and a reason for people to become more interested in buying his material.  Harvey's growing popularity then presents additional reasons to expect that projections in

Def.'s APP 009

*Michael A. Einhorn, Ph.D.* *Case 3:14-cv-04152-B D*

Section 6, which are established through techniques and data confined to my expertise as an economist, may be deemed somewhat low.

7.7) Public information regarding Mr. Harvey's finances and the sales of products associated with him has been scarce. I have been advised the Mr. Cooper has requested information from Mr. Harvey that is more reliable but not publicly available. When that information is provided, I reserve the right to revise my estimate of valuation to reflect the reality of Mr. Harvey's situation.

7.8) I am also advised that the Court may consider these additional factors when entering its final judgment. I will advise of additional personal documents of Mr. Harvey's that should be disclosed prior to this moment.


## 8. CONCLUSION

The above report represents my expert opinion and the conclusions to which I am prepared to testify in court. I am advised that prejudgment interest and discount adjustments may be fixed by the Court. I am advised that, per the Court's order, I will have an opportunity to supplement this report to update financial information related to Plaintiffs' damages and Defendants' expenses not previously included in my reports. I reserve the right to modify my results as full information becomes available for this and other data updates prior to trial**.**

**Michael A. Einhorn /s/**
_____

**Michael A. Einhorn, Ph.D.**

**July 10, 2015**

Def.'s APP 010

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **JOSEPH COOPER,** | § | |
| | § | |
| *Plaintiff,* | § | |
| **v.** | § | **CAUSE NUMBER: 3:14-cv-04152-B** |
| | § | |
| **BRODERICK STEVEN "STEVE" HARVEY** | § | |
| | § | |
| *Defendant.* | § | |

### DEFENDANT'S FRCP RULE 30
### NOTICE OF DEPOSITION, *DUCES TECUM,* OF MICHAEL EINHORN

PLEASE TAKE NOTICE that Defendant Broderick Steven "Steve" Harvey will take the oral deposition of Michael Einhorn, pursuant to Federal Rules of Civil Procedure 30, before an officer qualified to take the deposition.  The deposition will be videotaped.

Said deposition will be taken on **November 9, 2015, beginning at 10:00 a.m.** at BENNETT, WESTON, LAJONE & TURNER, P.C., Attorneys and Counselors at Law, 1603 LBJ Freeway, Suite 280, Dallas, TX 75234, and will continue day to day until completed.

*DUCES TECUM.*  **PLEASE TAKE NOTICE FURTHER** that the witness is hereby requested to produce at, or prior to, this deposition the items requested on Exhibit "B" attached hereto.

Defendant asks this entire notice be provided to the witness upon your receipt of it.

Respectfully Submitted,

AUBREY "NICK" PITTMAN
**THE PITTMAN LAW FIRM, P.C.**
100 Crescent Court, Suite 700

1

Dallas, Texas 75201-2112
214-459-3454
214-853-5912 – fax
pittman@thepittmanlawfirm.com


s/Wendle Van Smith
Wendle Van Smith
Texas Bar No. 18701400
**ANDERSON AND SMITH**
7322 Southwest Freeway, Suite 2010
Houston, TX 77074
(713) 622-5522
(713) 995-1499 (Telecopier)
Email: wendle1v@flash.net

**Attorneys for Defendant**

2

Def.'s APP 012

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this document was served upon Plaintiff's counsel in accordance with the Federal Rules of Civil Procedure on the 4th day of November 2015 as follows:

| J. Michael Weston | _____ | Via Hand Delivery |
| Bennett, Weston, et al | _____ | Via CMRRR |
| 1603 LBJ Freeway | __X__ | Via Telecopy [214-373-6810] |
| Suite 280 | _____ | Via Regular U.S. Mail |
| Dallas, TX  75234 | _____ | Via Overnight Courier |
| | __X__ | Via Email |

_____

AUBREY "NICK" PITTMAN

Def.'s APP 013

## "EXHIBIT A"

## DEFINITIONS

These Requests incorporate, without limiting the scope of the Federal Rules of Civil Procedure, the following definitions:

1.      "Plaintiff" shall mean and refer to Plaintiff Joseph Cooper, Close Up Video Productions, and all owners, board members, officers, employees, and/or other persons acting or purporting to act on behalf of Joseph Cooper and Close Up Video Productions.

2.      "Defendant" shall mean and refer to Steve Harvey and all persons whom you believe were acting on behalf of Defendant.

3.      "YOUR," and "YOU," shall mean and refer to Michael Einhorn, and all owners, board members, officers, employees, and/or other persons acting or purporting to act on behalf of Michael Einhorn.

4.      "Lawsuit" and "Complaint" refers to all claims, cross-claims, counterclaims and defenses, whether now asserted or asserted hereafter by amendment, supplement or otherwise, of the parties in the above-styled and numbered cause.

5.      "Identity," "Identify," and "Identification:"

      A.      As to a Person:  When used in reference to a person or individual, these terms mean to state his or her full name, address, place of employment, if known, and telephone number.

      B.      As to an Entity:  When used in reference to an entity such as a corporation, partnership or association, these terms mean to state the name of the entity, its business address, telephone number, and name of the entity's chief executive officer and the agent for service of process.

4

C.     <u>As to a Document</u>:  When used in reference to a document, these terms mean to state the following:

    i.     The title, heading or caption of the document;

    ii.     The date appearing on such document; or if no date appears, the approximate date on which the document was prepared;

    iii.     A general description of the document;

    iv.     The name of the person who signed the document or a statement that it was unsigned;

    v.     Name of the person or persons who prepared the document;

    vi.     Name of the persons to whom the documents was addressed and to whom the document was sent; and

    vii.     The physical location of the document.

6.     "<u>Document</u>" means any writing and any other tangible thing in YOUR custody, possession or control, whether printed, recorded, reproduced by any process, or written or contained in a computer (mainframe or otherwise) or on a computer disc, tape, software or electronic media of any kind or data compilation or produced by hand.  Set forth below is a list of examples of writings and tangible things which are included within this definition.  The list is not an exclusive list of the writings and tangible things included within this definition, but rather are intended to aid you in producing the documents that are requested.  Examples of writings and tangible things included within the definition of "document" are as follows:

Letters; e-mails; texts; tweets; electronically stored information; faxes; reports; agreements; intracompany and intercompany communications; correspondence; telegrams; memoranda; summaries or records of conversations; diaries; calendars; photographs; tape recordings; models; charts; plans; drawings; agendas; minutes or records of conferences or meetings; expressions or statements of policy; lists of persons attending meetings or conferences; summaries; investigations; opinions or reports of consultants; appraisals; records; brochures; pamphlets; advertisements; circulars; trade letters; reports, summaries or analyses prepared by or for any governmental entity or agency; press releases; drafts of any documents; revisions of drafts of any documents; canceled checks; bank statements; invoices; receipts; and notes.

7.      "Communication" or "communications" means any contact or act by which any information, knowledge or dialogue is transmitted or conveyed and shall include, without limitation, written contact by such means as letters, memoranda, e-mails, "instant messages," tweets, texts, telegrams, telex, or by any document, as well as oral contact by such means as face-to-face meetings and telephone conversations.

8.      The words "or," "and," "all," "every," "any," "each," "one or more," including," and similar words of guidance are intended merely as such and should not be construed as words of limitation.  The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the request.  The word "including" shall not limit any general category or description that precedes it.  The words "all," "every," "any," "each," and "one or more" shall include each other, when appropriate, to expand, not restrict, the scope of the Request.

