UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
-------------------------------------------------------------------x
JOSEPH COOPER

                                         Plaintiff,

VS.                                                          Case 3:14-cv-04152-B D

BRODERICK STEVEN "STEVE" HARVEY
.
                                         Defendant
-------------------------------------------------------------------x

## EXPERT REPORT OF
## OF MICHAEL A. EINHORN, Ph.D.,

## ON BEHALF OF PLAINTIFF

### January 25, 2016

*This report is a revision of an original report submitted on July 10, 2015.  It includes additional material that Defendant disclosed subject to court order .*

*Subject to change as additional information becomes available*

# TABLE OF CONTENTS

1. INTRODUCTION………………………………………………………………………….3
2. STATEMENT OF QUALIFICATIONS……………………………………………..….3
3. DOCUMENTS REVIEWED…………………………………………………………....5
4. SUMMARY OF CONCLUSIONS ……………………………………………………..5
5. REMEDIES FOR TORTIOUS INTERFERENCE …………………………………....5
6. DAMAGES FROM LOST ROYALTIES………………………………………….……9
7. ADDITIONAL CONSIDERATIONS……………………………………………….13
8. CONCLUSION...……………………………………………......………….………14

**Appendices**

    Professional Resume of Michael A. Einhorn, Ph.D.*

    Consumer Reviews

        Don't Trip … He Ain't Through with Me Yet  (2006)

        HBO Platinum Comedy Series:   Steve Harvey – One Man (2001, 2004)

        Steve Harvey's Grand Finale (2015)

        The Original Kings of Comedy (2001, 2013)

        Still Trippin' (2008)

## 1. INTRODUCTION

1.1) I have been asked by Plaintiff Joseph Cooper, by and through his attorney J. Michael Weston, for my professional valuation of damages that resulted from a breach of contract and tortious interference with business relations related to the actions of Steve Harvey.

1.2) Plaintiff Joseph Cooper is a video producer who taped and secured distribution rights for a collection of Steve Harvey comedy videos that were recorded in 1993-1994 at the Steve Harvey Comedy Club in Dallas, Texas. The comedy material is adult fare in language and subject matter. As used in this report, "adult fare" does not refer to anything that might be considered pornographic.

1.3) Defendant Steve Harvey is a prominent comedian who is now the host of the *Steve Harvey Morning Show* (reaching over sixty radio markets), the *Steve Harvey Talk Show* (on television in fifty states and the District of Columbia), and is the host of syndicated television shows *Family Feud* and *Celebrity Family Feud*. Mr. Harvey is also an author whose books have been made into movies. Prior to his committing to a prime time audience, Mr. Harvey performed a number of adult comedy acts throughout the U.S. and released an adult DVD *Still Trippin'* in as late as 2008

1.4) Plaintiff contends that he entered with the Defendant a video contract under which the plaintiff videotaped about 100 hours of Mr. Harvey's nightclub routines, in anticipation of releases at some later time.

1.5) I am advised that Plaintiff has now a history of attempting to create products from the videotapes of Mr. Harvey that resulted in delays by Mr. Harvey. I am also advised that Plaintiff believes that Mr. Harvey agreed to pay $5,000,000 for a buyout of Plaintiff's rights in the videos.

1.6) Plaintiff contends that Harvey interfered with the release of the first of five contracted videos in the year 2014 by inducing Music Video Distributors, Inc. to refuse to enter into a contract that Mr. Cooper had negotiated for the purpose of distributing to interested retailers the DVD volume *Live, Raw, & Uncensored;* four later sequels were planned. The DVDs were to be derived from videotaped performances of Steve Harvey at the Steve Harvey Comedy House in Dallas.

1.7) I am advised that Mr. Harvey's actions are unlawful and have occurred largely because of his change in his professional image that had become more family-friendly.

1.8) Rather, I have been asked to estimate the damages suffered as a consequence of breaches of contract and unlawful interference with a proper business relationship. I offer no opinion on liability in this case.

1.9) I am not related to any party in this lawsuit, nor do I have any financial interest in this case other than my hourly fees. I am paid for my services in report-writing at a rate of $400 per

hour, and for testifying at a rate of $500 per hour. My compensation is not contingent upon the outcome of this case.

1.10) My assumptions, methodologies, and calculations are based on current knowledge and professional methods consistent with the standards of the economics profession.

