UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOSEPH COOPER | § | |
| | § | |
| v. | § | CASE NO. 3:14-CV-04152-B |
| | § | |
| BRODERICK STEVEN "STEVE" HARVEY | § | |

COOPER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Joseph Cooper moves for summary judgment against Steve Harvey.  Cooper seeks judgment on all issues other than the relief to which he is entitled.

SUMMARY

A.    *Elements of Cooper's claims*

1.    Breach of Contract: (a) existence of a valid contract, (b) plaintiff performed or tendered performance, (c) defendant breached the contract, and (d) plaintiff suffered damages as a result of the breach.

2.    Legally enforceable contract: (a) an offer, (b) acceptance in strict compliance with the terms of the offer, (c) a meeting of the minds, (d) each party's consent to the terms, and (e) execution and delivery of the contract with the intent that it be mutual and binding.

3.    Tortious interference with business relations: (a) a reasonable probability that plaintiff would have entered into a business relationship; (b) an independently tortious or unlawful act by defendant that prevented the relationship from occurring; (c) defendant acted with a conscious desire to prevent the relationship from occurring or defendant knew the interference was certain or substantially certain to occur as a result of the conduct; and (d) plaintiff suffered actual harm or damages as a result of defendant's interference.

4.    Independent torts of defamation and business disparagement:  (a) plaintiff is a

private individual, (b) defendant published a statement, (c) statement was defamatory concerning

plaintiff, (d) defendant acted with negligence regarding the statements truth, and (e) plaintiff was

injured.  A statement is defamatory if it tends to (i) injure a person's reputation, (ii) expose him

to public hatred, contempt, ridicule, or financial injury, or (iii) impeach his honesty, integrity, or

virtue.

5.      Damages breach of contract: (a) the natural, probable, and foreseeable

consequence (b) of defendant's conduct.

6.      Damages tortious interference: (a) place injured person (b) in the position that he

would have been had the contract been performed.

7.      Permanent Injunction: (a) an irreparable injury; (b) remedies available at law,

such as monetary damages, are inadequate to compensate for that injury; (c) considering the

balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (d)

public interest would not be disserved by a permanent injunction.

8.      Declaratory Judgment: (a) case of actual controversy within the court's

jurisdiction, (b) may declare the rights and other legal relations of any interested party seeking

such declaration, whether or not further relief is or could be sought.

B.      *Elements of Harvey's affirmative defenses[1]*

9.      Failure to state claim upon which relief may be granted, no cognizable claim ¶¶ 4,

94.  Fed. R. Civ. P. 12(b)(6): (a) allegations of (b) enough facts (c) to state a claim for relief (d)

that is plausible.

10.     Lack of acceptance, ¶ 67: failure to (a) assent to (b) the terms of an offer (c) in a

manner authorized by the offeror as evidence by what the parties said and did.

---

[1]      Paragraph numbers refer to Document 123.

11.     Statute of frauds, ¶ 68: (a) transfer of copyright ownership, (b) an instrument of conveyance in writing, (c) signed by the owner of the rights conveyed.

12.     Indefinite terms, ¶ 69: contract is so uncertain that the court cannot understand the obligations under taken in the contract.

13.     Unconscionable contract, ¶ 70: (a) given the parties' general commercial background and the commercial needs of the particular need or case, (b) the clause involved is so one-sided that it is unconscionable under the circumstances existing (c) when the parties made the contract, (d) prevent oppression and unfair surprise.

14.     Unjust enrichment, ¶ 71: (a) one party (b) has obtained a benefit (c) from another by fraud, duress, or the taking of an undue advantage.

15.     Lack of consideration, ¶ 72: (a) entry into a contract, (b) at the time the contract is entered (c) the consideration was so inadequate as to shock the conscience, tantamount to fraud.

16.     Failure of consideration, ¶ 73: (a) a contract exists, (b) after entry into the contract, (c) some supervening cause arises, and (d) the promised performance fails.

17.     Failure of a condition precedent, ¶¶ 74, 81, 88: (a) a contract has a condition precedent, and (b) due to the nonperformance of a party, the condition precedent did not occur.

18.     Statute of limitations, ¶ 75.  The elements of the statute limitations are (a) the type of claim, (b) the applicable statute of limitations period, (c) when the cause of action accrued, (d) the statute of limitations accrues when facts are discovered that a cause of action exists.

19.     Lack of a license, copyright or related ownership interest, ¶¶ 76-79: (a) non-existence of a contract.

20.     Res judicata, ¶ 80: (a) parties are identical or in privity; (b) judgment in the prior action was rendered by a court of competent jurisdiction; (c) prior action was concluded by a

final judgment on the merits; and (d) same claim or cause of action was involved in both actions

21.     Collateral estoppel, ¶ 80: (a) identical issue that was previously adjudicated, (b) issue was actually litigated, and (c) previous determination was necessary to the decision.

22.     Equitable estoppel , ¶ 82: (a) one party, (b) due to the fault of another, (c) was induced, (d) to change his position for the worse.

23.     Quasi-estoppel ¶ 82: (a) asserting a right, (b) to another's disadvantage, (c) inconsistent with a position previously taken.

24.     Promissory estoppel ¶ 82:  (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to its detriment.

25.     Ratification of a contract, ¶ 83: (a) person's adoption or confirmation, (b) with knowledge of all material facts, (c) of a prior act that did not then legally bind the person, and that the person had the right to repudiate.

26.     Waiver, ¶ 83: (a) intentional relinquishment of (b) a known right, or intentional conduct inconsistent with claiming the right.

27.     Laches, ¶ 83: (a) an unreasonable delay in asserting a right or claim; (b) that is not excused, and (c) that results in undue prejudice to defendant.

28.     Disclaimer, ¶ 83: (a) statement, (b) that one has no responsibility for, knowledge of, or involvement with something.  To renounce or disavow a legal claim.

29.     Accord and satisfaction, ¶ 83: (a) contract, (b) in which the parties agree to the discharge (c) of an existing obligation, (b) by means of a subsequent payment tendered and accepted, and (d) parties specifically and intentionally agreed to discharge a party's obligations.

30.     Prior, material breach, ¶ 84: (a) breach of contract by a party, (b) that was material, (c) before the subsequent breach by the other party.

31.     Failure to mitigate, ¶ 85: (a) non-breaching party, (b) could avoid damages (c) by reasonable efforts (d) which could be avoided at a trifling expense or with reasonable exertions, (e) did not mitigate damages due to a lack of diligence, and (f) amount by which the damages were increased by the failure to mitigate.

32.     Fault of plaintiff, applies to torts (i.e. contributory negligence), ¶ 86:  (a) plaintiff's actions or omissions, (b) and the damages are the natural, probably, and foreseeable consequence of plaintiff's conduct.

33.     Mistake, ¶ 87: (a) a mistake of fact, (b) held mutually by the parties, and (c) which materially affects the agreed-upon exchange."

34.     First Amendment, ¶ 89: (a) a publication for general information, (b) by media, (c) of a reasonable and fair statement or criticism, (d) on a matter of public concern, (e) about a public official or public figure.

35.     Common law privilege or justification, ¶ 89:(a) communication made without actual malice, i.e. good faith, (b) concerning a subject matter that is of sufficient interest to the actor or in reference to a duty owed by the actor, and (c) communicated to a person who has a corresponding interest or duty.

36.     Contributing, concurring, intervening and/or superseding fault of Plaintiffs and/or other persons other than Defendant, ¶ 90: (a) determination of percentage of responsibility, (b) based on negligent act or omission or other conduct or activity that violates an applicable legal standard by (c) plaintiff or a responsible third person, (d) for the responsible third person, a designation of the responsible third person by filing a motion to leave to designate the responsible third person or or before the 60th day before the trial date.

37.     Unclean hands and/or *in pari delecto*, ¶ 91:  (a) seeking equitable relief, (b) guilty

of unlawful or inequitable conduct, (c) regarding the issue in dispute.

38.     Improper motive, ¶ 92.  No application has been found to the pending contract and tortious interference claims have been found.

39.     Truth, ¶ 93: (a) true statement, (b) that does not create a false impression by omitting material facts or by suggestively juxtaposing the facts.

40.     Knowledge, ¶ 93.  Knowledge does not seem to be a defense to the claims Cooper raises.

41.     Good faith, ¶ 93: (a) statement (b) where the person making the statement makes it in (c) good faith (d) on a subject matter (e) in which the person has a common interest with the person to whom the statement is made or if the speaker has a duty to communicate with the other person.

42.     Fraudulent inducement, ¶ 95: (a) defendant made a material misrepresentation; (b) defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (c) defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; (d) plaintiff suffered an injury by actively and justifiably relying on that representation, and (e) plaintiff entered into the parties' contract based on defendant's false representations.

43.     Cooper not suffer damages for breach of contract, ¶ 96: (a) no injury suffered (b) as a natural, probable and foreseeable consequence of the breach of contract (c) of lost benefits of contract, (d) loss of bargain, or (e) loss of expenditures.