9.      The words "refer to," "relate to," "reflect" or "concern " a given subject means concerning, referring to, alluding to, responding to, connected with, commenting on, in respect of, about, regarding, discussing, showing, describing, mentioning, reflecting, analyzing, constituting, evidencing, identifying or in any way pertinent to that certain subject.

10.     The word "person" means any natural person or any business, legal or governmental entity or association, including, but not limited to, private and public partnerships, associations, corporations, joint ventures, sole proprietorships, firms, and governments.

11.     The use of the singular form of any word includes the plural and vice versa.

12.     These requests seek disclosure to the full extent of the Federal Rules of Civil Procedure and applicable laws and shall be interpreted as inclusive rather than exclusive.

Def.'s APP 016

## EXHIBIT "B"

Please produce all documents, communications, and items requested below that are within your possession, custody or control:

1.   All documents, notes, ESI and communications that reflect the process, formulas, and/or calculations you used to determine the damages you believe to be proper in this matter.

2.   All publications that you have authored or co-authored within the last ten (10) years.

3.   All articles, papers, etc. that you have written or co-written on the subjects of damages calculations, accounting, forensics, or economics that have been peer-reviewed.

4.   A list of (a) any and all suits (by title, court and number) in which you were deposed or testified as to matters in the field of your expertise during the past four (4) years and (b) the attorneys who engaged you in each suit.

5.   Up to four textbooks, course books, seminar papers, articles, surveys, or other written composition, if any, that best reflect the methodology you employed in rendering your opinions in this matter.

6.   Up to four textbooks, course books, seminar papers, articles, surveys, or other written composition, if any, that best reflect the methodology used in the industry to calculate damages in lawsuits.

7.   All books, standards, treatises or studies that were relied upon or referred to in conducting your analysis, calculations and conclusions in this case.

8.   Any and all correspondence, e-mails, text messages, communications, memoranda, notes, ESI, charts, graphics, photographs, reports, documents, materials and/or notes of communications between you and your representatives and any other expert regarding in any way this lawsuit, your work performed in connection with this lawsuit, and/or any facts related in any way to the subject matter of this lawsuit.

9.   Any and all documents and communications that identify facts or data that attorneys for Joseph Cooper provided to you that you considered in forming the opinions to be expressed.

10.  All documents and communications that reflect, in whole or in part, any information or assumptions, provided to you by Cooper or by any of attorneys for Cooper in this matter for the purpose of you considering, and relying upon same, in arriving at your opinion(s) in this case.

Def.'s APP 017

11.    Any and all documentary, demonstrative or other tangible evidence, including photographs, charts, presentations, software, hardware, drawings, models, reports or other documents, demonstrative aids or tangible things, that you may use at trial to explain or support your testimony.

12.    Any and all documents that relate to or reveal any bias or potential bias of you in relation to the claims, the parties, the subject matter of this lawsuit and/or any of your opinions or analyses in connection with this case.

13.    Any and all documents, communications, and things constituting, relating or referring to any proposal, solicitation, offer or proposition put forward either by you or attorneys for Cooper that in any way concerns your retention or employment in this action or retention of you by Cooper or his counsel.

14.    Any and all documents reflecting the terms of your employment and/or the compensation paid or to be paid to you in connection with your involvement in this lawsuit, including, but not limited to, employment contracts or agreements, engagement letters, bills, statements, invoices, time records, acknowledgments, comments, reminders, observations, explanations or notations, log sheets and accounting summaries of amounts billed and/or paid and copies of checks received in connection with this lawsuit.

15.    All statements or invoices prepared by you or on your behalf covering any of your services in connection with the present action.

16.    All documents prepared by you at the request of or on behalf of Plaintiff or his attorneys.

17.    All documents prepared by Plaintiff and/or his attorneys that you reviewed and relied on in reaching your opinions and conclusions.

18.    All documents, including, but not limited to, reports prepared by you that discuss, refer or relate to this lawsuit in any way.

19.    All notes that discuss, refer or relate to any oral communication between you and Plaintiff or his attorneys.

20.    All files maintained by you related to your analysis and investigation in this case.

21.    Any and all photographs, videotapes, drawings, diagrams, charts, demonstrative aids, ESI, and other documents that form a basis for any of your opinions in this lawsuit.

Def.'s APP 018

Michael Allan Einhorn, Ph.D.

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOSEPH COOPER,              §
          Plaintiff,       §
                            §
VS                          §    CAUSE NUMBER:
                            §    3:14-cv-04152-B
BRODERICK STEVEN            §
"STEVE" HARVEY,             §
          Defendant.       §

--------------------------------------
ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL ALLAN EINHORN, Ph.D.

NOVEMBER 20, 2015
--------------------------------------

          ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL

ALLAN EINHORN, Ph.D., produced as a witness at the

instance of the DEFENDANT, and duly sworn, was taken in

the above-styled and numbered cause on the 20th day of

November, 2015, from 10:19 a.m. to 1:22 p.m., before

TINA TERRELL BURNEY, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of

Bennett, Weston, LaJone & Turner, P.C., 1603 LBJ

Freeway, Suite 280, Dallas, Texas 75234, pursuant to the

Federal Rules of Civil Procedure.

Def.'s APP 019

Michael Allan Einhorn, Ph.D.

2

                    A P P E A R A N C E S

1  FOR THE PLAINTIFF:
2       Mr. J. Michael Weston
3       BENNETT, WESTON, LAJONE & TURNER, P.C.
4       1603 LBJ Freeway, Suite 280
        Dallas, Texas 75234
5       214.691.1776  Fax 214.373.6810
        jmweston@bennettweston.com
6
7  FOR THE DEFENDANT:
8       Mr. Aubrey "Nick" Pittman
        THE PITTMAN LAW FIRM, P.C.
9       100 Crescent Court, Suite 700
        Dallas, Texas  75201
10      214.459.3454  Fax 214.853.5912
        pittman@thepittmanlawfirm.com
11
12      Mr. Wendle Van Smith
        ANDERSON & SMITH, P.C.
        7322 Southwest Freeway, Suite 2010
13      Houston, Texas  77074
        713.621.5522  Fax 713.995.1499
14      wendle1v@flash.net
15
16 ALSO PRESENT:

        Mr. Luis Acevedo (Videographer)
17
18
19
20
21
22
23
24
25

Def.'s APP 020

Michael Allan Einhorn, Ph.D.

5

1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  We're on the record

3    for the deposition of Michael Allan Einhorn.  The time

4    is 10:19 a.m. on November 20th, 2015.

5                    Will the court reporter administer the

6    oath?

7                    (Witness sworn.)

8                    MICHAEL ALLAN EINHORN, Ph.D.,

9    having been first duly sworn, testified as follows:

10                       EXAMINATION

11   BY MR. PITTMAN:

12       Q.    Sir, what's your full name?

13       A.    Michael Allan Einhorn.

14       Q.    And what's your business address?

15       A.    3 Nob Hill, Roseland, New Jersey.

16       Q.    And what's your home address?

17       A.    Same.

18       Q.    What do you do for a living?

19       A.    I'm an economist.

20       Q.    Where are you employed?

21       A.    I'm employed -- I'm self-employed.

22       Q.    What's your educational background since high

23   school?

24       A.    I went to Dartmouth.  I have a Bachelor of

25   Arts.  I have a Ph.D. from Yale.

Def.'s APP 021

Michael Allan Einhorn, Ph.D.

9

1           Is your self-employment by way of a sole

2   proprietor, a corporation, a partnership or what?

3       A.   A sole proprietorship.

4       Q.   Do you have any employees?

5       A.   No.

6       Q.   Have you ever worked with this law firm

7   before, the law firm that's representing Mr. Cooper?