## 2. STATEMENT OF QUALIFICATIONS

2.1) As an economist (Ph.D. Yale 1981), I have worked since 1997 in the area of media and intellectual property. My *curriculum vita is* attached hereto as Appendix A.

2.2) From 1997 to 2000, I worked as a staff economist at Broadcast Music, Inc. ("BMI"). BMI is a collecting agency that licenses performance rights in music to major broadcasters, including television networks, local stations, cable companies, and radio stations. Negotiating license fees for musical compositions generally involves some means of acknowledging the value of the intellectual property to the user. It also involves institutional knowledge of television, radio, movies, and cable programming.

2.3) From July 2000 to the present date, I have served as a testifying economist in court cases involving the valuation of the intellectual/entertainment properties owned by musicians, songwriters, music publishers, record labels, artists, photographers, actors, cartoonists, television producers, cable companies, and radio stations. A complete list of my testifying engagements is included in my attached *curriculum vitae*.

2.4) I have written 38 professional articles in the area of copyright and intellectual property in law journals and periodicals. I have delivered 36 professional lectures or CLE seminars related to these topics. I am also the author of the book *Media, Technology, and Copyright: Integrating Law and Economics* (Edward Elgar Publishers). I testified as an expert at deposition and/or trial on damages for copyright infringement in the cases of *Fitness Quest, Inc. v. Universal Music Publishing Group, Inc., et al.* (N. D. Ohio, 2004), *Bridgeport Music et al. v. Estate of Christopher Wallace, et al.* (M.D. Tenn., 2006), *Turino et al. v. Island Def Jam, et al.*, (C.D. Cal., 2006), *Bridgeport Music Inc. v. Smelzgood Entertainment, et al.* (M.D. Tenn., 2007), *TMTV Corp. v. Mass Productions, Inc.* (D.P.R., 2009). *Malibu Textiles v. Carol Anderson, Inc.* (S.D.N.Y, 2008), *Serendip LLC, et al. v. Franchise Pictures LLC, et al.*, (C.D. Cal., 2009), *Chris Lester v. U2, Apple Computer, and Universal Music* (C.D. Cal., 2009), *Kilter, Inc. v. Avon Corporation*, (S.D.N.Y., 2011), *Rafael Vergara Hermosilla v. The Coca Cola Company*, (S.D. Fl., 2011), *Dan Marino v. Usher, et al.*, (E.D. Pa., 2013), *Lessem v. Taylor*, (S.D.N.Y. 2012).

2.5) My analysis of copyright damages in *Bridgeport Music et al. v. Estate of Christopher Wallace, et al.*, was upheld on appeal by the Sixth Circuit Court of Appeals. Defendants did not challenge my expert analysis of damages in *Bridgeport Music Inc. v. Smelzgood Entertainment, et al.* in an appeal on other matters to the Sixth Circuit Court of Appeals. In no matter has my expert analysis ever been disqualified or limited by any court with regard to a matter of economic analysis.

3. **DOCUMENTS REVIEWED**

Second Amended Complaint and Jury Demand, Cooper *v. Harvey*.

Licensing and Distribution Agreement, Joseph Cooper and Movie Video Distribution, entered January 20, 2014.

Wikipedia Article, *Steve Harvey*.

Exhibit 5 to Scott Barnes' Deposition.

Deposition, Scott Barnes, December 22, 2015, pp. 64-66.

MVD Music Video Distributors, Press kit.

Expert Report of Scott A. Barnes.

Defendant's Motion to Exclude the Report and Testimony of Michael A. Einhorn and Brief in Support.

American Institute of Certified Public Accountants (AICPA), Calculating Lost Profits, 2006, Chapter 10.

4. **SUMMARY OF CONCLUSIONS**

As I believe that the distribution contract implicated a collection of five DVDs in total, I estimate that Mr. Cooper may have lost the opportunity to earn $864,396 on his first release.

**Depending on the degree to which sales drop off in subsequent releases, total lost earnings may have ranged from $864,396 to $4,321,980.**

5. **FINANCIAL REMEDIES FOR TORTIOUS INTERFERENCE**

5.1) As a matter of law, I am advised that Plaintiff is entitled to recovery of actual damages suffered as a consequence of the Defendant's breach of contract and tortious interference.

5.2) Actual damages may be estimated based on lost plaintiff earnings resulting from lost sales

5.3) It is often necessary in a tortious interference on a product release to estimate lost earnings when the product in suit itself has no sales history – an immediate consequence of interference prior to the initiation of production.