44.     Cooper not suffer damages for tortious interference, ¶ 96:  (a) no actual damages or losses suffered, (b) of lost benefits of contract, (c) loss of bargain, or (d) loss of expenditures.

C.     *Elements of Harvey's counterclaim*

45.     Invasion of Privacy, ¶ 97: (a) defendant appropriated plaintiff's name or likeness for the value associated with it; (b) plaintiff can be identified from the publication; and (c) there was some advantage or benefit to defendant.

46.     Violation of Right to Publicity, ¶ 98: (a) defendant misappropriated plaintiff's name or likeness for the value associated with it, (b) plaintiff may be identified from the publication, and (c) there was some advantage or benefit to defendant.

47.     Conversion, ¶ 99: (a) plaintiff owned, had legal possession of, or was entitled to possession of the property; (b) defendant, unlawfully and without authorization, assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, plaintiff's rights; (c) plaintiff made a demand for the property; and (d) defendant refused to return the property.

48.     Lost profits, ¶ 108: (a) a reasonable certainty, (b) by competent evidence, (c) that profit would have been made.

49.     Injury to reputation (relates to slander, defamation, libel): no elements found.

50.     Quantum meruit, ¶ 108: (a) value of (b) goods or services provided (c) which were accepted by defendant (d) with reasonable notice that plaintiff expected compensation for goods or services, inapplicable to claims made by Harvey.

51.     Permanent injunction, ¶ 108:   see paragraph 3.

52.     Request for seizure of all articles at issue, Document 123, ¶ 112-117:  only preliminary relief sought by Harvey.

D.      *Elements of Cooper's Defenses to Harvey's Counterclaim*[2]

53.     Two year statute of limitations, ¶29: (a) type of claim, (b) applicable statute of

---

[2]     Paragraph numbers refer to Document 118.

limitations period, (c) when the cause of action accrued, (d) the statute of limitations accrues when facts are discovered that a cause of action exists.

54.     Laches, ¶32: (a) an unreasonable delay in asserting a right or claim; (b) that is not excused, and (c) results in undue prejudice to defendant.

55.     Unclean hands, ¶33: (a) seeking equitable relief, (b) guilty of unlawful or inequitable conduct, (c) regarding the issue in dispute.

56.     Equitable estoppel, ¶34: (a) one party, (b) due to the fault of another, (c) was induced, (d) to change his position for the worse.

57.     Waiver, ¶35: (a) an intentional relinquishment of (b) a known right, or intentional conduct inconsistent with claiming the right.

58.     Consent, ¶36: (a) agreement, approval, or permission regarding (b) some act or purpose.

59.     Judicial admission, ¶38: (a) formal concession in pleadings, (b) regarding facts, (c) by a party or counsel.

60.     Judicial estoppel, ¶38: (a) party changing positions, (b) the positions are clearly inconsistent, and (c) the party convinced a court to accept the previous position.

EVIDENCE

61.     Cooper submits the following evidence found in his Appendix in support of his Motion for Partial Summary Judgment:

Pages 1                 March 20, 1993 Video Contract ("Contract)

Pages 2-32              Cooper affidavit

Pages 33-89             Steve Harvey deposition

Pages 90-99             Deposition of Michael Golland

| | |
|---|---|
| Pages 100-117 | Deposition of Edward Seaman |
| Pages 118-124 | First Amended Response to Requests for Admission |
| Pages 125-140 | Amended Responses to Plaintiff's Request for Production |
| Pages 141-162 | Pleadings from the State Court lawsuit *Steve Harvey v. Joe Cooper, d/b/a Close Up Video Production,* No. 98-9501, 193rd Judicial District Court, Dallas County, Texas, ("State Court lawsuit") produced by Harvey in discovery |
| Pages 163-185 | Original Petition from State Court lawsuit |
| Pages 186-198 | documents produced by Harvey in the course of discovery in this lawsuit |
| Pages 199-228 | Harvey's Objections and Responses to Plaintiff's Second Set of Interrogatories |
| Pages 229-255 | Harvey's Objections and Responses to Plaintiff's Third Requests for Production |
| Pages 256-262 | Harvey's Responses to Plaintiff's Interrogatories and Request for Production Related to Damages |
| Pages 263-276 | Deposition of Scott Barnes |

**THE CASE**

*Background*

Since 1984, Joseph Cooper has operated a videotape/advertising company called Close Up Video Productions.  Cooper creates tapes and advertising for politicians, public figures, church leaders, entertainers and others.  Cooper has taped performances of musicians, comedians and other entertainers.  Cooper taped on an exclusive basis performances at the Longhorn Ballroom and the Steve Harvey Comedy House.  ("Comedy House").  App. 2, 11.

Steve Harvey is a producer, actor, writer, comedian and host of the Steve Harvey Show and Family Feud on television and his radio show.  App. 37-38.  Harvey started as a stand up comedian on October 8, 1985.  App. 39.  In 1992-1993, Harvey owned and operated the Comedy House.  App. 40-41.

In March 1993, the Comedy House was not doing well enough to generate income for Harvey not go on tours or to advertise.  App. 48.  On March 20, 1993, Cooper and Harvey agreed that Cooper would tape performances at the Comedy House with which to produce promotional materials.  Cooper received (a) $2,000, plus taxes, in installments, (b) designation as the exclusive official videographer of the Comedy House, (c) "the rights to use the original tape and/or reproductions for display, publication or other purposes" and (d) ownership of the original videotapes.  App. p. 1.  Harvey did not talk to Cooper about who owned the videos taken until this lawsuit arose.  App. 57.

From the Comedy House tapes, Cooper created a video of Harvey's performances and plans for four more videos.  App. 9.  Harvey has prevented and wants to prevent Cooper from doing so.  Harvey testified that his comedy at the Comedy House was "edgier" than what he now does.  App. 58-59, "You know, subject matter was -- I didn't have to concern myself with branding or imaging or anything.  You could just say -- I thought I was funnier." Harvey talked to Cooper about not wanting the videos published, and that Cooper sought Harvey's endorsement.  App. 66-68.  In 1998, Cooper attempted to sell the tapes to Harvey and attempted to sell videos made from the tapes to the public.  App. 5.

In December 1998, Harvey sued Cooper in the State Court lawsuit.  App. 163-185. Cooper counterclaimed.  App. 146-154.  Harvey agreed to a temporary restraining order prohibiting him from interfering with Cooper's efforts to sell, produce, distribute, advertise or license the Harvey videos.  App. 157-160.  Cooper requested dates for the temporary injunction hearing, App. 161.  The conditions for the expiration of the Agreed Order never occurred.  App. 141-145.  The State Court lawsuit was dismissed without prejudice.  App. 162.

In 2013-2014, Cooper attempted to sell the Harvey video.  App. 7-8.  Harvey acted

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 10**

through his attorney to prevent Cooper from doing so.  App. 95-96, 121-123.  Harvey's actions

destroyed the non-monetary value of Cooper's consideration under the Contract.  In May 2013,

Harvey's attorney demanded that Google remove materials Cooper posted on YouTube about

Harvey and the tapes.  App. 7, 187-198.  In May 2014, Harvey's attorney told the attorney for a

company with whom Cooper sought to distribute videos made from the tapes recorded under the

Contract that Cooper not have rights to do so and that Harvey "would very likely take action to

stop that from happening."  App. 95-96.

A.    *The Lawsuit*

62.    Cooper sued Harvey for breach of contract and tortious interference with business

relations.  Document 29, ¶ 46-49.  Harvey counterclaimed for invasion of privacy, violation of

right to publicity and conversion.  Document 123, ¶¶ 97-101.  At the center of the disputes are

the provisions in the March 20, 1993, Contract, App. p. 1, which provide that Cooper "reserves

the right to use the original tape and/or reproductions for display, publication or other purposes,

Original videotapes remain the property of [Cooper]."  This language consents to Cooper's use of

Harvey's name and image to publish the Videos.

63.    Harvey takes contradictory positions regarding the Contract and Cooper.  Harvey

denies he signed[3] or agreed to the Contract, App. 64-65, sued Cooper in 1998 based on the

Contract, App. 163-185, and contests the meaning of the Contract's language.  Document 123,

11-13, 17, 23, 30-64, 69-70, 72-74, 77-79, 81-82, 87-88.  Harvey denies Cooper owns the

Videos, App. 64-65, and admits that he does not intend to prevent Cooper from asserting his

ownership of the Videos.  Document 123, see ¶ 23, 30-33, App. 122-123.  Harvey agreed to the

Agreed Order protecting Cooper's rights to the Videos, and denies Cooper has rights to the

---

[3]     In discovery, Harvey agreed to provide "five exemplars if found."  App. 125.  No
exemplars were found.  App. 53.