8       A.   No.

9       Q.   Sir, what do you perceive as your purpose and

10   function in this case?

11       A.   Estimating the damages resulting from tortious

12   interference with rights that Mr. Cooper had to

13   distribute and market videotapes of Steve Harvey's

14   performances.

15       Q.   You're not here to testify as an expert as to

16   whether a contract was breached, correct?

17       A.   Correct.

18       Q.   You're not here to testify as to whether a

19   contract was tortiously interfered with, correct?

20       A.   Correct.

21       Q.   Who retained you in this case?

22       A.   Mr. Weston.

23       Q.   Did Mr. Weston tell you how he came about you?

24       A.   No.

25       Q.   Did you ask?

Def.'s APP 022

Michael Allan Einhorn, Ph.D.

13

1    to you by Mr. Weston, correct?

2         A.   Some documents, yes.

3         Q.   Did you rely on any of those documents in

4    forming your opinions in this case?

5         A.   Yes.

6         Q.   Which documents did you rely on?

7         A.   Well, Mr. Weston came up with the awareness of

8    the Nash Information Services, which provides the -- is

9    a marketing service that provides data on estimated DVD

10   sales, and through that awareness, I was able to contact

11   Nash Information Services and get some data from them,

12   and then understand from them their methodology and what

13   they try to do in ways that I agree with and ways that I

14   don't.

15        Q.   Had you ever worked with Nash Information

16   Services before?

17        A.   No.

18        Q.   Had you ever heard of them before?

19        A.   No.

20        Q.   Have you done any type of economic analysis or

21   damages analysis in the TV business?

22        A.   Yes.

23        Q.   How about the radio business?

24        A.   Yes.

25        Q.   How about the movie business?

Def.'s APP 023

21

1   methodology, that would be improper, wouldn't it, for an

2   expert?

3       A.   It would be improper to conceptualize the

4   matter in two different ways, correct.

5       Q.   Item 5 on Exhibit 2 asks for textbooks, course

6   books, seminar papers or other written composition that

7   best reflects the methodology you employed in rendering

8   your opinions in this matter.  Do you have any of those?

9       A.   I don't have any textbooks that will -- that I

10  can point to immediately.  I've come across the concepts

11  of this methodology through reading court cases and

12  other expert reports, and I'm aware of what's used in

13  the business.

14      Q.   So if the court wanted to know of a textbook

15  or course book or seminar paper that reflects the

16  methodology you used, you would not be able to identify

17  one for the court; is that correct?

18      A.   I would not be able at this point to identify

19  one for the court.

20      Q.   Well, at what other point would you be able

21  to?

22      A.   Well, if I were asked the question, I would go

23  head and troll through my memory and troll through the

24  Internet and Google and search and find a list of papers

25  that would accommodate the general approach.

Michael Allan Einhorn, Ph.D.

22

1    Q.   Well, did you not understand that Exhibit

2    Number 2, the Notice of Deposition Duces Tecum, was for

3    that very purpose, for you to do that so that you could

4    identify those?  Did you not understand that?

5              MR. WESTON:  I'll object to the question.

6    A.   I'm sorry, which point are we --

7    Q.   Number 5.

8              MR. WESTON:  And I'll object to the

9    question as a matter of form.

10   A.   What I interpreted that to mean was that of

11   any of these textbooks or course books that I could

12   recall that reflected the methodology at hand.  In the

13   course of my career, I have become aware of these --

14   this method and these conceptualizations used over and

15   over again, but off the top of my head, I could not

16   immediately recall which one would meet up to the exact

17   standards.

18   Q.   My question was:  Did you not understand that

19   this request was asking for you to do that?

20             MR. WESTON:  Objection.

21   A.   I did not understand the full implication.

22   Q.   Okay.  So you have no book, paper, article or

23   any kind of written composition that you can show us

24   that reflects the methodology that you used in this

25   case; is that correct?

Def.'s APP 025

Michael Allan Einhorn, Ph.D.

23

1    A.    From my memory, correct.

2    Q.    Well, you don't have any paper that can show

3    that either, do you, sir?

4              MR. WESTON:  Objection, form.

5    A.    I did not refer to my immediate source in

6    using this methodology, as I had seen this in the course

7    of doing my professional work over many, many years as

8    an expert.

9              MR. PITTMAN:   Objection, nonresponsive.

10   Q.    That wasn't my question.  Let me ask you:  Are

11   you aware that when a court looks at an expert, a court

12   looks to see whether the expert uses a methodology that

13   is accepted by experts in the field?  Are you aware of

14   that?

15   A.    Correct.

16   Q.    So my question to you is:  Can you show the

17   court any documentation that reflects the methodology

18   that you used?

19              MR. WESTON:  Objection, form.

20   A.    I'm having a difficult time understanding

21   this.

22   Q.    It's very simple.  Let me ask it -- let me ask

23   it two ways.  Do you believe you used a methodology

24   that's accepted by experts in the field in doing the

25   work you did in this case?

Def.'s APP 026

Michael Allan Einhorn, Ph.D.

24

1    A.   I do.

2    Q.   Okay.  Now, do you believe that that

3  methodology is reflected in some paper or documentation

4  that other experts prepared or used?

5    A.   I do.

6    Q.   And you can't identify any of those; is that

7  right?

8    A.   I cannot at this moment recall exactly papers

9  and reports that I can source in a professional citation

10  manner that would accommodate that last request.

11    Q.   Item 7 asks for all books, standards,

12  treatises, studies you relied on or referred to in

13  conducting your analysis, calculations and conclusions.

14  Did you bring anything?

15    A.   No.

16    Q.   Item 11 asks for all documents and

17  communications that would reflect any information or

18  assumptions provided to you by Cooper or his attorneys.

19    A.   I was asked to assume that Mr. Cooper's

20  ability to release or to market his DVDs was stopped in

21  the year 2008 by Mr. Harvey.

22    Q.   Do you have any -- did you bring any written

23  email or letters or documentation that reflects the

24  assumptions they told you to make?

25    A.   No.

Def.'s APP 027

Michael Allan Einhorn, Ph.D.

57

1    A.    Correct.

2    Q.    And you did call Nash, didn't you?

3    A.    I did.

4          (Exhibit 8 marked.)

5          MR. PITTMAN:  Unfortunately, I only have

6    two copies of this one.  If you want to look at this, I

7    only have two copies.

8          MR. WESTON:  Do you want to take a minute

9    and let me get another copy made?

10         MR. PITTMAN:  Well, let me ask about this

11   and then we can.

12         MR. WESTON:  Okay.  I'd like to see

13   what's going on.

14         MR. PITTMAN:  These are documents you

15   produced yesterday, by the way.

16   Q.    Let me ask you to take a look at Exhibit 8.

17   You see on the first page it says "Draft," correct?

18   A.    Correct.

19   Q.    Then you see starting on the second page

20   there's a number of inserts that have a red line?

21   A.    Correct.

22   Q.    Do you see that?

23   A.    Correct.

24   Q.    Whose language is this?

25   A.    This is Mr. Weston suggesting possible -- I'm

58

1  sorry -- yes, Mr. Weston suggesting possible changes in

2  a word where I could be more factually correct or more

3  concise, better writing, more thorough.

4      Q.   So on Exhibit 8, Mr. Weston, Mr. Cooper's

5  attorney, has taken your report, and he's gone through,

6  and on Page 2 he has made some substantial edits to it,

7  hasn't he?

8      A.   He has -- yes.  He has made some -- offered

9  some ideas.

10     Q.   Well, these are ideas that you accepted?

11     A.   I accepted, yes.

12             MR. WESTON:  Let's take a quick break so

13  I can make a copy of that.  All I need to do is hand it

14  to her.