5.4)   In order to determine lost sales resulting from interference on a new product, it is appropriate to determine a measure based on sales of comparable market benchmarks or yardsticks.

5.5)   Mr. Barnes points out that the purpose of valuation in this matter is to put the plaintiff in the same financial position that would have arisen but for the improper actions of the defendant.  There are three approaches to valuation -- i.e.**, Before and After Approach, Market Forecast Approach, and Yardstick Approach. See Barnes Report, §14.**   There is insufficient data to apply the first two because none of Mr. Cooper's videos were ever released

5.6)   With the *Yardstick Approach* , an expert can then  estimate lost profits resulting from an act of tortious interference by using an independent comparable circumstance, index, or parameter that most reasonably resembles the performance that the plaintiff would otherwise have experienced were no infringement or interference to have occurred. (*See also* Barnes, §16)   This would relate to the actual experience of a *similar product unaffected by Defendant's action.*  (§19)

5.7)   A description of the yardstick approach appears in the American Institute of Certified Public Accountants (AICPA), Calculating Lost Profits, 2006, Chapter 10, *which supports the basic concepts used in the following analysis*.

5.8)   One possible yardstick for an infringed sales campaign may include an economic product that is similar in attributes and/or sales patterns to the product in suit.

5.9)   As a matter of law, I am advised that experts may rely upon comparable product attributes (*extrinsic considerations*) and audience reactions (*intrinsic considerations*) that may form the paradigm for comparing two products, such as two videotapes.  A comparison of two videos would form the foundation for the two tapes.

5.10)  As a matter of economic theory, it is proper to determine whether two products are benchmarks based on their potential substitutability for one another.  Substitutability among consumer products is principally based in microeconomic literature on product attributes that generate similar consumer reactions, and not on the subjective tastes and judgments of one analyst.  This puts the analytic emphasis on the reactions of the prospective audience for whom the work is intended, as is consistent with economic theory.

5.11)  To determine a yardstick measure for the video releases now under consideration, I considered using sales data from recent comedy videos on which Steve Harvey appeared. These include

    Don't Trip … He Ain't Through with Me Yet  (2006)

    HBO Platinum Comedy Series:   Steve Harvey – One Man (2001, 2004)

    Steve Harvey's Grand Finale (2015)

    The Original Kings of Comedy (2001, 2013)

Still Trippin' (2008)

5.12) Based on consumer reviews that appear in the Appendices to this report, I determined that the most comparable video to Mr. Cooper's material was the video *Still Trippin'*, which Mr. Harvey released in the year 2008.

5.13) Unlike the remainder of the video material listed in §5.7, *Still Trippin'* features adult fare quite different from Harvey's other work, which is generally more low-key. This is a primary indication that the video would have attracted the same audience as Mr. Cooper's fare.

5.14) Indeed, the online store Amazon.com describes *Still Trippin'* as follows.

> "Steve Harvey once again commands the stage in his 90 minute stand-up comedy concert I'm Still Trippin'. Harvey kept it clean and family friendly in his last comedy special Don't Trip: He Ain't Through With Me Yet. Not easy for one of the Original Kings of Comedy, but then Harvey's versatility is precisely why he's in a class of his own. In I'm Still Trippin' Harvey never misses a beat and no topic is off limits. Harvey takes you on a ride through his personal experiences as it pertains to his family, work and traveling. Filmed in New Jersey to a full house, his energy and comedic timing are second to none. This comedic performance is sure to become an instant classic." http://www.ebay.com/itm/Steve-Harvey-Still-Trippin-2008-DVD-New-/291456752150; http://www.amazon.com/Steve-Harvey-Still-Trippin/dp/B001B73PQC

5.15) On a five star scale, reviews of the DVD were generally favorable.

5 star          54%
4 star          13%
3 star          8%
2 star          11%
1 star          14%

The release averaged 3.8 out of 5 on Amazon.

5.16) As an entertainment -product,  the material in *Still Trippin'* is quite different from the comedian's other work listed above.  The material adult-oriented charged with raw language, sexual innuendo, and racial fare.  An entire catalog of Amazon viewer comments on the DVD appears in the Appendix.

5.17) Some number of reader reviews  found that the *Still Trippin'* tape has the substantial product similarity to Mr. Cooper's material – i.e. adult material.

**9 of 10 people found the following review helpful**
By Denise D. Blanks on October 15, 2010

I thought this video was "clean" like "Don't Trip..." I was wrong! Not into all the cussing stuff -those days are over for me. If you are thinking this video is like the first one, IT'S NOT! I gave it away!