Videos.  App. 64-65.  Harvey agreed to the Agreed Order and denies knowledge of the Agreed

Order.  App. 60-61.  Harvey agreed to the Agreed Order, agreed to the terms of the Agreed

Order, App. 120, and admits that his agent told MVD that Cooper did not have the right to

distribute the Videos.[4] App. 122, Document 123, ¶ 31.  Harvey denies committing defamation

and admits that he consistently advanced the false position that Cooper does have not an

ownership interest that allow him to sell or distribute the videos.  Document 123, ¶¶ 31, 34-36,

40-41, 54.

JUDICIAL ADMISSIONS AND JUDICIAL ESTOPPEL

68.     In his First Amended Answer, Document 123, Harvey made the following

admissions:

Document 123, ¶ 3: Cooper is a resident of Dallas County, Texas.

Document 123, ¶ 4: Harvey is a resident of Atlanta, Georgia.

Document 123, ¶ 6: In 1993 Cooper conducted business as Close Up Video Production in Dallas, Texas.

Document 123, ¶ 8: In 1993 and for a period thereafter, Harvey did business in Dallas County as the Steve Harvey Comedy House.

Document 123, ¶¶ 31, 34-36, 40:  Harvey has consistently advanced the position that Cooper has no copyright or related ownership interest that allows Cooper to sell or distribute the videos.

Document 123, ¶ 11: Harvey asserts that the Contract is an invoice received from Cooper on March 20, 1993.

Document 123, ¶ 17:  Cooper taped performances at the Steve Harvey Comedy House ("Comedy House") from March 1993 until it closed in 1994.

Document 123, ¶ 24: In December 1998, Harvey filed the State Court lawsuit seeking an injunction against Cooper to stop his unauthorized distribution and sale of the videos that use Harvey's name, likeness and/ or identity.

---

[4]     This statement alone proves the breach of contract.

Document 123, ¶ 29: The State Court lawsuit was dismissed without prejudice.

69.     In his Amended Responses to Cooper's First Set of Requests for Admission, App.

118-124,  Harvey made the following admissions:

Request 1:  This Court has diversity jurisdiction over Cooper's claims.  App. 118.

Request 4:  On or about March 20, 1993, Harvey engaged Cooper of Close-Up Video Productions to video shows that were being performed at the Steve Harvey Comedy House.  App. 118.

Request 16:  You filed suit against Joseph Cooper in the Action *Steve Harvey v. Joseph Cooper,* Cause No. 9809501, 193rd District Court, Dallas County, Texas.  App. 120.

Request 17. Attached as Exhibit B is a true and correct copy of the Agreed Order to Extend Temporary Restraining Order entered in the lawsuit *Steve Harvey v. Joe Cooper, d/b/a Close Up Video Production*, Cause No. 98-9501,193rd Judicial District Court, Dallas County, Texas.  App. 120.

Request 18. You agreed to the terms of Exhibit B.  App. 120.

Request 19:  On or about May 15, 2014, Ricky Anderson represented you in connection with Cooper.  App. 121.

Request 21:  On or about May 15, 2014, Ricky Anderson represented you in connection with the Videos.  App. 121.

Request 23:  On or about May 15, 2014, Ricky Anderson knew that Michael Golland represented Music Video Distributors.  App. 121.

Request 25:  On or about May 15, 2014, Ricky Anderson told Michael Golland that Steve Harvey had not given Joseph Cooper the rights needed to distribute the Steve Harvey video.  App. 122.

Request 27:  On or about May 15, 2014, in his conversation with Michael Golland, Ricky Anderson was acting as your agent.  App. 122.

Request 28:  On or about May 15, 2014, in his conversation with Michael Golland, Ricky Anderson was authorized to act for you and did act within the scope and course of his representation of you.  App. 122.

Request 29:  You do not intend to prevent Cooper from asserting his rights to own the Videos.

RESPONSE: Objection, improper procedure, subject to said objection, Admit.  App. 122.

Request 31:  On or about March 20, 1993, you engaged Mr. Cooper of Close-Up Video Production to video shows that were being performed at the Steve Harvey Comedy House.  App. 122-123.

Request 32:  You have no intention of preventing Cooper from asserting that Cooper owns the Videos.  App. 123.

   70.   The only agreement between Harvey and Cooper is App. 1.  App. 133, Request

for Production No. 23.

   71.   Harvey made the following admissions in the State Court lawsuit:

Harvey alleged in his Original Petition, App. 163-164:

> On or about March 20,1993, . . . Harvey . . . engaged Cooper . . . to video shows that were being performed at the Steve Harvey Comedy House, Cooper was paid to prepare promotional materials from the presentations made by various entertainers and comics who performed . . . . A copy of the contract is attached hereto as exhibit "A" as if fully copied herein and set forth at length.

Harvey's attorney verified the Original Petition as required by the Texas Rules of Civil Procedure based on his personal knowledge.  App. 169.

The referenced contract is the Contract.  Exhibit A to App. 1, 177.

By a letter from Cooper's counsel to Harvey's counsel dated July 9, 1999, App. 157,

Harvey agreed:

> The Temporary Restraining Order as intended against your client, and whose terms you have, will be effective until the Temporary Injunction hearing or further agreement by all parties even if that hearing is scheduled after the fourteen day period of a normal TRO. Although we will all strive to schedule the Temporary Injunction hearing as soon as possible, it is understood that the hearing will be scheduled so that our witnesses' schedules and yours will permit attendance.

On August 12, 1999, the State court entered the Agreed Order to Extend Temporary Restraining Order pursuant to a Tex. R. Civ. P. 11 agreement between Harvey and Cooper ("Agreed Order"), App. 157-160, which enjoined Harvey from:

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 14**

Contacting any of Movant Joe Cooper's business associates or anyone with whom Movant has entered into negotiations with regard to the sale, production, distribution, advertising, or licensing of a certain video tape that is the subject matter of the above referenced suit for the purpose of threatening them with legal action, any other negative action in the event they do business with Movant or for the purpose of intimidating them into refraining from doing business with Movant regarding certain video tape of Mr. Steve Harvey, Respondent, which is the subject matter of the above referenced suit, and from disparaging Movant or any of his employees, agents, assigns, companies or attorneys to third persons.

IT IS FURTHER ORDERED that this Temporary Restraining Order is extended until hearing for temporary injunction is held or until further agreement by the parties as per the Rule 11 Agreement attached as Exhibit "A" and incorporated for all purposes.

Harvey agreed to the terms of the Agreed Order.  Request for Admission 18, App. 120.

After the Agreed Order was entered, no hearing was set for a temporary injunction and no further agreement was entered by Harvey and Cooper.  App. 141-145.

72.     Harvey testified as follows in his deposition:

App. 39:  Harvey drove around doing comedy performances from 1985 through 1992 or 1993.

App. 44-45:  Harvey was the main performer at the Comedy House either Tuesday or

Wednesday through Sunday.

App. 47-48:  When other performers came to the Comedy House, Harvey acted as emcee:

A.      Well, I hosted the shows when I was in town.  I acted as the MC whenever I was in town that week. So if Bernie comes to town, he's the headliner; I'm still the host. I may have a feature act come up. I host. I bring up the feature act. Then I bring up the headliner, a guy like a Bernie Mac.

Q.      Were you just introducing, or did you put on performances yourself?

A.      You always are performing if you're standing up there, yeah, always.

***

Q.      But of that time how much would be your time?

A.      Well, it varied. I opened the show, let's say, 15, 20 minutes. I might do 30 minutes in between a guy. I might do a hour after the headliner is over. It just varied. Depends on how the evening was going.

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 15**

App. 40:  Harvey was still on the road when the Comedy House was open:

> Q.      What portion of your time was spent on the road or what proportion at the Comedy House doing performances?

> A.      I mean, the bulk of my touring is always on the road. If I'm -- if I'm touring 42 weeks out the year, which was usually more, at least 30 of it was out on tour. That's how I made my money. I couldn't really make money at my comedy club.

App. 49:  Q.   How did you promote the Comedy House?

> ***
> A.      Okay. It was mostly word of mouth. I was already pretty popular because I just moved the club from down the street. So I had a huge following.

> Q.      . . . Well, at the beginning would you sell out every night?

> A.      Yeah, in early goings. Yeah.

> Q.      Did you advertise the events?

> A.      Not right away. I didn't have the money for advertising.

App. 57:  Q.   Did you ever discuss with Mr. Cooper who owned videos taken of performances at the Steve Harvey Comedy House?

> A.      Not until this all occurred.

App. 58-59:  Harvey's comedy was "edgier" in 1993-1994 and he thinks he was funnier.

App. 66-68:  Q.      Did you ever talk to Mr. Cooper about the fact that you didn't want the videos published?

> A.      Yes.  * * * I don't know the exact date. But we've had many conversations about it.

> Q.      Why didn't you want it published?

> A.      I didn't think -- like it said right here, I didn't think the material was appropriate for where I was in my life at that time.

> Q.      So why wouldn't telling Mr. Cooper that be important if Mr. Cooper didn't have a right to publish them in the first place?