15             THE VIDEOGRAPHER:  Off the record at

16  11:38.

17             (Recess.)

18             THE VIDEOGRAPHER:  We're on the record.

19  The time is 11:51.

20             (Exhibit 9 marked.)

21     Q.   Let me hand you a copy of what I've marked as

22  Exhibit Number 9.  Can you identify Exhibit Number 9?

23     A.   I see this.

24     Q.   What is it?

25     A.   This is a draft of a report that I sent to

59

1    Mr. Weston.

2        Q.    And do you see on Page Number 8 there's a red

3    line section added that's 5.16?  Do you see that?

4        A.    Yes.

5        Q.    Whose language is that?

6        A.    Mr. Weston's.

7        Q.    So here is another insert that Mr. Cooper's

8    attorney is suggesting that you put into your report,

9    correct?

10       A.    Yes.

11       Q.    Did you accept that language?

12       A.    I did.

13       Q.    Was there any language that they submitted

14   that you did not accept?

15       A.    Well, let me take a look at the final.  I

16   certainly changed the wording of what he offered me in

17   1.2.  I accepted his ideas, but I did not accept his

18   language.  I did not accept verbatim everything he

19   offered me in 1.3.

20       Q.    What did you not accept?

21       A.    Well, you can compare 1.3 of the final report

22   with 1.3 of Mr. Weston's draft back to me in his red

23   line.

24       Q.    Okay.  I'd like for you to do that.

25       A.    Okay.  Let's see, 1.3 --

Def.'s APP 030

Michael Allan Einhorn, Ph.D.

60

1    MR. WESTON:  Give the exhibit number as

2  you're referring to it.

3    A.   Exhibit 8 is Mr. Weston's red line to me, and

4  Exhibit 6 is my final report.  Mr. Weston wrote -- let's

5  see, he wrote, "Steve Harvey is a prominent" -- I wrote,

6  "Steve Harvey is a prominent comedian who is now host of

7  the..."

8    Mr. Weston comes in, "...of the Steve

9  Harvey Morning Show, which run ins over 60 markets; the

10  Steve Harvey Talk Show, which appears to be on

11  television stations in all 50 states and the District of

12  Columbia, and is the host of Family Feud and Celebrity

13  Family Food."

14    I wrote -- I changed the edit to "host of

15  the Steve Harvey Morning Show, reaching over 60 radio

16  markets."  I had an edit change there.  "The Steve

17  Harvey Talk Show on television (on television in 50

18  states and the District of Columbia)."

19    I changed that, the wording there.  "And

20  is the host of syndicated television shows, Family Feud

21  and Celebrity Family Food."  I changed the wording

22  there.

23    Mr. Weston then continued, "Mr. Harvey is

24  an author whose books have been made into movies."  I

25  used that verbatim.

Michael Allan Einhorn, Ph.D.

61

1          Then he said, "Mr. Harvey's television

2   career started with Showtime at the Apollo.  I didn't

3   use that at all.  Then he wrote, "When he closed the

4   Steve Harvey Comedy Club in 1994, Mr. Harvey starred in

5   a television show named Me and the Boys."  I didn't use

6   that at all.

7          Then I finished up with "Prior to his

8   committing to a prime time audience, Mr. Harvey

9   performed at a number of adult comedy clubs throughout

10   the U.S. and released a DVD, Still Trippin', as late as

11   2008.

12          So he offered some ideas, but I

13   considered them and then I worded them more to my

14   liking.  I didn't just take Mr. Weston's wording

15   verbatim.  I never do.

16      Q.  Well, you took -- you took -- you took all of

17   his language, except you made a few stylistic changes.

18   The only thing you didn't accept was the reference to

19   the Apollo and Me and the Boys, correct?

20      A.  And I made stylistic changes to the rest of

21   his language, yes.

22      Q.  Correct.  You didn't change the substance.

23   You just changed -- maybe he didn't have the proper

24   sentence structure.

25      A.  I'll accept that -- I'll accept that I

Def.'s APP 032

Michael Allan Einhorn, Ph.D.

62

1    accepted the substance.  I thought these were good

2    ideas.

3         Q.   Let me hand you now a copy of what I have

4    marked as Exhibit 10.

5                    (Exhibit 10 marked.)

6                    MR. WESTON:  Do you have a copy for me?

7                    MR. PITTMAN:  Again, I don't know why she

8    didn't make copies of them.  This is the stuff you gave

9    me yesterday, but I told her to make four copies, and I

10   got two.

11                   MR. WESTON:  Okay.

12                   MR. PITTMAN:  I think there's just one

13   more.  I think the rest of them are fine.

14                   MR. WESTON:  Okay.  When we hit that one

15   more, let me get my copies of them.

16        Q.   Exhibit 10 is another copy of a draft,

17   correct?

18        A.   Correct.

19        Q.   And in Exhibit 10, you have just taken the

20   location of the information that Mr. Weston gave you

21   earlier and put it in a different location, correct, if

22   you would turn to Page 8 and Page 10?

23        A.   Yes.

24        Q.   So you're keeping the language that Mr. Weston

25   gave you for your report, you're just putting it in a

Michael Allan Einhorn, Ph.D.

63

different section of your report, correct?

A.   Correct.

           (Exhibit 11 marked.)

Q.   Let me hand you a copy --

A.   One second, please.  No.  Let me correct

something here.  5. -- if you go to Exhibit 6 and go to

Paragraph 5.16 --

Q.   Well, no.  I'm on Exhibit 10.  My question is

as it relates to Exhibit 10.

A.   I'm sorry, Exhibit 10.

Q.   Exhibit 10, you're taking the language that

Mr. Weston gave you --

A.   No, I made a mistake.

Q.   Okay.  Let me ask my question.  If you look at

Page 8, we discussed earlier that this is information

that Mr. Weston provided to you, correct?

A.   I made a mistake.

Q.   You made a mistake on what?

A.   This information I originally wrote in 5.16.

The information on Exhibit 10 that appears in Paragraph

5.16 is originally my writing, and it says there that I

relied upon information provided in a wikipedia.org

article on Mr. Harvey.

Q.   Well, let me ask you -- let me let you look at

this other exhibit, and then you tell me what's true and

64

1    what's not.   Let me -- I'm handing you a copy of what I

2    have marked as Exhibit 11.  Do you see Exhibit 11?  It's

3    an email between you and Mr. Cooper's lawyers, correct?

4         A.   Yes.

5         Q.   And you see -- starting at the bottom of Page

6    2, you see where on July 9th, 2015 at 2:40, you tell

7    Mr. Weston that you have "basically accepted all your

8    changes."  Do you see that?

9         A.   Okay.

10        Q.   So Mr. Weston provided some changes to you,

11   and you told him the day before the report was due that

12   you basically accepted all of Mr. Cooper's attorneys'

13   changes, correct?

14        A.   Okay.

15        Q.   And then Mr. Weston writes back to you at 4:04

16   p.m. -- I'm not sure if that's Eastern Time or Central

17   Time -- but he writes back to you and asks you to look

18   at Page -- look at Paragraph 5.16 on the attached,

19   correct?

20        A.   Correct.

21        Q.   Does that refresh your recollection that 5.16

22   was Mr. Weston's writing?

23        A.   (No response.)

24        Q.   And then look at the message right above that

25   where you say, "try this," and "a new shot at Section

Def.'s APP 035

Michael Allan Einhorn, Ph.D.

65

1   7."  Does that reflect that you moved 5.16 to Section 7?