*7 of 8 people found the following review helpful*
**By Pandora's' Box on December 9, 2008**

I was very disappointed with this dvd. I wish I wouldn't have spent my money on it. I almost fell asleep trying to watch this dvd. He only had 1 really funny joke. I listen to his show every morning driving to work. The majority of the jokes he has already said on his radio show. It did not tear my mouth out. I think that Mr. Harvey is a very talented guy, but this dvd did not do it for me and I was quite disappointed in it. He never did finish his last joke. It was a waste of my money. If you want to rent it and watch it or watch a friends dvd, then I would suggest you to do that before actually purchasing a copy for yourself to keep.

*2 of 2 people found the following review helpful*
**By Jose Lopez on April 21, 2011**

Steve Harvey seems like a Nice and Intelligent person, kind of like Bill Cosby (Almost), He is not hilarious, especially in this long and at times boring stand up. I don't care if someone curses or not, I found the ghetto wedding bit funny and his talk about His sons wanting Dread Locks or tattoos etcera. However when he got political and his reasoning was he voted just to vote for someone skin's color made him as "Ig-Nant" as he says as the next person or more, I "Hope" He does not vote for the same mistake again based on one's skin, If it were about that I would have never voted for anyone who did not have my name or similar or skin tone.

*1 of 1 people found the following review helpful*
**By George T. McDonald on June 3, 2013**

I chose this because my husband likes Steve Harvey. This was from SH earlier days and was racially insensitive, so even my husband did not watch most of it.

*1 of 1 people found the following review helpful*
**By lildee on October 16, 2012**

The product quality was great, as for the DVD its self just ok not really impressed with the contents. totally for adults that might enjoy 4 letter words.

*1 of 1 people found the following review helpful*
**By Lisa Marie on May 15, 2013**

Come on Steve. I was hoping for variety. You certainly don't need to be vulgar to be funny or entertaining.

*1 of 1 people found the following review helpful*
**By Kindle Customer on February 20, 2013**

The quality was very poor. I wanted to send it back but I had already opened and he wasn't funny either.

5.18) Based on market evidence, I have determined that the video release of *Still Trippin'* is the best benchmark for the potential of Mr. Cooper's video releases, which are also adult-related.

5.19) I have not attempted to impose any personal valuations of the similarity of material on the two tapes. I am an economist and such an interpretation calls for an assessment beyond my professional training.

5.20) I am also advised that any DVD product can be made with the latest production technology, thus obviating any concern about outdated methods. This is commonly done in entertainment product, where music and movies can be re-released from masters with updated technology. Indeed, it is possible to add new material, characters, and coloring to the content of the video when so desired.

5.21) Economics is the social science that seeks to describe the factors which determine the production, distribution and consumption of goods and services. When doing an economic evaluation, *it is necessary to utilize accepted procedures and concepts that are deemed reliable by the profession.* .

5.22) Here, product research in economics and marketing calls for a review of data in a wider market. I have relied in my review of available yardsticks upon the discernible facts at hand that are related to this market for Mr. Harvey's comedy DVDs. To do otherwise would result in subjective belief or unsupported speculation (*Daubert*, 509 U.S. at 590)

## 6. DAMAGES FROM LOST ROYALTIES

6.1) I was able to obtain a sales total for Still *Trippin'* from a Statement of Net Proceeds (June, 2009- September, 2013) provided by the defendant.

6.2) Since September, 2008, I estimate that *Still Trippin'* generated the following amounts in product sales:

| | |
|---|---|
| Gross Billable Sales | $2,842,109 |
| Broadcast Earnings | $371,250 |
| Digital Sales | $111,327 |
| International Sales | $13,045 |
| Returns | $657,375 |
| Net Billable Sales | $2,680,357 |
| Reserve for Returns | |

|                          |             |
|--------------------------|-------------|
| Additions                | $723,276    |
| Liquidations             | $711,412    |
| Net Sales after Reserves | $2,668,763  |

I shall use the figure of $2,668,763 as the estimate of net sales (after reserves, before costs) that the first DVD (in the five volume series of *Live, Raw, & Uncensored*) *might* have earned if Mr. Cooper's rights were fully executed.

6.3) A common difficulty with tortious interference is that a possible contract was never executed due to the Defendant's activity. In this consideration, I am advised as a legal matter that a Distribution Agreement proposed in January, 2014 for action between Joseph Cooper and Music Video Distributors, Inc. meets the necessary criterion as a legal standard by which a tortious interference may be evaluated.