> A.      Well, if he had the right to publish it, why would he need my permission?

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 16**

Q.      Did he ask for your permission?

A.      A bunch of times he proposed these proposals to me, that we take this public. He asked me over and over and over several times.

Q.      He asked you to assist him in promoting it, didn't he?

A.      He asked me to be a part of it.

Q.      Do you think that a video of Steve Harvey from the early days is more valuable with Steve Harvey's endorsement than without?

A.      Of course. That's the only way you can have value to it.

73.     Harvey produced the following documents in discovery, App. 187-198:

Take Down Notices sent to Google dated May 20, 2013.

74.     OTHER EVIDENCE

75.     Joseph Cooper swears to the following:

App. 2:  2.      Since 1984, I have operated a videotape/advertising company called Close Up Video Productions.  I create tapes and advertising for politicians, public figures, church leaders, entertainers and others.  I have taped performances of musicians, comedians and other entertainers.  I taped on an exclusive basis performances at the Longhorn Ballroom and the Steve Harvey Comedy House.  ("Comedy House").

App. 2-3:  3.      On March 20, 1993, at 8:30 a.m., I met with Steve Harvey at his place of business known as the Steve Harvey Comedy House located at 4343 Camp Wisdom, Suite 216, Dallas County, Texas.  When we met, Mr. Harvey told me he was having problems in getting customers to come to the Comedy House.  We discussed the matter for a time, and we agreed that I would develop TV Commercials to promote the Comedy House.  That included videotaping all of the performances at the Comedy House and using the material to work towards promoting the Comedy House.  We agreed that I would tape performances at the Comedy House with which to produce promotional materials.

App. 4:  4.      I provided Mr. Harvey with my standard video contract.  The Video Contract is a standard form that I have used for years in conducting business.  When a customer seeks different times, we negotiate and make changes to the standard form.  For example, with the Texas Ballroom, we did not use my standard form at all.  The Texas Ballroom and I negotiated a deal where I was the exclusive videographer for performances at Texas Ballroom and was paid a fair market sum for each performance I videotaped, and Texas Ballroom owned the tapes I made.

App. 3:  4.       Mr. Harvey reviewed the contract.  I completed the portion describing the services included.  As noted, Mr. Harvey completed the blanks on the form related to money and signed the contract in my presence.   I signed the video contract in Mr. Harvey's presence.

App. 3:  6.       I told Mr. Harvey that I had to be paid the $2,000 in advance.  Mr. Harvey went back to his office and came back with the money he had available at the time, $1,300.00.  Mr. Harvey read over the contract, rounded off the deposit amount to $1,365 and wrote in the amount as paid and wrote the amounts due at the bottom of the agreement.  I watched Mr. Harvey sign the agreement.  Mr. Harvey then went to his office with the other $65.00 so that the balance due would be $800 even.

App. 4: 10.       I filmed about 104 hours of Mr. Harvey's performances at the Comedy House in 1993 and 1994, plus filming performances by other performers appearing at the Comedy House. I stopped filming performances when Mr. Harvey stopped coming to the Comedy House when he left in 1994 for Los Angeles in connection with a comedy television show in which Mr. Harvey starred for ABC called "Me and the Boys."

App. 4:  11.       The price I charged Mr. Harvey for my services was lower than my customary charge because Mr. Harvey told me that he had spent a lot of money on radio advertising and it had not worked. I agreed to accept a low lump sum payment from Mr. Harvey because I was to be the exclusive producer of all TV and video performances at the Comedy House and because I would own the videotapes that I took. I was willing to give Mr. Harvey a good price because I believed and hoped that Mr. Harvey would be successful and well-known, which would make the videos I took valuable.  I estimate that the value of my services to Mr. Harvey, excluding the value of the equipment, was between $100,000 and $150,000.

App. 5:  16.       When I communicated with Mr. Harvey about the videos and he asked me at various times not to release the videos as he was at an important time of his career and he did not want the videos to distract him. Mr. Harvey and I talked about my plans to use the recordings of Mr. Harvey's performances to create videos that would be sold at retail. Mr. Harvey did not disagree with my plans.

App. 6:  22.       In 2010-2013, I again decided to try to market, distribute and sell the first volume of a five volume set of videos entitled "Steve Harvey 'Live, Raw & Uncensored.'" The videos taken from the recordings I had made of Mr. Harvey at the Comedy House.

App. 7:  24. In 2013, I placed a number of videos on YouTube related to the videos I had made of Mr. Harvey. Some of the videos promoted the video I planned to market and other videos described the problems that I had with Mr. Harvey over the years.

App. 7:  26.       I negotiated with a number of companies who wished to market, distribute and sell Steve Harvey "Live, Raw & Uncensored." After quite a bit of work, I decided that a company named Music Video Distributors, Inc. from Pennsylvania would best be able to [do] what I envisioned to be the proper way to market, distribute and sell the Harvey

videos.

App. 7-8: 27.    I negotiated an agreement with Music Video Distributors and in May 2014 was prepared execute a Licensing and Distribution Agreement granting Music Video Distributors an exclusive Worldwide license to promote, advertise, sell and distribute Steve Harvey "Live, Raw & Uncensored," and to promote, advertise, sell, transfer and distribute the video. Attached as Exhibit 2 is a true and correct copy of the agreement I was prepared to execute. The proposed Licensing and Distribution Agreement provides that I am "the owner of all right, title and interest, free and clear of all judgments, claims and encumbrances" of Steve Harvey "Live, Raw & Uncensored." Because of my communications with Mr. Harvey and the 1998 State Court lawsuit, lawsuit, I disclosed to Music Video Distributors my history with Mr. Harvey, including the previous litigation.

App. 8: 28.    I was to receive a royalty 75% of the sales price of the videos less the actual manufacturing and approved marketing costs. Music Videos Distributors agreed to advance me $25,000 against the royalties to be paid to me. Attached as Exhibit 3 are true and correct copies of communications I had with Music Video Distributors about the Harvey videos.

App. 8: 29.    Based on my knowledge of the industry and of Mr. Harvey's appeal, I anticipated that I would make between $20,000,000 and $30,000,000 with the videos I planned to market and sell.

App. 8: 30.    As shown by the attached exhibits, combined as Exhibit 4, I expended probably $30,000 in creating the Harvey video, putting it on medium, and obtaining packaging.

App. 8: 31.    In May 2014, I was advised by Music Video Distributors that they would not be signing the agreement that we had negotiated. I was told that Mr. Harvey's attorney had challenged my rights to the videos and would sue Music Video Distributors if it attempted to market, distribute and sell the videos.

App. 8: 32.    Music Video Distributors sent me copies of email communications it had with its attorney and those emails are attached hereto as Exhibit 4.

    76.    Michael Golland, attorney for MVD,[5] testified regarding his conversation with

Harvey's attorney on May 15, 2014, as follows:

App. 94-96:

    Q    How did Ricky Anderson identify himself to you in the conversation?

    A    I don't recall specifically. But I believe he said that he represents Steve Harvey or

_____

[5]    Mr. Golland is an attorney licensed by the State of California.  App. 93.

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 19**

Steve Harvey's companies.

Q      In the course of your conversation with Ricky Anderson, what did you say to Ricky Anderson?

A      I told him that my client Music Video Distributors was looking into entering a licensed agreement with Mr. Cooper regarding some Steve Harvey videotaped material, and there seemed to be some question as to whether Mr. Cooper had the rights to the material. And I was asking Mr. Anderson if he could shed some light on the subject.

Q      In the course of your conversation with Ricky Anderson, what did Ricky Anderson say to you?

A      He said that Mr. Cooper did not own that material, and that if my client was going to exploit that material that Mr. Harvey would very likely take action to stop that from happening.

77.      Edward Seaman, COO and general manager of Music Video Distributors (MVD),

App. 103, testified:

Cooper approached MVD about the Harvey video.  App. 104-105.

MVD would have sold the Harvey video through DVD, cable VOD (video on demand), platforms like Hulu, for video on demand, transactional video on demand, streaming and all forms of digital distribution.  App. 105-106.

MVD believed that the potential revenue from the Harvey video could be low but had no limit MVD could not tell at the time Seaman dealt with Cooper or at the time of the deposition what the revenue would have been.  App. 107.

MVD knew stand up comedy does well with home video, that Harvey is a strong entertainer, and this is a strong segment of home video.  App. 108.

MVD's attorney contacted Harvey's attorney about Cooper.  App. 109.

App. 110:  Q   Did the company call his attorney because of the footage or because of some concern with the ownership of the video?

A      Yes.

Q      Why? Why did the company call its attorneys?