2       A.   Yeah.  That looks -- yeah, that looks right.

3   That looks like Mr. Weston's writing.

4       Q.   And also on Page 11 -- I'm sorry, on Exhibit

5   11, look at the first page.  Mr. Weston is telling you

6   that -- his word is -- I'm sorry, his phrasing is, "I am

7   thinking of something like this placed at an early point

8   in the report."

9            Do you see that?

10      A.   Yes, I do.

11      Q.   So that's Mr. Weston telling you what you

12  should place in the report, correct?

13      A.   Not what I should place, what I should

14  consider.

15      Q.   And do you see where it talks about the nature

16  of the economic review -- or nature of economic review?

17      A.   I see three paragraphs there.

18      Q.   Right.  And do you see where it says -- in

19  Paragraph 1.1, for instance, the second sentence, it

20  says "In this report, even though it released in 2008,

21  it is assumed that Mr. Harvey's video, Still Trippin',

22  is fungible with the videotapes owned by Mr. Cooper."

23           Do you see that?

24      A.   Yes.

25      Q.   Now, that's Mr. Cooper's attorneys writing

Def.'s APP 036

Michael Allan Einhorn, Ph.D.

66

1   that language, correct?

2        A.   Correct.

3        Q.   And the last sentence said, "When that

4   information is provided, we will revise our estimate of

5   valuation to reflect the reality of Mr. Harvey's

6   situation," correct?

7        A.   Correct.

8        Q.   And that is coming from Mr. Cooper's

9   attorneys, correct?

10       A.   Correct.

11       Q.   And do you see further on 1.12 it says, "In

12  the area of entertainment, significant factors that may

13  impact on economic performance cannot be measured to the

14  required for use and economic rejection."

15            Do you see that?

16       A.   I do.

17       Q.   And that language comes from Mr. Cooper's

18  attorneys, correct?

19       A.   Correct.

20       Q.   Can you look at your expert report and tell

21  the jury how much of that information that came from

22  Mr. Cooper's attorneys was included in your report?

23            MR. WESTON:   You're referring to Exhibit

24  11?

25            MR. PITTMAN:   Exhibit 11, how much of

Def.'s APP 037

67

that found its way into the final report that's Exhibit
6.

A.   I took 1.10 and modified the thoughts to read
something that I was more comfortable with, and I
included that as 7.1.  I took 1.11 and used about half
of it, and then removed the remainder, and then included
that as 7.2.

I took 1.12, and I don't see where I used
that at all.  So I considered Mr. Weston's ideas, and I
am -- have used some of them when I felt comfortable
using them.

Q.   Well, here, for instance, it says -- on
Exhibit 11 it says, "When doing an economic evaluation,
it is necessary to utilize accepted procedures and
sources that are deemed reliable."

Do you see that?

A.   Yes.

Q.   And you used that information, correct?

A.   Yes.  Mr. Weston is an attorney.

Q.   Well, sir, my question is simply whether --
well, let me ask you this.  Do you know whether
Mr. Weston has an economic background?

A.   No.  I have an economics background.

Q.   Do you know whether he has one?

A.   No.  I presume that he doesn't.

Def.'s APP 038

Michael Allan Einhorn, Ph.D.

68

1    Q.    And the 1.11 on Exhibit 11, the language that

2    comes from Mr. Cooper's attorneys, one premise of an

3    economic evaluation is to be able to compare things that

4    are fungible, mutually interchangeable."

5              Do you see that?

6    A.    Yes.

7    Q.    The only change you made was you changed the

8    word "fungible" to "that are similar and possibly

9    interchangeable."

10             Do you see that?

11   A.    Yes.

12   Q.    You accepted the idea and the premise that

13   Mr. Cooper's attorney provided to you, didn't you?

14   A.    I think the word similar and the word fungible

15   mean two different things.  So I accepted the -- when

16   Mr. Weston offered an idea, I considered it.  If I liked

17   it, I put it in.  And as more often is the case, I

18   edited it to an area where I felt it was suitable.

19             Mr. Weston offered ideas on this draft.

20   Q.    And this is without you having any knowledge

21   of what Mr. Weston's experience was in economics or

22   damages evaluation or comedic performances or a

23   copyright damages estimation?

24   A.    If he made sense, I took it, and if he didn't

25   make sense, I didn't.  And if he made sense and it

Def.'s APP 039

Case 3:14-cv-04152-B   Document 142-1   Filed 01/07/16   Page 40 of 65   PageID 1830
Michael Allan Einhorn, Ph.D.

69

1    needed a modification, we did that.

2                    MR. PITTMAN:   Objection --

3        A.   I judged the thoughts just as an entirely

4    enclosed capsule and reviewed them ab initio, regardless

5    of any understanding I had of Mr. Weston's background.

6                    MR. PITTMAN:   Okay.   Objection,

7    nonresponsive.

8        Q.   My question is:   You accepted input from

9    Mr. Weston without knowing whether he had any background

10   in the kind of expertise that was needed here, correct?

11       A.   Correct.

12       Q.   And, sir, did you ever tell Mr. Weston, "Look,

13   I am the economic expert here, you stay with the law and

14   let me handle the economic evaluation"?   Did you ever

15   tell him that?

16       A.   I did that when I modified his words.

17       Q.   Sir, that wasn't my question.   Did you ever

18   tell him -- because we've seen now at least five

19   instances where Mr. Weston was providing information to

20   you for your report.   Did you at any point tell him that

21   you don't feel comfortable accepting input from a lawyer

22   when this was something that required an economic

23   evaluation?   Did you ever tell him that?

24       A.   I did feel comfortable hearing his ideas.

25       Q.   Did you tell him that this was something that

Michael Allan Einhorn, Ph.D.

70

1    he should allow you, the expert, to do and not rely on

2    the lawyer?  Yes or no.

3         A.   No.

4         Q.   Sir, how much work did you do on your report,

5    I mean actual work from whether it's drafting, whether

6    it's calculation, whether it's analysis?  I want you to

7    tell the jury how much work.  Just sum up the work that

8    you did yourself.

9         A.   Well, I was hired -- the purpose of my

10   engagement here was principally to estimate the damages,

11   damages owing from the suppressed sales from

12   Mr. Harvey's presumed tortious interference.

13              And if you go here, how much work did I

14   do, I went in and I dealt with materials in Section 5

15   and Section 6 concerning Mr. Harvey's sales, the

16   comparable of Still Trippin', how much Still Trippin'

17   sold.  I dealt with information from Nash Information

18   Services, and I dealt with a construction of the lost

19   sales of Mr. Harvey, and then I took that construction

20   of lost sales from Mr. Harvey or from Mr. Cooper and

21   turned it into a dollar -- a dollar figure based on

22   revenues and costs and resulting profits.

23              So basically I'd say I was hired to do

24   damages, and I estimated those damages in my own

25   opinion, and Mr. Weston did not say, "Could you please

Def.'s APP 041

Michael Allan Einhorn, Ph.D.

75

1  try to benchmark sales from any other DVDs that had

2  15-year-old material to determine -- to assess what the

3  sales would have been?

4       A.   No.

5       Q.   Do you know what company produced and

6  distributed the 2008 video, Still Trippin'?

7       A.   No, I do not.

8       Q.   Now, let's talk about --

9       A.   I'm sorry.  I'm sorry.  If I can see the

10 original complaint, this information was provided to me.

11      Q.   What information was provided?

12      A.   Of who that -- who that distributor was.

13      Q.   I'm asking do you know who it was.

14      A.   I do not recall.  It's in the complaint.

15      Q.   Okay.  And if it's not in the complaint, you

16 don't know?  In other words, you didn't do any

17 independent investigation yourself --

18      A.   I did not do any independent investigation.

19      Q.   You know that you could have gone -- you could

20 have Googled it to find out.  You know that, correct?