6.4) Due to the presumed tortious interference of Mr. Harvey, this contract was never executed. I shall assume that the prospective contract provides a basis to examine a suitable arrangement that the parties would have entered in the absence of Mr. Harvey's interference. As a professional economist, I offer no opinion on the legal basis for this assumption.

6.5) Per the terms of this agreement, Mr. Cooper's video material would have been distributed by a nationally leading distributor of music and video material to over 500 accounts in the U.S. and Canada. According to its press kit, MVD had distribution arrangements with the leading retail chains – e.g., Best Buy, Walmart, K-Mart, and Amazon – as well as other distributors – e.g., Baker & Taylor, Ingram, AEC, Norwalk, and Super D.  As a media distributor is primarily identified by the span of its retail network,  MVD presents the full capacity to make its content available to the widest audience in online and physical retail outlets.

6.6) Per the terms of the Distribution Agreement,  Mr. Cooper was to receive a royalty of 75 percent of all sales of distributed works;  the royalty base was wholesale revenues less production costs incurred by MVD (at §3a).

- 6.7) Per the terms of the license,  the Licensor would have  granted to the Distributor "an exclusive license for the Territory of the World (i) use the Film for *all audiovisual medium* [emphasis mine] including but not limited to Digital Video Disc format ("DVD"), Videotape (VHS), Blue Ray Disc,  HD-DVD, Video On Demand (VOD), paid downloading, Pay Per View, and any digital distribution known now or in the future, including editing, authoring and encoding,  replication and packaging of the Film; and (ii) promote, advertise, sell, transfer and distribute the Film throughout the Territory, with Distributor's label and in packaging mutually acceptable to Distributor and Licensor." The product terms of license would evidently have included each of the categories listed above.
- 
- 6.8) From the net sales total of $2,668,763, distributor MVD retained a 25 percent share as its distribution fees (Distribution Agreement, at §3). After a 25 percent deduction, remaining revenues are $2,001,573.

- 6.9) Distributor and Licensor agreed that all replication, packaging and related production expenses for the film may be deducted against royalties to Licensor.

6.10) From the Statement of Net Proceeds, these respective amounts correspond to manufacturing and refurbishing that total to $510,977.

6.11) Although not explicitly specified in the contract, I shall also allow full deduction for returns processing, supply chain fees, cooperative advertising, marketing, DJ/promo charges, and handling. These amounts are reasonable costs of business that MVD would presumably have undertaken in one manner or another.

6.12) From the Statement of Net Proceeds, these respective amounts sum to $469,780.

6.13) I have also allowed as a cost deduction a sum of $1,000 to cover the maximum allowable deduction for DVD Authoring and Encoding by MVD.

6.14) I have not allowed any cost deduction for a 10 percent corridor fee that appears on UMG's Statement of Net Proceeds. This amount is a pro forma adjustment that has no accompanying cost-based rationale.

6.15) I have not allowed any cost deduction for other adjustments that appear on UMG's Statement of Net Proceeds. At this point, I am unaware of the composition of this component and the correspondence with any actual costs that MVD would incur. I reserve the right to amend my results if additional information becomes available.

6.16) Deducting from net revenues after distribution ($2,001,753; see §6.8) amounts for manufacturing & refurbishing ($510,977; §6.10), marketing et al. ($469,780; §6.12), and authoring and encoding ($1,000; §6.13), I determined that Plaintiff Joseph Cooper may have recovered a sum of $1,019,816 related to his lost earnings from the first missed video.

6.17) For the sake of conservatism, I have adjusted my result downward by 15.24%. This is the estimated drop-off in total digital product spending from 2008 to 2014 in the U.S. Retail Market; it is based on data from the Digital Entertainment Group reported in the Barnes Report (p. 19). With this estimated attrition, Mr. Cooper would have suffered losses of $864,396 from the missed release of his first video.

6.18) It is not possible to use economic techniques to determine whether Mr. Cooper's remaining four videos would have earned more or less than the first release.

6.19) I have projected sales revenues for four subsequent videos without taking a legal position on whether such projections are speculative. I have then attempted to describe a range of results that would include the possibility that all later releases would earn no profits at all.

6.20) The remaining four videos may have been less lucrative to Mr. Cooper if the five releases together presented a saturation effect that would tend to reduce total sales.