A      Well, you know, for us to enter into an agreement with the content owner and to be putting money out of our pocket into that content when the ownership might be questionable and where Mr. Harvey may object to the usage could result in,

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 20**

well, a number of bad things.  Ultimately, you know, for me to get involved in that where it might end up with cease and desist notices all around the industry and I'm sitting on the debt with no recourse is not good for me.

g.      App. 111:  Q   Was the reason that was given to you by the company ' s counsel or was the conversation with the company ' s counsel the reason why MVD did not move forward with the contract or agreement with Mr. Cooper ?

* * *

A.      It was definitely a contributing factor.

h.      App. 112:  Q   Do you know what they [Harvey's attorney] said whatsoever?

A       I know that they had a problem with it. And my sense was that entering into a content distribution deal where there would be a probable problem with the artist would serve against our common core and belief. So we walked away.

Q       And that's the reason why this agreement was not made, correct?

A       Yes.

THE CONTRACT

78.     As discussed, Harvey provided little information about the bases for his various

defenses.  Harvey is bound by his responses.

79.     Cooper submitted his Third Set of Requests for Production which with Harvey's

Objections and Responses is App. 229-255.  Harvey's primary response, after form objections,

was

> Not waiving said objections and insisting on the same, Defendant has produced and/or will produce unobjectionable documents, if any, responsive to a reasonable reading of this request that are relevant to the claims or defenses in this matter and reasonably calculated to lead to the discovery of admissible evidence.
>
> Defendant also reserves the right to amend his response, if necessary, as discovery proceeds.

App. 230-254 (there was only one request with numerous subparts).

No specified documents were produced.

80.      Cooper submitted Interrogatories to obtain information about Harvey's Answer. In response to Cooper's Second Set of Interrogatories, Harvey made broad objections, and then provided position statements which most of the time ignored the substance of the interrogatory answered.

81.      Cooper filed his Corrected Second Motion to Compel, Document 76, and the Motion was taken under advisement on October 9, 2015, per the Electronic Minute Entry, Document 84.

82.      Harvey did not have to enter into the Contract as it was written.  In the years 1987-2000, Cooper taped performances at The Longhorn, unlike Harvey, The Longhorn Ballroom paid Cooper for the services he rendered and negotiated to own the tapes Cooper produced.  App. 3.

83.      Harvey seeks to have the handwritten description of Cooper's services eliminate the printed portions of the Contract.  Document 123, ¶ 12.

84.      Harvey testified that he engaged Cooper for the Comedy House, but the Contract does not reflect the terms of the agreement.  App. 54.  Harvey sued Cooper on the Contract in the State Court lawsuit.  App. 163-185.  Harvey can point to no documents which show what he believes are the correct terms of his agreement with Cooper.  App. 53.

85.      Harvey accepted the Contract by his actions of (a) signing the Contract, (b) paying the moneys due, and (c) accepting Cooper's taping performances at the Comedy Club for more than a year.  Harvey further evidenced existence of the Contract when he sued Cooper on the Contract in 1998.  App. 163-185.

86.      Harvey seeks to impose his meanings on the Contract claiming (a) "the absolute right to possess a copy of the" Videos, (b) "dominion and control over the sale or distribution of

the Videos," and (c) it "authorized the creation of the [Videos] mandated that the videos be released to [Harvey] without restriction upon [his] full payment of said Invoice."  Document 123,¶¶ 12, 17, 23, 99.  Harvey swore in discovery that the Contract confirms Harvey's absolute rights, dominion, and the mandate. App. 203-205.  The Contract does not contain the language propounded by Harvey.

87.     Harvey alleges that Cooper lacks a license, copyright or related ownership interest in videos at issue, Document 123, ¶¶ 76-79.  The Contract is a binding contract, and, by its terms, the Contract grants Cooper ownership of the tapes and the right to publish.

88.     Harvey attacks the consideration for the Contract.  See App. 210-214.   Under the terms of the Contract, Harvey paid $2,000, plus taxes, and gave Cooper the disputed rights, and in return, Cooper taped performances at the Comedy House from March 1993 until the Comedy House closed in 1994.[6]  Cooper estimates the value of his services, excluding the value of the rental of the equipment, was between $100,000 to $150,000 if Harvey wanted the rights he argues he has in this lawsuit.  App. 4.  At the time of the Contract, Harvey could not even pay Cooper $2,000 as a lump sum.  App. 3.

89.     By his dealings with Google and MVD and his consistently denying Cooper's rights under the Contract, Harvey breached the Contract.

TORTIOUS INTERFERENCE

81.     Harvey through his attorney Ricky Anderson told MVD's attorney that Cooper did not have rights in the Harvey tapes and "that Mr. Harvey would very likely take action to stop that from happening."  The statement was false and caused MVD not to enter into a contractual relationship with Harvey.  The statement constituted defamation and business disparagement.

---

[6]     Cooper's taping services only ended because the Comedy House closed when Harvey moved to Los Angeles to be in a television show.  App. 4.

84.     The measure of the damages for breach of contract and tortious interference are the same in this case.  Cooper seeks to recover damages that are the natural, probable and foreseeable consequence of Harvey's conduct.  Specifically, Cooper's out of pocket expenses in creating and attempting to sell the Harvey video estimated at $30,000, App. 9, and the lost value of the video due to Harvey's actions.  Cooper has one video that has been created and intends to create four more, at this point, none of the videos has any value.  Before MVD's attorney talked to Harvey's attorney, MVD agreed to give Cooper a $25,000 advance.  App. 8.  The communication stopped MVD from entering into an agreement with Cooper, App. 111-112, which caused Cooper injury and, at the least, prevented Cooper from receiving the $25,000 advance.  App. 8.

85.     Cooper seeks a permanent injunction pursuant to Fed. R. Civ. P. 65(d)(1)(C). Cooper meets the standards for a permanent injunction (a) that he has suffered an irreparable injury; (b) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (c) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (c) that the public interest would not be disserved by a permanent injunction.

86.     Cooper seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 as this Court has diversity jurisdiction and the parties have demonstrated a conflict over the meaning of the Contract and their respective rights under the Contract.

HARVEY'S DEFENSES

87.     Harvey relies on Fed. R. Civ. P. 12(b)(6) by asserting a failure to state claim upon which relief  may be granted and no cognizable claim.  Document 123, ¶¶ 4, 68.

88.     Acceptance is an expression of assent to the terms of an offer in a manner

authorized by the offeror as evidence by what the parties said and did.  Regarding acceptance, Harvey swore that

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to Plaintiffs conduct. The document in question confirms other facts alleged herein. And the parties have evidence indicating that the invoice was paid as discussed above and that no rights were conveyed to Plaintiff. The parties also have no evidence that Defendant "accepted" the terms or conveyance of rights advanced in Plaintiffs Complaint.

App. 207.  The evidence is that, even without Harvey's signature, both parties performed their contractual obligations, and, in 1998, Harvey sued Cooper regarding the Contract.  The Contract is binding.

89.     Harvey pleadings the statute of limitations.  Document 123, ¶75.  The defense fails as the breach of contract and tortious interference claims regarding MVD occurred in May 2014, and the claims regarding Google occurred in May 2013.  Suit was filed on November 21, 2014.  Document 1.  The statute of limitations for tort is two years and for contracts four years.

In response to an interrogatory seeking the basis for the defense, Harvey swore:

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to Plaintiffs conduct. The document at issue, even if it were a contract, provides the applicable dates on which the statute of limitations began to run. Plaintiff has also rendered no services or provided no consideration that would entitle him to what is being sought. The parties, third parties, and experts can confirm the facts necessary for this defense, if any.  App. 212-213.

90.     Harvey asserts that Cooper's claims are barred by res judicata/collateral estoppel. Document 123, ¶80.  In discovery, Harvey swore

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Previous legal disputes over this issue provide evidence of this defense.  The parties, third parties, and experts can also confirm the facts necessary for this defense, if any.  Exhibit K, p. 17-18.

91.     No final judgment on the merits was granted in the State Court lawsuit, App. 162, thus, res judicata cannot apply to this case.

92.     Collateral estoppel is issue preclusion.  The only issue that might fall into this category is this Court's dismissal of Cooper's claims for copyright infringement.  Document 14.  The Court did not dismiss Cooper's common law claims for breach of contract and tortious interference.  Document 14.  At best, the law of this case is that Cooper does not have a claim for copyright infringement, but continues to have his state law claims.  Document 14.

93.     In response to inquiries about the defenses of estoppel, quasi-estoppel and promissory estoppel, Harvey responded

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, he cannot have it both ways - getting paid for services and attempting to own rights in the work for hire materials. The parties, third parties, and experts can also confirm the facts necessary for this defense, if any.

App. 215-217.  Harvey and Cooper performed under the Contract except to the extent that Harvey contests Cooper's rights under the Contract.[7]  More than one form of consideration may support a contract.  Harvey sued Cooper on the Contract.  Cooper is not estopped from asserting his positions regarding the Contract.

94.     The evidence shows that Cooper has maintained one position regarding the Harvey videos since 1993, that he owns and has the right to publish the videos.  That position is why Harvey sued Cooper in 1998 and counterclaimed in this lawsuit.  App. 163-185, see Document 123, ¶¶ 23, 25, 46-48, 97-99.  The Contract and Harvey's actions violating the Contract are why Harvey's attorneys agreed to the Agreed Order.