21      A.   Sure.

22      Q.   But you didn't Google it to find out who

23 produced that 2008 video?

24      A.   No.

25      Q.   In Paragraph 5.10 and 5.11, just so we're

Michael Allan Einhorn, Ph.D.

76

1  clear, you did not go through any kind of independent

2  process yourself to determine the ranks and pricing

3  information for that benchmark product that you used,

4  correct?

5      A.   This was provided by Nash.

6           MR. PITTMAN:  Objection, nonresponsive.

7      Q.   You did not personally do it yourself,

8  correct?

9      A.   No.

10     Q.   So the information that's in Item 5.10 and

11 5.11 and 5.12, you did not personally research and

12 compile this information, correct?

13     A.   Correct.

14     Q.   So this is actually not your work?

15     A.   This is work from Nash.

16     Q.   So it's not your work, correct?

17     A.   Correct.

18          (Exhibit 13 marked.)

19     Q.   Let me hand you a copy of what I've marked as

20 Einhorn Exhibit 13.  Do you recognize Exhibit 13?

21     A.   Correct.

22     Q.   What is it?

23     A.   It's an email from Bruce Nash to me.

24     Q.   So just so that we're clear, Exhibit 13 is a

25 document that was provided to you by a third party, a

Def.'s APP 043

Michael Allan Einhorn, Ph.D.

77

1    gentleman by the name of Bruce Nash, correct?

2         A.    Correct.

3         Q.    And it's information that you relied on in

4    forming the opinions in your report, correct?

5         A.    Correct.

6         Q.    In fact, you have even gone so far as to take

7    language from Mr. Nash's email that's Exhibit 13 and put

8    it into your report, correct?

9         A.    I did take some language, yes.

10        Q.    And, again, this is Mr. Nash's language, not

11   yours?

12        A.    Correct.

13        Q.    And Mr. Nash is someone you'd never used

14   before, correct?

15        A.    Correct.

16        Q.    Did you do any kind of research into

17   Mr. Nash's background?

18        A.    I understand that he runs a company called

19   numbers.com which provides video information.

20             MR. PITTMAN:  Objection, nonresponsive.

21        Q.    Did you personally do any research into

22   Mr. Nash's background?

23        A.    No.

24        Q.    Do you know whether Mr. Nash has ever

25   testified in court?

Def.'s APP 044

Michael Allan Einhorn, Ph.D.

78

1    A.    No.

2    Q.    Do you know whether Mr. Nash has ever been

3  accepted as an expert by any court?

4    A.    No.

5    Q.    Did you do anything, any independent research

6  yourself, to verify any of the information that Mr. Nash

7  supplied to you for inclusion in your report?

8    A.    I did an independent analysis.

9    Q.    I said investigation of the numbers that

10  Mr. Nash provided to you to use in your report.

11   A.    I used the numbers that Mr. Nash provided in

12  5.11.

13        MR. PITTMAN:   Objection, nonresponsive.

14   Q.    My question is:  Did you do any independent

15  research to verify the numbers that he provided to you?

16   A.    No.

17   Q.    Now, on Page 7 of your report, these numbers

18  that you have listed here, starting with the date of

19  November 13th, 2008 through September 14th, 2014, these

20  are numbers that you lifted directly from the

21  information that this third party provided to you,

22  correct?

23   A.    Correct.

24   Q.    And in 5.12, you see where you say, "From very

25  limited information, I estimated that Amazon accounts

Michael Allan Einhorn, Ph.D.

91

1      A.   No.

2      Q.   You didn't make any adjustment for that, did

3   you?

4      A.   No.

5      Q.   So you didn't -- in other words, you didn't

6   take into account whether any other products that

7   Mr. Harvey had in the marketplace would have

8   cannibalized the release of this 20-year-old material,

9   did you?

10     A.   No.  There was -- well, no.

11     Q.   Now let's look at Page 8 of your report,

12  Exhibit 6.  Now, in Item 6.1, you are assuming here that

13  this contract with Music Video Distributors would have

14  been entered into, correct?

15     A.   Correct.

16     Q.   Did you ask anyone from Music Video

17  Distributors whether the contract had been entered into?

18     A.   Well, no, because my understanding is

19  Mr. Harvey stopped it from being entered into.

20          MR. PITTMAN:  Objection, nonresponsive.

21     A.   No, I did not.

22     Q.   Okay.  You did not ask anyone from Music Video

23  Distributors whether this contract would have been

24  entered into, correct?

25     A.   Correct.

Def.'s APP 046

Michael Allan Einhorn, Ph.D.

92

1    Q.    Did Mr. Cooper or Mr. Weston tell you that the

2    chief operations officer of Music Video Distributors had

3    some reservations about this contract or entering into

4    this contract even before he had any conversation with

5    Mr. Harvey's lawyer?

6    A.    No.

7    Q.    So if this contract was not a definite

8    contract for reasons unrelated to Mr. Harvey, it would

9    not be appropriate to use this contract to assess

10   damages, correct?

11   A.    If that were true, yes.

12   Q.    "Yes," that's correct?

13   A.    Correct.

14   Q.    Let me hand you a copy of what was previously

15   marked as Defendant's Exhibit 39.  Is this a copy of the

16   contract you used to make your assessment of damages?

17   A.    Correct.

18   Q.    And, again, did you review this contract in

19   detail?

20   A.    Yes.

21   Q.    Did you look at -- turn to Page 2 of this

22   contract and look under Item 6-A.

23   A.    (Witness complies.)

24   Q.    Can you read that?

25   A.    "Distributor shall have the right to utilize

93

1  not more than three minutes or one complete song as

2  performed in the film, whichever is longer, for

3  broadcast promotion use only."

4      Q.   Does this relate to the video?  Are you aware

5  that there were no songs in the video?

6      A.   Well, it doesn't say at the top of the

7  contract who Music Video Distributors entered into the

8  contract with.

9      Q.   Correct.

10     A.   So I am not aware what the -- this is the

11  contract that Music Video Distributors established with

12  somebody, and I used this contract for Mr. Cooper.

13            MR. PITTMAN:   Okay.  Objection,

14  nonresponsive.

15     Q.   Are you aware that there were no songs in the

16  Cooper videos?

17     A.   I'm not aware.

18     Q.   And, again, if this contract was not agreed

19  upon, absent any involvement from Mr. Harvey, then your

20  numbers are irrelevant, correct?

21     A.   If this contract were not a -- by legal

22  definition, if -- this is for the judge to determine.  I

23  can't answer that.  That's a legal -- a legal

24  determination, but if it's determined that this contract

25  was not suitably entered into, then that's the end of

96

1  that's Exhibit 39 was not going to be entered into, then

2  your calculations are not proper, correct?

3      A.   I would want to show if the contract could be

4  used as a suitable representation with common practice,

5  but, no, not immediately.

6      Q.   So you're talking about another report.  In

7  other words, you would have to go out and look at some

8  other contracts in the marketplace, wouldn't you, sir?

9      A.   If this contract were not valid, there would

10  have to be another -- another analysis.

11      Q.   And you didn't do that analysis, did you?

12      A.   I used only this contract.

13      Q.   And you also used a suggested retail price of

14  14.95 and a wholesale price of 8.25, didn't you?

15      A.   Correct.

16      Q.   Did you do any analysis to see whether this

17  20-year-old material could sell for the wholesale price

18  of 8.25?

19      A.   No.  I adopted this contract as to what it

20  said.