95.     In response to an interrogatory about the defense of ratification, Harvey swore

> Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, Plaintiff's acceptance of

---

[7]     Cooper's taping services only ended because the Comedy House closed when Harvey moved to Los Angeles to be in a television show.  App. 4.

payment on work for hire is a ratification of the work for hire terms of the invoice, providing him no rights in the underlying work.

App. 217.  The Contract does not meet the work for hire standards.  Cooper accepted payment, and ownership of the tapes and the rights to display and publish given in the Contract.

96.     Harvey's allegations contradict the language of the Contract vesting ownership of the Videos in Cooper and giving him to publish products created from the Videos.  Cooper did not accept or ratify the alternative terms and conditions advanced by Harvey or the non-existence or unenforceability of the Contract.  Cooper has maintained that he owns the tapes and has the right to publish a videos from tapes since 1993, in this Court and in the State Court lawsuit. App. 146-154.

97.     "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right."  Harvey responded to discovery by swearing:

> Plaintiff's records and other evidence will confirm the accuracy of this belief as to Plaintiff's conduct. Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, the delay in his conduct in arguing these rights prevents him from recovering years later. The parties, third parties, and experts can also confirm the facts necessary for this defense, if any.

App. 218-219.  Evidence is that Cooper consistently sought to enforce his known rights and waived nothing.  App. 149-155.  Cooper has made no statement that he does not claim the rights given to him under the Contract or disclaimed those rights.  App. 9-10.

98.     *Laches* only applies to Cooper's claim for equitable relief.  Harvey responded to discovery as follows:

> Plaintiff's records and other evidence will confirm the accuracy of this belief as to Plaintiff's conduct. Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, the delay in his conduct in arguing these rights prevents him from recovering years later. The parties, third parties, and experts can also confirm the facts necessary for this defense, if any.

App. 218. There is no evidence of an unreasonable delay committed by Cooper when the suit was filed a year and three months after Anderson's contact with Google as the agent for Harvey, and seven months after Anderson's conversation with MVD's attorney. App. 122. The evidence shows no change in Harvey's position due to any delay in filing suit by Cooper.

99.   In response to an interrogatories inquiring about alleged prior material breach and failure to mitigate, Harvey responded

> Plaintiff's records and other evidence will confirm the accuracy of this belief as to Plaintiff's conduct. Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, the delay in his conduct in arguing these rights prevents him from recovering years later. The parties, third parties, and experts can also confirm the facts necessary for this defense, if any.

App. 220-221. Cooper performed under the Contract. Cooper attempted to sell, market and distribute the Harvey videos, which is the only thing that would have mitigated his but Harvey prevented that mitigation by the actions that form the bases of Cooper's claims for breach of contract and tortious interference. A party does not breach a contract by failing to exploit the consideration he received under the Contract on some arbitrary timetable, such a time limitation would be found in the Contract.

100.   Cooper performed under the Contract. Cooper attempted to sell, market and distribute the Harvey videos, which is the only thing that would have mitigated the damages suffered by Cooper. The facts related to Harvey's conduct as alleged in the State Court lawsuit and in Cooper's Second Amended Complaint evidence Harvey's conduct which prevented the

mitigation.

101.    Harvey alleges that Cooper's own act or omissions caused the injury and damages. The elements of causation for breach of contract are (a) Cooper's actions or omissions, (b) and the damages are the natural, probably, and foreseeable consequence of Cooper's conduct.  Under the Contract, Cooper had the duty to tape performances at the Comedy House, and it is not disputed that Cooper did tape performances.  Cooper did not cause Harvey's breach the Contract or Harvey's agent making statements to Google and MVD.

102.    Harvey alleges mistake.  Document 123, ¶ 87.  Where parties got that which they bargained for and were not acting under mistake, fraud, or the like, the courts do not concern themselves with the relative values exchanged or the wisdom of the contract.  Harvey made no mistake in entering the Contract.  Harvey alleges his mistake was that the Contract does not reflect his "intent" that the Videos be used only for promotional purposes, which they were.  In response to discovery, Harvey swore:

> Plaintiff's records and other evidence will confirm the accuracy of this belief as to Plaintiff's conduct. Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, the delay in his conduct in arguing these rights prevents him from recovering years later. The parties, third parties, and experts can also confirm the facts necessary for this defense, if any.  App. 222-223.

103.    The elements of mutual mistake are (a) a mistake of fact, (b) held mutually by the parties, and (c) which materially affects the agreed-upon exchange.  The disputes between Harvey and Cooper do not relate to whether the Contract contains certain language, but, rather, as to the meaning of the language used.  A party is bound to the contract he signs regardless of whether he read it or believed it had different terms.  There was no mutual mistake.

104.    A condition precedent must happen or be performed before a right can accrue to enforce an obligation.  Document 123, ¶¶ 74, 81, 88.  In response to the Interrogatory requesting

the basis for the allegations regarding the failure to satisfy conditions precedent, Harvey swore

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. The parties, third parties, and experts can
> confirm the facts necessary for this defense, if any.

App. 212.  The Contract creates one condition precedent for Cooper, taping of performances at

the Comedy House.  That condition has been satisfied.

105.     Harvey alleges "that he paid the March 20, 1993 Invoice in full which granted

him the absolute right to possess a copy of the 120 hours of video performances that captured

Defendant's name, likeness and identity."  Document 123, ¶¶ 17, 107, 115.  In response to

discovery, Harvey swore

> The document in question conforms these facts. And the parties have evidence indicating
> that the invoice was paid as discussed above.

App. 233.  Cooper does not dispute payment of moneys, but the Contract does not grant Harvey

the "absolute rights" he claims, Document 123, ¶ 17, in fact, the Contract grants Cooper

exclusive ownership of the tapes.  Harvey is bound by the language of the Contract which gives

Cooper ownership of the tapes and the right to publish.

106.     Harvey "denies that Plaintiffs have any copyright or related ownership interest

that allows Plaintiffs to sell or distribute the videos at issue . . . ."  Document 123, ¶ 23, 30-64,

75-80.  In response to an interrogatory, Harvey swore

> Plaintiff's records and other evidence will confirm the accuracy of this belief as to
> Plaintiff's conduct.  The document in question confirms other facts alleged herein. And
> the parties have evidence indicating that the invoice was paid as discussed above and that
> no rights were conveyed to Plaintiff.

App. 234.  Harvey is bound by the language of the Contract, which gives Cooper ownership of

the Videos and the right to display, publish and otherwise use the Videos.

107.     Harvey raises the statute of frauds.  Document 123, ¶ 68.  Harvey responded to

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 30**

the interrogatory about the statute of frauds that

> Plaintiff's records and other evidence will confirm the accuracy of this belief as to Plaintiff's conduct.  The document in question conforms other facts alleged herein. And the parties have evidence indicating that the invoice was paid as discussed above and that no rights were conveyed to Plaintiff. The parties also have no evidence that Defendant 'accepted' the terms or conveyance of rights advanced in Plaintiff's Complaint.

App. 236-237.  The Contract is the signed writing giving Cooper ownership and the right to display, publish and otherwise use the tapes.  The language give Cooper consent to use of Harvey's name and image in publishing the Videos.  Harvey sought to enforce his version of the Contract is the State Court lawsuit and agreed to be enjoined in accordance with Cooper's understanding of the Contract.

108.    Harvey alleges that the terms of the Contract are indefinite.  Document 123, ¶ 69. Harvey responded an interrogatory stating "Plaintiff's records and other evidence will confirm the accuracy of this belief as to Plaintiff's conduct.  Even if the document in question were considered a contract, the terms of it appear on the document."  App. 237-238.  The terms of the Contract, included the disputed provisions, are simple and clear.  In accordance with the stated terms of the Contract, Harvey paid Cooper and vested Cooper with ownership of the tapes taken pursuant to the Contract, with the right to publish or use the tapes, and Cooper taped performances.  The parties evidence no uncertainty about the terms of the Contract.  Harvey is bound by the terms of the Contract, which are definite.

109.    Harvey's claim that the Contract is unconscionable attacks consideration. Unconscionability is a question of law.  In discovery, Harvey swore,

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct. Even if the document in question were considered a contract, and if
> Plaintiffs arguments were considered, it has no evidence that anyone would agree to what
> it is contending in this lawsuit. The parties, third parties, and experts can confirm the
> facts necessary for this defense, if any.

App. 238.  Unconscionability is to be determined in light of a variety of factors existing on

March 20, 1993, which aim to prevent oppression and unfair surprise; in general, a contract will

be found unconscionable if it is grossly one-sided.  The only conceivable unfairness towards

Harvey is the reality that the tapes may be more valuable in today than in 1993.