21      Q.   Look at Page -- again, we're on your report

22  that's Exhibit 6.  Look at Page 8.  On Page 8 you say

23  that, "as I believe that the distribution contract

24  implicated in total a collection of five DVDs that were

25  derived from Mr. Cooper's videotapes."

Michael Allan Einhorn, Ph.D.

97

1          Do you see that?

2     A.   What paragraph, please?

3     Q.   6.8.

4     A.   Okay.

5     Q.   Do you see that?

6     A.   Correct.

7     Q.   Who told you that?

8     A.   Mr. -- Mr. Weston.

9     Q.   But you saw the contract yourself, didn't you?

10    A.   I believe that there was a possibility of

11   five -- five DVDs in total.

12    Q.   Do you see that in the contract?

13    A.   No.

14    Q.   Okay.  So you just relied on Mr. Cooper's

15   attorney?

16    A.   Correct.

17    Q.   You didn't ask anyone from Music Video

18   Distributors whether they would have done five DVDs, did

19   you?

20    A.   No, I did not contact Music Video.

21    Q.   You didn't make any assessment as to whether,

22   even if they were -- the first video wasn't successful,

23   whether the second, third, fourth and fifth would have

24   been released, did you?

25    A.   No, I did not.

Def.'s APP 050

Michael Allan Einhorn, Ph.D.

116

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOSEPH COOPER,           §
          Plaintiff,     §
                         §
VS                       §     CAUSE NUMBER:
                         §     3:14-cv-04152-B
BRODERICK STEVEN         §
"STEVE" HARVEY,          §
          Defendant.     §

_____

REPORTER'S CERTIFICATION

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL ALLAN EINHORN, Ph.D.

NOVEMBER 20, 2015

_____

I, Tina Terrell Burney, Certified Shorthand

Reporter in and for the State of Texas, hereby certify

to the following:

That the witness, MICHAEL ALLAN EINHORN,

Ph.D., was duly sworn by the officer and that the

transcript of the oral deposition is a true record of

the testimony given by the witness;

I further certify that pursuant to FRCP Rule

30(f)(1) that the signature of the deponent:

_____xx__ was requested by the deponent or a

party before the completion of the deposition and is to

be returned within 30 days from date of receipt of the

transcript.  If returned, the attached Changes and

Def.'s APP 051

Michael Allan Einhorn, Ph.D.

117

1    Signature Page contains any changes and the reasons

2    therefor;

3                _____ was not requested by the deponent or a

4    party before the completion of the deposition.

5                I further certify that I am neither attorney

6    or counsel for, nor related to or employed by, any of

7    the parties or attorneys to the action in which this

8    deposition was taken.  Further, I am not a relative or

9    employee of any attorney of record in this case, nor am

10   I financially interested in the outcome of the action.

11               Subscribed and sworn to on this the 24th

12   day of November, 2015.

13

14

15   TINA TERRELL BURNEY  Texas CSR No. 2908
     Expiration Date:  12/31/16
16   DepoTexas – Firm Registration No. 459
     Sunbelt Reporting – Firm Registration No. 301
17   6500 Greenville Avenue, Suite 445
     Dallas, Texas 75206
18   214-373-4977

19

20

21

22

23

24

25

Def.'s APP 052

EDWARD  SEAMAN

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

- - -

```
JOSEPH COOPER                 :
                              :
        v.                    : Case No. 3:14-cv-04152-B
                              :
BRODERICK STEVEN "STEVE"      :
HARVEY                        :
```

- - -

Tuesday, November 3, 2015

- - -

Deposition of EDWARD SEAMAN, taken at the

offices of MVD Entertainment Group, 203 Windsor Road,

Pottstown, Pennsylvania 19464, on the above date,

beginning at 2:00 p.m., before Brad Tratenberg, Court

Reporter and Notary Public.

- - -

Def.'s APP 053

EDWARD  SEAMAN

Page 2

1   APPEARANCES:

2            CASEY S. ERICK, ESQ. (By telephone)
             of BENNETT, WESTON, LaJONE & TURNER, P.C.
3                1603 LBJ Freeway, Suite 280
                 Dallas, Texas  75234
4                (214)691-1776
                 cerick@bennettweston.com
5                    Counsel for Plaintiff

6

             AUBREY PITTMAN, ESQ.
7            of THE PITTMAN LAW FIRM, P.C.
                 100 Crescent Court, Suite 700
8                Dallas, Texas  75201
                 (214)459-3454
9                pittman@thepittmanlawfirm.com
                     -and-
10           WENDLE VAN SMITH, ESQ.
                 One Arena Place, Suite 2010
11               7322 Southwest Freeway
                 Dallas, Texas  77074
12               (713)621-5522
                 wendle1V@flash.net
13                   Counsel for Defendant

14           MICHAEL H. GOLLAND, ESQ. (By telephone)
             of HAMRICK & EVANS, LLP
15               2600 West Olive Avenue, Suite 1020
                 Burbank, California  91505
16               (818)763-5292
                 mgolland@hamricklaw.com
17                   Counsel for Music Video Distributors,
                     Inc.
18                            - - -

19

20

21

22

23

24

Def.'s APP 054

EDWARD  SEAMAN

Page 3

1                            I N D E X

2      WITNESS                                        PAGE

3      EDWARD SEAMAN

4          By Mr. Erick  ------------------------------    4

5          By Mr. Pittman  ---------------------------   28

6                          - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Def.'s APP 055

EDWARD SEAMAN

Page 4

1            MR. ERICK:  This is under the federal

2        rules.  So everyone will agree to use that.

3        Beyond that, I don't believe there are any

4        additional agreements.

5                    - - -

6            ...EDWARD SEAMAN, having been duly

7        sworn, was examined and testified as follows:

8   BY MR. ERICK:

9   Q        Please state your name for the record.

10  A        Ed Seaman.

11  Q        Hi, Mr. Seaman.  My name is Casey Erick and I

12  represent the plaintiff, Mr. Joseph Cooper, in this

13  lawsuit against Steve Harvey.  Do you understand who I

14  am and who I represent?

15  A        I do.

16  Q        I want to ask some background questions about

17  you, beginning with your current position at Music Video

18  Distributors.  What is your title at the company?

19  A        I am the COO and the general manager.

20  Q        Just generally, what are some of your

21  responsibilities?

22  A        Overseeing the staff, looking out for products

23  acquisition, content.  I do the business and legal

24  affairs.  I oversee the finances.  I run the operation.

Def.'s APP 056

EDWARD  SEAMAN

Page 18

1   Q        Any other examples that you thought of at the

2   time when you were evaluating this proposal with Mr.

3   Cooper?

4   A        No, not off the top of my head.

5   Q        Now, after this proposed agreement, after you

6   sent the proposed agreement to Mr. Cooper, did you have

7   a conversation with or did Mr. Harvey's attorney contact

8   you?

9   A        There was --

10               MR. GOLLAND:  Just answer yes or no,

11          Ed.

12               THE WITNESS:  I'm trying to understand

13          the question.  I remember that something in

14          the -- I think when we got to the point of

15          doing an advance, I asked for Mr. Cooper's

16          proof of the content and ownership.  And I

17          don't know that I felt great about what I saw

18          in that proof of ownership.  And I asked my

19          attorney to take a look.

20               MR. GOLLAND:  Ed, he just asked you if

21          Mr. Harvey's attorney talked to you.

22               THE WITNESS:  I'm sorry.

23               MR. GOLLAND:  The question was just did

24          you have a conversation with Mr. Harvey's

EDWARD  SEAMAN

Page 19

1          attorney during that period?