110.    Harvey alleges unjust enrichment.  Document 123, ¶ 71, 101.  Unjust enrichment

occurs "when one person has obtained a benefit from another by fraud, duress, or the taking of

an undue advantage."  In response to discovery, Harvey swore:

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. The parties, third parties, and experts can
> confirm the facts necessary for this defense, if any.

App. 238-239.  Knowingly entering into the Contract precludes the defense of unjust enrichment.

The terms of the contract were not unjust on March 20, 1993, moreover, Cooper and Harvey

negotiated the terms of the Contract and performed.  If the Contract is unjust, Harvey sued to

enforce the Contract in the State Court lawsuit even though the Contract was unjust to him.

Under Harvey's theory, a person who purchased a house in 1993 which appreciated has been

unjustly enriched.  Harvey and Cooper negotiated and entered into a valid contract, and Cooper

seeks to enjoy the benefits of the Contract, that is not unjust.

111.    Harvey's lack of consideration defense, Document 123, ¶72, requires that on

March 20, 1993, the consideration for the Contract was "so inadequate as to shock the

conscience, being tantamount to fraud."  It is Harvey's burden to prove a lack of consideration in

the face of the presumption that consideration exists.  Harvey swears:

COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 32

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. The parties, third parties, and experts can
> confirm the facts necessary for this defense, if any.

App. 239-240.  Cooper taped performances as agreed.  Harvey's only complaint of unfairness is

that the Videos have value today that they did not have in 1993.  The parties negotiated the

terms, performed under the Contract and Harvey sued Cooper in 1998 on the Contract.  The lack

of consideration defense fails.

112.    Consideration did not fail.  Document 123, ¶ 73.  Failure of consideration occurs

when, because of some supervening cause arising after the contract is formed, the promised

performance fails.  Cooper taped the performances as agreed and Harvey paid as agreed, thus,

the consideration did not fail.  Harvey swore

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. The parties, third parties, and experts can
> confirm the facts necessary for this defense, if any.  App. 240.

113.    The conditions precedent did not fail.  Document 123, ¶ 74, 81.  The Contract

creates one condition precedent for Cooper, taping of performances at the Comedy House.  A

condition precedent is an event that must happen or be performed before a right can accrue to

enforce an obligation.  In response to the Interrogatory requesting the basis for the allegations

regarding the failure to satisfy conditions precedent, Harvey swore

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. The parties, third parties, and experts can
> confirm the facts necessary for this defense, if any.

App. 240.  As agreed in the Contract, Cooper taped performances at the Comedy House from

March 1993 until the Comedy House closed in 1994.  App. 4, 43-44.  The Contract place one

condition precedent on Cooper, the taping of performances at the Comedy House, and that

condition has been satisfied.

114.    Harvey alleges that Cooper failed to fulfill conditions precedent, Document 123, ¶ 74:  (a) delivery of the tapes to Harvey, and (b) by failing to obtain from Harvey agreements to permit Cooper to sell Harvey videos and/or to use Harvey's name, image or likeness.  Harvey's purported conditions precedent are not found in the Contract.

115.    Harvey would be able to assert the defense of accord and satisfaction, Document 123, ¶ 83, if Harvey had fulfilled his obligations under the agreement that he and Cooper entered in 1999 in the form of the obligations imposed by the Agreed Order in the State Court lawsuit, but Harvey did not fulfill his obligations as evidenced by his attorney's communications with Google and MVD.  In response to discovery, Harvey swore:

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, Defendant's obligations, if any, have been satisfied and Plaintiff has been paid. The parties, third parties, and experts can also confirm the facts necessary for this defense, if any.  App. 248.

116.    Harvey asserts defenses of First Amendment, privilege and justification, Document 123, ¶ 89.  Harvey responded to an Interrogatory as follows

> Plaintiff has rendered no services or provided no consideration that would entitle him to what is being sought. Even if Plaintiff had a valid contract, Defendants action were justified.  .

App. 250-251.  Cooper and Harvey performed under the Contract, which gave Cooper ownership of the tapes and consented to Cooper's right to publish the Videos.

117.    The First Amendment defense is inapplicable to this case as the offending communications with Google and MVD's attorney were not made to the media and Cooper is not a public official or public figure.

118.     The justification and privilege defenses fail for a lack of good faith.  Harvey
entered into the Contract and sued on the Contract in the State Court lawsuit.  Harvey sought
injunctive relief in the State Court lawsuit based on the required personal knowledge verification
provided by his attorney, Ricky Anderson, who swore to having personal knowledge of the facts
stated in the Original Petition, which includes the allegations related to the Contract.  Harvey's
lawyers agreed to the Agreed Order with Harvey's approval.  Statements that Cooper has no
rights to the Videos were not made in good faith in the context of the Contract, the State Court
lawsuit and the Agreed Order.  Harvey's attorney, who made the contacts with Google and
MVD, verified the Original Petition which relied upon the Contract and his law firm agreed to
the Agreed Order.  In the face of such knowledge, Harvey did not act in good faith.

119.     Harvey affirmatively pleads that contributing, concurring, intervening and/or
superseding fault of Cooper and/or other persons other than Harvey caused Cooper's damages.
Document 123, ¶ 90.  It is assumed that this allegation seeks a finding on proportionate
responsibility under Tex. Civ. Prac. & Rem. Code, Chapter 33 regarding proportionate
responsibility, which only applies to tort claims.  The elements of proportionate responsibility
are (a) determination of percentage of responsibility, (b) based on negligent act or omission or
other conduct or activity that violates an applicable legal standard by (c) plaintiff or a responsible
third person, (d) for the responsible third person, a designation of the responsible third person by
filing a motion to leave to designate the responsible third person or or before the 6oth day before
the trial date.  The issue is not properly before the Court.  Cooper did not commit a negligent act
or omission or engage in other conduct or activity related to Harvey's tortious interference with
business relations.

120.     Harvey alleges unclean hand and *in pari delicto* ("in equal fault").  Document

123, ¶ 91.  In response to discovery regarding unclean hands, Harvey swore

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct.  Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. Even if Plaintiff had a valid contract, his
> underhanded acts of attempting to use Defendant's property prevent him from recovering
> years later.

App. 251-252.  Cooper performed under the Contract and the Contract gives Cooper ownership

of the tapes and the right to publish products made with the tapes.  Harvey seeks to have the

Court judge the 1993 contract by conditions that exist today rather than in 1993.  Harvey testified

that he and Cooper communicated about Harvey purchasing the videos and about them working

together to sell the videos.  App. 66-67.  The Agreed Order recognizes Cooper's right to act.  It

cannot be said that Cooper engaged in wrongful conduct by "attempting to use" the Videos.

121.     The assertion that Cooper's rights are somehow reduced because he allegedly had

an "improper motive" is meaningless.  Harvey responded to discovery stating

> Plaintiffs records and other evidence will confirm the accuracy of this belief as to
> Plaintiffs conduct. Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. Plaintiffs conduct of suing Defendant is
> brought for the improper motive of forcing money from Defendant.

App. 253-254.  Cooper performed under the Contract.  Cooper attempted to sell the tapes to

Harvey and to publish the Harvey videos with Harvey's assistance.  App. 66-68.  As the Contract

give Cooper ownership of the tapes and the right to publish, these attempts to not evidence

improper motive.

122.     The allegations that the "claims are barred, in whole or in part, by truth,

knowledge, and good faith" relate to the independent torts for the tortious claim.  Document 123,

¶ 93.  Ricky Anderson's statements to Google and MVD are not true or made in good faith

because, as the person who  verified Harvey's Original Petition, Anderson had direct, personal

knowledge of the true facts and his law firm in the State Court lawsuit recognized on behalf of

Harvey the fact of Cooper's rights to own and publish the videos.  App. 157-160, App. 163-185.

Harvey, through Anderson, did not act in good faith.

123.     The parties' representations are contained in the Contract.  App. p. 1.  To prove

fraudulent inducement, Document 123, ¶ 95, Harvey must prove  (a) Cooper made a material

misrepresentation; (b) Cooper knew the representation was false or made the representation

recklessly without any knowledge of its truth; (c) Cooper made the representation with the intent

that the other party would act on that representation or intended to induce the party's reliance on

the representation; (d) Harvey suffered an injury by actively and justifiably relying on that

representation, and (e) Harvey entered into the parties' contract based on Cooper's false

representations. The provisions of the Contract are not false.  Fraudulent inducement fails.

124.     Harvey claims in paragraph 96 of his Answer that Cooper suffered no damages.

Cooper has estimated his damages to be at least $40,000,000.  Document 29, ¶ 56.  Cooper has

not moved for summary judgment as to the amount of damages.  Cooper's proof of his

expenditures to prepare the Harvey videos and of MVD's offer of a $25,000 advance show the

fact of Cooper's damages.  App. 8.