2                    THE WITNESS:  No, I did not.

3     BY MR. ERICK:

4     Q        At any point, did Mr. Steve Harvey's attorneys

5     contact you about the proposed agreement with Mr.

6     Cooper?

7     A        Not to me, no.

8     Q        Did Mr. Harvey's attorney contact your

9     attorney?

10    A        I don't think they contacted my attorney, no.

11    Q        Did anybody communicate from your company to

12    Steve Harvey's attorneys?

13    A        Not from my company, no.

14    Q        From what company?

15    A        From Michael Golland.  And our attorney

16    contacted their attorney.

17    Q        I'm sorry.  When I said "you," I'm referring to

18    your company, not personally.  I mean the company's

19    attorney, Mr. Golland.

20    A        Okay.  Then yes.

21    Q        I need to clarify.  Mr. Harvey's attorneys

22    contacted Music Video Distributors' attorney at the

23    time, Mr. Michael Golland, correct?

24                    MR. GOLLAND:  I think the distinction

EDWARD  SEAMAN

Page 20

1          is they didn't contact Music Video

2          Distributors.  Music Video Distributors through

3          my office contacted Mr. Harvey's attorney.  So

4          I think that's where the distinction is.

5                    THE WITNESS:  Correct.

6    BY MR. ERICK:

7    Q       Mr. Seaman, it's your understanding that your

8    attorney, or the company's attorney rather, contacted

9    Mr. Harvey's attorney?  True?

10   A       Correct.

11   Q       Now, why did your attorney contact Mr. Harvey's

12   attorney?

13                    MR. GOLLAND:  Objection.  That calls

14          for him to potentially divulge our

15          communication, which would be privileged.

16                    MR. ERICK:  All right.

17   BY MR. ERICK:

18   Q       Let's try this:  I believe you mentioned that

19   you were uncomfortable with proof of ownership or words

20   to that effect.  Was there something that you saw or

21   heard that made you inquire as to the company's attorney

22   about that issue?

23   A       Yes.  I mean, it's going back a little and I

24   haven't looked at the information again since this

EDWARD SEAMAN

Page 21

1    occurred.  But what I saw in terms of Mr. Cooper's

2    paperwork did not seem rock solid to me.

3    Q      And what paperwork are you referring to?

4    A      It was some paperwork between Mr. Cooper and

5    Mr. Harvey for him recording the performance and

6    something about -- and I don't remember what

7    specifically but something gave me pause in terms of,

8    you know, the claimed ownership.

9    Q      Did you ever discuss the lawsuit that Mr.

10   Harvey filed against Joseph Cooper regarding that

11   agreement and enforcing that agreement?

12   A      With whom?

13              MR. GOLLAND:  Discuss with whom?

14              MR. ERICK:  Let me strike that.

15   BY MR. ERICK:

16   Q      Did you ever discuss the lawsuit that Mr.

17   Harvey filed against Mr. Cooper based on that agreement,

18   based on that contract?

19              MR. GOLLAND:  Well, again, I'm going to

20         object.  Discuss with whom?

21              MR. ERICK:  I'm sorry.

22   BY MR. ERICK:

23   Q      Did you discuss it with Mr. Cooper?

24   A      No, I don't think so.

Def.'s APP 060

EDWARD SEAMAN

Page 23

1    A        You know, as far as common practice, I would

2    think so.  I would think that anybody in this business

3    that wants to protect themselves makes sure that when

4    somebody says they own something, they really do, yes.

5    Q        Did you ever receive a cease and desist letter

6    from Mr. Harvey's attorneys?

7    A        No.

8    Q        Did your attorney contact Mr. Harvey's

9    attorneys?

10   A        Yes.

11   Q        And what did your attorney relate to you about

12   that conversation?

13            MR. GOLLAND:  Obviously he can't answer

14       that.  That's privileged.

15   BY MR. ERICK:

16   Q        Was the reason that was given to you by the

17   company's counsel or was the conversation with the

18   company's counsel the reason why MVD did not move

19   forward with the contract or agreement with Mr. Cooper?

20            MR. PITTMAN:  Objection, form.

21            THE WITNESS:  It was definitely a

22       contributing factor.

23   BY MR. ERICK:

24   Q        Had that conversation not occurred, would the

EDWARD  SEAMAN

Page 24

1   company have gone forward with the agreement with Mr.

2   Cooper to market and distribute that footage?

3                    MR. PITTMAN:  Objection, form.

4                    THE WITNESS:  It's hard to say.  I

5          can't really answer that fairly.  I know that I

6          didn't feel good about things.  So, you know,

7          typically if I don't feel good about something,

8          I don't do it.  So I can't answer that question

9          fairly.

10  BY MR. ERICK:

11  Q       You would not send a proposed contract to

12  someone that you did not intend on having an agreement

13  with, is that fair?

14                   MR. PITTMAN:  Objection, form.

15                   THE WITNESS:  I hadn't seen his alleged

16         ownership when I sent that proposal.  So you

17         can do with that information as you wish.

18  BY MR. ERICK:

19  Q       What, if anything, did you hear or were you

20  told by Mr. Harvey's attorneys that --

21                   MR. GOLLAND:  He's not going to reveal

22         communications between him and me.

23  BY MR. ERICK:

24  Q       Are you aware, Mr. Seaman, if Mr. Harvey's

EDWARD  SEAMAN

Page 30

1   multiple usages.  And an invoice, that sounds like it

2   could be correct.

3   Q       And I believe you said you've been in this

4   business over 20 years?

5   A       Yes.

6   Q       You're able to make an assessment whether

7   there's something that gives a person a clear right to

8   do what he's asking you to do?

9   A       Yes.

10  Q       And when Mr. Cooper approached you, did he

11  actually send you one of the videos he had or did he

12  send you a snippet?  You don't recall?

13  A       I just don't remember.  I'm sure I saw

14  something.  I think the footage was older.  I think the

15  quality wasn't great.  I'm almost sure it was standard

16  def and not high def.  But I don't recall if it was the

17  whole thing or partial.

18  Q       And your recollection is that Mr. Cooper sent

19  you something, you were uncomfortable with it and you

20  sent it, you promptly sent it to your attorney to have

21  your attorney look at it?

22  A       Please repeat that for me.

23  Q       Mr. Cooper presented something to you where he

24  said, this evidences my ownership.  You were

EDWARD  SEAMAN

Page 31

1   uncomfortable with it, so you presented it to your

2   attorney?

3   A        Correct.

4   Q        And that's sort of your standard process, if

5   you have questions about whether you have a right,

6   whether your company has a right to distribute

7   something?

8   A        Truthfully, most things I handle on my own.

9   And I wasn't sure about this one.  It didn't seem right.

10  So I sent it to our attorney.

11  Q        Now, when Mr. Cooper presented to you with this

12  opportunity, did you or anyone from your company look at

13  his financials to see what kind of business --

14  A        No.

15  Q        So you have no idea about his financial

16  situation?

17  A        No.

18  Q        And you had no idea about whether he had any

19  marketing or sales ability to assist in this project?

20  A        I didn't anticipate any marketing support.

21  From what I recall, I felt that that would need to come

22  from us, that I recall.

23  Q        Your company did not present a budget to Mr.

24  Cooper, did it?

Def.'s APP 064

EDWARD  SEAMAN

C E R T I F I C A T I O N

I HEREBY CERTIFY that the foregoing is
a true and correct transcript of the proceedings held in
this matter, as transcribed from the stenographic notes
taken by me on November 3, 2015.

_____

BRAD TRATENBERG

Court Reporter - Notary Public

(This certification does not apply to

any reproduction of this transcript, unless under the

direct supervision of the certifying reporter.)

Def.'s APP 065