*Harvey's Counter Claims.*

125.     The elements of invasion of privacy are (a) defendant appropriated plaintiff's

name or likeness for the value associated with it; (b) plaintiff can be identified from the

publication; and (c) there was some advantage or benefit to defendant.  Consent is a defense to

the claim and Cooper received Harvey's consent in the Contract.  App. p. 1.

126.     No damages for invasion of privacy are recoverable because Harvey does not seek

damages recoverable for the cause of action.  Recoverable damages for invasion of property are

mental anguish, loss of earning capacity and nominal damages, none of which are sought

Harvey.  Document 123, ¶ **116.**

127.     Harvey's claim of a violation of right to publicity, also referred to as

misappropriation, fails because consent is a defense.  App. p. 1.

128.     Harvey alleges conversion of the tapes made by Cooper.  However, under the

Contract, Cooper has exclusive ownership of those tapes, App. p. 1, thus, conversion did not

occur by Cooper's possession of the tapes.

129.     Harvey does not seek the damages allowed for conversion, the lost value of the

property or (b) have the property returned and recover damages for loss of use during the

property's detention.  Harvey sued for neither.

130.     The previous discussions of the terms and conditions of the Contract, and the

validity of the Contract as a binding agreement, negate Harvey's claims.

131.     Harvey seeks as damages lost profits, injury to reputation and quantum meruit.

Other than as stated, Harvey has not alleged the damages permitted for his causes of action, and

cannot prove the proper damages he claims.

132.     The only damages for violation of right to privacy, misappropriation, for which

Harvey has made a claim is lost profits.

133.     The elements of lost profits are (a) a reasonable certainty, (b) by competent

evidence, (c) that profit would have been made.  Harvey's damages proof consist of his

Interrogatory response, App. 258, Interrogatory No. 1,[8] that

> By exercising dominion and control over the 120 hours of video recording, Harvey was
> deprived of the opportunity to review is previous work for possible incorporation into his

---

[8]     The Interrogatory asked "In your first Answer, Document 32, paragraph 118, allege [sic] you suffered
damages of lost profits, state in detail the factual bases for this claim, including in your answer the name, address,
phone number and summary of knowledge possessed of each person identified."

commercial work, and was also prevented from being able to commercially exploit any of this material himself.  Persons with knowledge of these facts include Harvey, McDonald and, to some extent, Plaintiff himself.[9]

134.    Harvey's expert did not advance a theory of lost profits, but a theory of what Harvey would have been paid in other circumstances, rejecting the general unjust enrichment analysis of requiring defendant to return what unjustly received.  App. 270-271.  Harvey has proven that he did not suffer damages.

135.    Regarding Harvey's alleged to injury to reputation, Harvey answered

Plaintiff admits to having over a hundred (100) conversations with people throughout the country regarding Harvey allegedly reneging on a so-called promise to pay him $5 million for Harvey's recorded works. In addition, during many of these conversations, Plaintiff also contended that Harvey gave copyrightable rights to Plaintiff that Harvey did not give. Persons with knowledge of these facts include Harvey, McDonald and all of the people to whom Plaintiff made calls. As a result of these accusations, many people became nervous about their current and future business relationships with Harvey.  App. 258-259, No. 2.

136.    Regarding Harvey's alleged damage claim of quantum meruit, Harvey swore in his response to an interrogatory, App. 259:

By exercising dominion and control over the 120 hours of video recording, Harvey was deprived of the opportunity to review is previous work for possible incorporation into his commercial work, and was also prevented from being able to commercially exploit any of this material himself.  Persons with knowledge of these facts include Harvey, McDonald and, to some extent, Plaintiff himself.[10]

137.    Harvey seeks a permanent injunction pursuant to Fed. R. Civ. P. 65(d)(1)(C). The applicable elements are that Harvey demonstrate (a) that he has suffered an irreparable

---

[9]     Request for Production No. 1, Exhibit K, requested documents related to damages of lost profits as alleged in Document 123, ¶ 118, and Harvey responded "Defendant and/or Plaintiff have already produced documents that are responsive to a reasonable and objective reading of this request. To the extent other documents become available, they will be produced."

[10]    Request for Production No. 3, Exhibit K, requested documents related to damages of lost profits as alleged in Document 123, ¶ 118, and Harvey responded "Defendant and/or Plaintiff have already produced documents that are responsive to a reasonable and objective reading of this request. To the extent other documents become available, they will be produced."

injury; (b) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (c) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (d) that the public interest would not be disserved by a permanent injunction.  Harvey cannot prove a claim that supports injunctive relief.  The remedies for Harvey's claims are well established, he has just not alleged to proper relief and is not able to proof the relief he purports to seek.

138.    Harvey seeks preliminary seizure of the Harvey tapes under 17 U.S.C. § 503(a). Permanent relief, not sought by Harvey, is found in 17 U.S.C. § 503(b).  Harvey has no claim for permanent relief as he has not raised a claim for a violation of exclusive copyrights, 17 U.S.C. § 501(a) or for permanent relief.

*Cooper's Defenses to Harvey's Counterclaim*

139.    Harvey alleges torts against Cooper.  The Texas statutes of limitation for torts is two years from the date of accrual, Tex. Civ. Prac. & Rem. Code § 16.003.  Document 111, ¶ 29. The elements are the passage of time and when a cause of action accrued.  A cause of action accrues when some legal injury occurs.

140.    The purported act of conversion occurred when Cooper did not deliver the tapes to Harvey, which occurred, at the latest in 1994 when taping stopped.  App. p. 4, 43-44.

141.    Harvey provides no evidence of when the alleged torts of invasion of privacy and violation of publicity occurred.  In response to requests for production on the right to privacy (response:  "Will supplement"), efforts to protect his name, and efforts to protect his name and image as a comedian (referral made to trademark documents and the Google Take Down Notices), Harvey provided nothing.  App. 134.

142.    The elements of *laches*, Document 111, ¶ 32, are (a) an unreasonable delay in

asserting a right or claim; (b) that is not excused, and (c) that results in undue prejudice to

defendant.   As discussed with regard to the statute of limitations, Harvey, at best, waited from

2000 to seek relief, and, in that period, Cooper prepared to market and sell the video he had

created from the tapes made of Harvey's performances.  App. 8.

143.    In response to an interrogatories asking about the defenses of *laches*, waiver,

disclaimer, and accord and satisfaction, Harvey responded to each

> Plaintiff's records and other evidence will confirm the accuracy of this belief as to
> Plaintiff's conduct. Plaintiff has rendered no services or provided no consideration that
> would entitle him to what is being sought. Even if Plaintiff had a valid contract, the delay
> in his conduct in arguing these rights prevents him from recovering years later. The
> parties, third parties, and experts can also confirm the facts necessary for this defense, if
> any.  App. 218-220.

As discussed previously, the Contract is supported by consideration.

144.    Harvey statements only makes sense if (a) the videos are valuable as claimed by

Cooper, and (b) the 1993 Contract is reviewed in the context of circumstances existing in 2014-

2015.  Cooper seeks a vindication of the rights that he received in 1993 under the terms of the

Contract.  It is not clear what Harvey is attempting to say with his response that "Even if Plaintiff

had a valid contract, the delay in his conduct in arguing these rights prevents him from

recovering years later."  That statement does not support any of the defenses raised by Harvey.

145.    The elements of unclean hands or *in pari delecto,* Document 111, ¶ 33, are (a)

seeking equitable relief, (b) guilty of unlawful or inequitable conduct, (c) regarding the issue in

dispute.  As discussed above, Harvey has taken contradictory positions as it has suited his current

purposes.  At this point, Harvey has accepted and rejected (a) the existence of the Contract, (b)

Cooper's ownership of the videos, and (b) Cooper's rights to publish the videos.  That is not

equitable conduct.  Cooper has consistently asserted and exercised his rights to publish the

videos.  Harvey has blocked Cooper's efforts to publish the videos.  App. 9-10, 146-154.

146.    The elements of equitable estoppel, Document 111, ¶ 34, are (a) one party, (b) due to the fault of another, (c) was induced, (d) to change his position for the worse.  See discussion of unclean hands.

147.    The elements of waiver, Document 111, ¶ 35, are (a)  an intentional relinquishment of (b) a known right, or intentional conduct inconsistent with claiming the right. See discussion of unclean hands.

For the reasons stated, Joseph Cooper requests that the Court grant his Motion for Partial Summary Judgment.

**Respectfully submitted,**

**BENNETT, WESTON, LAJONE & TURNER, P.C.**

**s/ J. Michael Weston**

_____

J. Michael Weston
SBN: 21232100
jmweston@bennettweston.com
Casey S. Erick
SBN: 24028564
cerick@bennettweston.com
1603 LBJ Freeway, Suite 280
Dallas, TX 75234
214.691.1776
Fax:  (214) 373-6810

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Brief in Support of Cooper's Motion for Partial Summary Judgment was served on all counsel through the electronic filing on this 1st February 2016.

s/ J. Michael Weston

_____

**COOPER'S MOTION FOR SUMMARY JUDGMENT - Page 42**