**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JOSEPH COOPER,** | § | |
| | § | |
| *Plaintiff,* | § | |
| **v.** | § | **CAUSE NUMBER: 3:14-cv-04152-B** |
| | § | |
| **BRODERICK STEVEN "STEVE" HARVEY** | § | |
| | § | |
| *Defendant.* | § | |

<u>**AFFIDAVIT OF BRODERICK STEVEN HARVEY**</u>

BEFORE ME, the undersigned notary public, on this day personally appeared Broderick Steven Harvey, who being duly sworn, deposed and stated:

1.      My name is Broderick Steven Harvey.  I am over 18 years of age, of sound mind and am competent to make this affidavit. I have firsthand personal knowledge of facts stated in this affidavit and they are true and correct.

2.      I met Mr. Cooper in or about 1993.  I had a club in Dallas, Texas where I performed.  It was known as "Steve Harvey's Comedy Club."

3.      At some point in 1993, I decided that I wanted to record my acts during each show in order to develop promotional material.

4.      In order to accomplish my desire to record my performances, I met with Mr. Cooper, who agreed to record the shows by video.  He charged me $2,000.00 for the video work that he agreed to do.  Mr. Cooper was paid in full for his work.

5.      During the time he was videoing my shows, Mr. Cooper never presented me with a release of any other form or contract by which I agreed to release any rights to the footage videoed at my comedy club.  It was always my intent and it was understood that the material would be released to me for use as study material to develop future acts. To a certain extent I

would also use it as promotional in-house, looping excerpts of my performances before and after shows at Steve Harvey's Comedy Club.

6.      I have reviewed what Mr. Cooper claims is a video contract that he and I allegedly negotiated and signed on March 20, 1993. I did not sign this document and my signature is not affixed to the instrument beneath the alleged terms of the invoice, where one would normally sign a legal document.

7.      I have also never signed any document, or made any oral agreement with Cooper, that would give Mr. Cooper permission to exploit my name, image, likeness, or identity.

8.      Also, contrary to his representation, I never made any other "agreements" with Mr. Cooper during the time he was performing videotaping services in 1993.

9.      Mr. Cooper has represented that he has filmed over 120 hours of my performances during conversations and in his affidavit suggests that he has filmed 104 hours of my performances. I cannot attest to this because he has never produced any videos or film for me to personally view.

10.     Although I paid Mr. Cooper to record my performances, he has never given me any of the tapings I paid for, nor has he allowed me to view the footage.

11.     I have never made any type of oral agreement or arrangement with Mr. Cooper giving him the right to copy and distribute the videotapes of my performances or to use my name, likeness, image, or identity for any purpose.

12.     I never asked Mr. Cooper to "delay" releasing any footage from my performances. One of the main reasons is that I never gave him permission to release any footage and therefore would have no reason to ask him to "delay" releasing it.

13.     Any discussions I had with Mr. Cooper since 1993 involved me making clear to him that there was no agreement allowing him to copy, sell, or distribute the videotapes.

14.     Mr. Cooper has initiated a campaign to essentially extort me, coerce me, and embarrass me as I started to build my entertainment career.  He has made numerous calls to my agents, lawyers, employers, and potential employers to make disparaging remarks about these performances and how provocative they were.  He has used these tapes to threaten and harass me for years.

15.     Mr. Cooper has communicated how sensitive these tapes he has are and how they could affect my career.  He even offered to "sell" me my own material for Five Million Dollars ($5,000,000), so that I may "save myself the embarrassment of their release."

16.     I never entered into an agreement oral, written, or otherwise to buy or purchase these tapes from Mr. Cooper.  I have never given him permission to use, sell, or distribute these tapes for his commercial exploitation of my name, likeness, or identity or for any other purpose.

17.     Indeed, I have not entered into any type of oral or written agreement, legal or otherwise that would allow Mr. Cooper to sell, distribute or market any videos.

18.     The State Court lawsuit that was initiated in 1998 involved the parties extending the length of a temporary restraining order to allow the parties an opportunity to prepare the arguments for a full hearing.  However, the lawsuit was non-suited by the parties on or about October 13, 2000.  No oral or written agreements arose out of the State Court lawsuit or the non-suit of it that would permit Cooper to sell or distribute the video tapes or to commercially exploit my name, likeness, or identity for any purpose.

19.     Mr. Cooper has tracked my career since I left Dallas and the comedy club.  Each time I have been hired for a television show, Mr. Cooper would contact the owners or principals

to inform them of the potentially embarrassing material and or tapes and attempt to have them influence me to pay him for the tapes.

20.     As for the value of the video, tapes, or film, I do not believe they are worth $20,000,000.00 to $30,000,000.00 and no information has been presented to substantiate Mr. Cooper's claim.

21.     Contrary to his representation, I have never agreed or offered to pay Mr. Cooper $5,000,000.00 for the tapes of my performances.

22.     Any contact made by me or my representatives with Music Video Distributors was initiated by their representatives.  We merely notified them that we have no relationship with Joseph Cooper.  Any arrangement that they have or had with Mr.  Cooper or decisions they made as to whether to do business with Cooper is not based on any other representations made by me or my representatives.

Broderick Steven Harvey, Affiant

**SWORN AND SUBSCRIBED TO BEFORE ME** on September 25, 2015, to certify which witness my hand and seal of office.

NOTARY PUBLIC IN AND FOR
THE STATE OF Georgia

My Commission Expires:

May 2018

Printed or Stamped Name:

<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                      DALLAS DIVISION

 4   JOSEPH COOPER,                )
                                   )
 5              Plaintiff,         )
                                   )
 6   VS.                           )   CAUSE NUMBER:
                                   )   3:14-CV-04152-B
 7   BRODERICK STEVEN "STEVE"      )
     HARVEY,                       )
 8                                 )
                Defendant.         )
 9

10

11

12   *************************************************

13           VIDEOTAPED ORAL DEPOSITION OF

14                   JOSEPH COOPER

15                 OCTOBER 23, 2015

16   *************************************************

17

18        On the 23rd day of October, 2015, at 10:24 a.m.,

19   the videotaped oral deposition of JOSEPH COOPER was

20   taken at the instance of the Defendant, before

21   Michelle L. Munroe, Certified Shorthand Reporter

22   in and for the State of Texas, at Bennett, Weston,

23   Lajone & Turner, P.C., 1603 LBJ Freeway, Suite 280,

24   Dallas, Texas, pursuant to Federal Rules of Civil

25   Procedure and the agreement hereinafter set forth.
</pre>

1                    A P P E A R A N C E S

2

    FOR THE PLAINTIFF:
3           Mr. J. Michael Weston
            BENNETT, WESTON, LAJONE & TURNER, P.C.
4           1603 LBJ Freeway
            Suite 280
5           Dallas, Texas   75234
            214.691.1776   telephone
6           855.741.1776   fax

7

8    FOR THE DEFENDANT:
            Mr. Aubrey "Nick" Pittman
9           THE PITTMAN LAW FIRM, P.C.
            100 Crescent Court
10          Suite 700
            Dallas, Texas   75201
11          214.459.3454   telephone
            24.853.5912   fax
12          pittman@thepittmanlawfirm.com

13

            Mr. Wendle Van Smith
14          ANDERSON AND SMITH
            7322 Southwest Freeway
15          Suite 2010
            Houston, Texas   77074
16          713.622.5522   telephone
            713.995.1499   fax
17          wendle1v@flash.net

18

19   ALSO PRESENT:
            Will Rain, Video Technician
20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2                  THE VIDEOGRAPHER:  We are now on the
 3   record for the video deposition of Joseph Cooper.
 4   The time is 10:24 a.m. on October 23, 2015.  This is
 5   the matter of Joseph Cooper versus Broderick Steven
 6   "Steve" Harvey, Cause Number 3:14-CV-04152-B.  This
 7   is being held in the United States District Court for
 8   the Northern District of Texas, Dallas Division.
 9                  The court reporter is Michelle Munroe
10   and the videographer is Will Rain, both are
11   representatives of DepoTexas.
12                  Now, will counsel please state their
13   appearances for the record.
14                  MR. WESTON:  My name is Michael
15   Weston.  I'm appearing for Joseph Cooper.
16                  MR. PITTMAN:  Aubrey "Nick" Pittman on
17   behalf of the defendant.
18                  JOSEPH COOPER,
19   having been first duly sworn, testified as follows:
20                  EXAMINATION
21   BY MR. PITTMAN:
22       Q.   Will you state your full name for the
23   record?
24       A.   Joseph Cooper.
25       Q.   Do you have a middle name?
```

1        A.    Edward.

2        Q.    What's your date of birth?

3        A.    11/27/56.

4        Q.    And what's your current home address?

5        A.    2029 Town East Boulevard.

6        Q.    Do you have a business address?

7        A.    No.

8        Q.    Are you currently employed?

9        A.    Yes, uh-huh.

10       Q.    Who do you work with?

11       A.    I'm independent.  I'm a video producer.

12       Q.    Sir, can you give us an account of your

13   educational history since high school?

14       A.    Just high school, only finished high

15   school.

16       Q.    Have you attended any type of vocational

17   training or business training-type courses since

18   high school?

19       A.    No.

20       Q.    Did you attend any type of courses that

21   taught you anything about videography?

22       A.    No.

23       Q.    How did you learn videography?

24       A.    Well, I began to do work independently and

25   I just found my way.  I worked with people at the TV

Joseph Cooper

```
 1        A.   Yes.   Yes, it's -- it's involved in -- in
 2   the contract.
 3        Q.   And you did not produce any of those
 4   contracts in this lawsuit, correct?
 5        A.   Well, I produced some.   I don't know
 6   exactly which ones.
 7        Q.   Well, I'm speaking of between 1984 and
 8   1992, you did not produce a contract, correct?
 9        A.   No, I don't think I did.   Those are way
10   back older ones.
11        Q.   What was your primary source of income
12   between 1984 and 1992?
13        A.   Video production.
14        Q.   And did you have a company at that time?
15        A.   Yes.
16        Q.   What was the company called?
17        A.   Close Up Video Productions.
18        Q.   Now, that -- that -- that's not a
19   corporation, correct?
20        A.   No, sir.
21        Q.   That's a d/b/a?
22        A.   Yes, sir, uh-huh.
23        Q.   And how do you report income?
24        A.   How?
25        Q.   Yes, sir.
```

1      A.    It's back in '84.

2      Q.    Is that your full-time occupation?

3      A.    Yes.

4      Q.    Have you ever had any employees?

5      A.    No.  No.

6      Q.    Have you ever had any partners?

7      A.    No.

8      Q.    What's the business of Close Up Video?

9      A.    Just producing videos; corporate videos,

10   civic, social, and TV commercials for small business

11   owners.

12     Q.    Do you have a specialty?

13     A.    Specialty?

14     Q.    Yes, sir.

15     A.    No, just covering all those services.

16     Q.    Now, in -- in the 1984 to, say, 1992 time

17   frame --

18     A.    Yes, sir.

19     Q.    -- did you ever do any video of any

20   stand-up comedians?

21     A.    Yes, uh-huh, yes.

22     Q.    Who between 1984 and 1992?

23     A.    Oh, I had a number of -- they're not

24   famous people.  These are all people going into

25   talent shows and stuff like that.  They're not

```
 1        A.    Well, not -- not -- not listed from a --
 2   from a program.  See, when we're doing shows like
 3   fashion shows, civic programs, there is an agreement
 4   between my -- myself and the person who hired us
 5   that we will sell videos to the audience.
 6        Q.    Is that -- is that in the -- your video
 7   contract?
 8        A.    Yes.
 9        Q.    Okay.
10        A.    Yes.
11        Q.    And that's my question, I guess.  And we
12   can look at one in a second.  But --
13        A.    Uh-huh.
14        Q.    -- if there's nothing in the video
15   contract that says that you're going to sell the
16   videos or CD's, then that means that that wasn't
17   part of the agreement, correct?
18        A.    Well, it's not discussed, no, if it's not
19   something we need to do.
20        Q.    Now, you have -- you have reported income
21   from Close Up Video each year since 1992 --
22        A.    Uh-huh.
23        Q.    -- correct?
24        A.    Uh-huh.
25        Q.    Is that correct?
```

Joseph Cooper                                                                                    59

1         Q.    Have you had any other type of experience

2    besides experience you say you have in negotiating

3    your recording contracts, do you have any other

4    experience in negotiating any type of entertainment

5    contracts?

6         A.    No, sir.

7         Q.    Have you ever negotiated a contract where

8    somebody was giving up their copyrightable works?

9         A.    Not to my knowledge.

10        Q.    Have you ever taken any -- any classes or

11   courses on how to interpret terms within a contract?

12        A.    No, sir.

13        Q.    You have never testified in a case about

14   what a contract means, have you?

15        A.    No, sir.

16        Q.    Have you ever sued anyone else besides

17   Mr. Harvey in -- as it relates to your video

18   recording services?

19        A.    No, sir.

20        Q.    Now, you have been sued before?

21        A.    Yes, sir.

22        Q.    On how many occasions have you been sued?

23        A.    Once.

24        Q.    Who was that?

25        A.    That was way back in 2000.

1    just guest performers.

2         Q.   Now, when -- when you talked to Mr. Harvey

3    on March 20th, 1993 --

4         A.   Yes, sir.

5         Q.   -- what price did you quote for him for

6    the work you were going to do?

7         A.   I told him $2,000.

8         Q.   And that -- that was based on your -- your

9    looking at the club, correct?

10        A.   Yes, sir.

11        Q.   Understanding what was going to be

12   required --

13        A.   Uh-huh.

14        Q.   -- correct?  Correct?

15        A.   Yes, sir.

16        Q.   Understanding exactly what was going to be

17   required of you in terms of postproduction?

18        A.   Yes, sir.

19        Q.   And based on your evaluation, you made a

20   quote to Mr. Harvey that you could do all of this

21   work for $2,000 --

22        A.   Yes, sir.

23        Q.   -- is that correct?

24        A.   Uh-huh.

25        Q.   And what was the total contract price?

```
 1        A.    $2,165.

 2        Q.    Okay.  Now, did you ever -- after you left

 3   there on March 20th, did you ever send Mr. Harvey

 4   anything in writing summarizing your understanding

 5   with him?

 6        A.    No.  No.

 7        Q.    And you -- you believe that the

 8   discussions you had with him on March 20th were

 9   memorialized in some written document, correct?

10        A.    Yes, uh-huh.

11        Q.    And that is what you're calling the video

12   contract --

13        A.    Yes, sir.

14        Q.    -- is that right?

15              Now, when you -- when you went out to

16   Mr. Harvey's shop, did you take a video contract

17   with you?

18        A.    When I did what, sir?

19        Q.    When you went to Steve Harvey Comedy

20   House --

21        A.    Uh-huh.

22        Q.    -- did you take a video contract with you?

23        A.    Oh, yes.

24        Q.    Okay.

25        A.    Uh-huh, uh-huh.
```

Joseph Cooper

```
 1          Q.   And so the -- the -- the video contract

 2   that you took with you, that was a blank document?

 3          A.   Yes, sir, uh-huh.

 4          Q.   Who prepared or drafted that template for

 5   you?

 6          A.   Oh, that was a company that prints them

 7   for me.

 8          Q.   It's called New England Business Services?

 9          A.   Yes, sir.

10          Q.   And -- and that also called NEBS --

11          A.   Yes.

12          Q.   -- is that right?

13          A.   Uh-huh.

14          Q.   N-E-B-S?

15          A.   Yes, sir.

16          Q.   As part of -- or strike that.

17               Do you have to have a membership in NEBS?

18          A.   No.

19          Q.   As part of the arrangement you had with

20   NEBS, did you provide the language for them to put

21   on the business form?

22          A.   No.

23          Q.   This is something that they --

24          A.   Uh-huh.

25          Q.   -- prepare?
```

1      A.    Yes, sir.

2      Q.    And I just -- I just want to ask you about

3   the two checks that are on Exhibit 5.

4      A.    Uh-huh.

5      Q.    The two checks that are listed on

6   Exhibit 5, are those for payments of the video

7   invoice contract that's Exhibit 1?

8      A.    For the video contract Exhibit 1, yes.

9      Q.    Okay.  And, sir, just -- just so that

10   we're clear -- and again, going back on Exhibit 1,

11   it shows a balance that was due.

12          Exhibit 1 was paid in full by Mr. Harvey

13   and/or his Comedy House, correct?

14      A.    Yes, sir.

15      Q.    So there's no balance outstanding on the

16   video services that you rendered for Mr. Harvey,

17   correct?

18      A.    No.

19      Q.    Is that correct?

20      A.    Yes, sir.

21      Q.    Now, besides the video services that we

22   have -- that we have discussed in Exhibit 1 --

23      A.    Yes, sir.

24      Q.    -- what other services do you say you

25   rendered for Steve Harvey or the Steve Harvey Comedy

```
 1   that you were supposed to provide -- let's start
 2   with the section that says "services include."
 3        A.    Kind of hard to read.  The first part I
 4   can't see.
 5        Q.    It says "produce," doesn't it?
 6        A.    Sir?
 7        Q.    Doesn't it say "produce"?  The first word
 8   says "produce," doesn't it?
 9        A.    I can't see on this one, actually.  Okay.
10   Looks like, Produce videotapes of promotional
11   materials from the -- I can't read it, actually.
12        Q.    "Facility," doesn't it?
13        A.    Sir?
14        Q.    Doesn't that say "facility"?
15        A.    On this one, I can't see it.  It didn't
16   duplicate good.  Yeah, it's "facility."
17        Q.    Sir, let me read and you tell me if I'm
18   reading it wrong.
19        A.    Okay.
20        Q.    It says, Services include, quote, produce
21   videotapes of promotional material from the facility
22   including interior shots, audience, stage
23   performers -- stage performances, and graphics with
24   official logos, period.  Tape will also include
25   names, dates and music --
```

1     A.    Uh-huh.

2     Q.    -- sound tracks, period.   Tapes will be

3   looped for continuous play before, during and after

4   show performances.

5     A.    Yes.

6     Q.    Did I read that correctly?

7     A.    Yes, sir.

8     Q.    And that's what you agreed to?

9     A.    Yes, sir.

10     Q.    And it -- in terms of the tapes, it's got

11   "VHS" checked and "other" checked?

12     A.    Yes.

13     Q.    Do you see that?

14     A.    Uh-huh.

15     Q.    What "other" were you referring to?

16     A.    The broadcast tapes.

17     Q.    Okay.   And did you use any official logos?

18     A.    Yes.

19     Q.    What logos did you use?

20     A.    The official logos that Mr. Harvey gave

21   me.

22     Q.    Okay.   So they're not logos that you

23   produced?

24     A.    No.

25     Q.    They're logos that he provided to you,

Joseph Cooper

1    correct?

2         A.    Logos he provided to me to put --

3         Q.    And those were his copyrighted logos,

4    correct?

5         A.    Yes, sir.

6         Q.    Now, in terms of the first part of this,

7    it says, Produce videotapes of promotional material.

8         A.    Uh-huh.

9         Q.    When, if at all, did you produce the

10   videotapes of promotional material?

11        A.    Well, I started producing the first night.

12        Q.    Okay.

13        A.    Uh-huh.  First night I started shooting.

14   It was all to be so we can use the content to put

15   together the promotional materials, including

16   commercials.

17        Q.    Okay.  Now, did you ever provide

18   Mr. Harvey with -- let's take 1993.

19             In 1993 after this document was signed by

20   you on March 20, 1993 --

21        A.    Yes, sir.

22        Q.    -- did you ever provide Mr. Harvey with

23   the raw footage that you taped?

24        A.    No.

25        Q.    Have you ever to this day provided

1    Mr. Harvey with -- with all of the raw footage that

2    you produced?

3         A.    No, that's not the agreement.

4         Q.    Have you ever provided Mr. Harvey with --

5    with the -- with all of the videotapes that you

6    subsequently edited and post-produced?

7         A.    No.

8         Q.    Now, can you -- can you read into the

9    record or do you need me to read into the record the

10   additional services that are requested in Exhibit 1?

11        A.    Well, my copy, again, this one didn't

12   duplicate that well.

13        Q.    Well, you and I are reading from the same

14   copy.

15        A.    Sir?

16        Q.    You and I are reading from the same copy.

17        A.    Well, as you can see, that one didn't --

18   you can't hardly see it.  If you can read it, I can

19   confirm, you know, if that's what it is.  But

20   it's...

21        Q.    Okay.  So it looks like it says, Video

22   footage from KKDA Apollo Night, buffet and --

23        A.    Lobby --

24        Q.    Yes.

25        A.    -- area.  Yeah, lobby area.

1    Q.   -- lobby area, mingling with Mr. Harvey --

2    A.   And guests.

3    Q.   -- and guests.  Business networking

4    footage.

5         Do you see that?

6    A.   Yes, sir.

7    Q.   Okay.  So those were the additional

8    services you were to perform, correct?

9    A.   Some of them.

10   Q.   Well, those were additional services

11   that's in Exhibit 1, correct?

12   A.   Yes, sir, uh-huh.

13   Q.   And you don't have any other document

14   besides Exhibit 1 that lists the services that you

15   were supposed to provide to the Steve Harvey Comedy

16   House or Mr. Harvey, correct?

17   A.   No, sir.

18   Q.   Is that correct?

19   A.   Yes.

20   Q.   Now, in terms of the additional services,

21   the video footage from KKDA Apollo Night, so on and

22   so forth, and the mingling in the lobby area, did

23   you videotape that?

24   A.   Yes.

25   Q.   Did you ever produce any videotapes of

Joseph Cooper

```
 1   that mingling and the KKDA Apollo Night?

 2        A.   Yes.

 3        Q.   And did you provide that to Mr. Harvey?

 4        A.   No, sir, that's not the agreement.

 5        Q.   Okay.  And, in fact, to this very day you

 6   have not provided that footage to Mr. Harvey,

 7   correct?

 8        A.   No, sir.

 9        Q.   Is that correct?

10        A.   No, sir.

11        Q.   That's not correct?  Is it correct that

12   you have not provided it?

13        A.   The footage, yeah, was at the club, yes.

14   I didn't hand it to him but we -- we used it at the

15   club.

16        Q.   My question is:  Have you provided that

17   video footage to Mr. Harvey?

18        A.   Yes.  At the club, uh-huh.

19        Q.   How did you provide it to him?

20        A.   Well, we would -- anything we had to play

21   in the club, we would play it in the club.  I would

22   give it to the DJ.  He controls all the video in the

23   back.  Yeah, he controlled all that.

24        Q.   And did you -- did you provide a physical

25   copy of that to Mr. Harvey?
```

Joseph Cooper

```
 1          A.    To his worker, Tony.  Yeah, he was the man
 2     in charge of the video.
 3          Q.    So --
 4          A.    That's who he told me to give it to.
 5          Q.    So in terms of the footage --
 6          A.    Yes, sir.
 7          Q.    And I -- and I just want to make sure I'm
 8     understanding.
 9                There are sort of two separate aspects of
10     your videotaping.
11          A.    Okay.
12          Q.    Okay.  One is the actual performance on
13     the stage?
14          A.    Uh-huh.
15          Q.    And the other is sort of the crowd area --
16          A.    Yes, sir.
17          Q.    -- where -- where you're recording maybe
18     in between --
19          A.    Uh-huh.
20          Q.    -- performances --
21          A.    B-roll.
22          Q.    -- correct?
23          A.    Yes, sir.
24          Q.    B-roll.
25                It's your testimony that the A-roll you
```

1    never gave to Mr. Harvey, correct?

2        A.   Well, I gave him finished products of both

3    A-roll and B-roll.  I mean, I gave him finished

4    products.  That's what I gave him.

5        Q.   When did you give him finished product?

6        A.   Well, back when we were working on it.  We

7    did a number of promotional videos and commercials,

8    a number of them.

9        Q.   Okay.  I'm speaking of the footage.

10       A.   No, the footage I own.

11       Q.   Okay.

12       A.   Uh-huh.

13       Q.   Well, that's -- that's not my question.

14       A.   Okay.

15       Q.   My -- my question is:  Did you ever give

16   Mr. Harvey the footage of the performances that you

17   taped?

18       A.   Are you talking copies or original?

19       Q.   Well, let -- let's start with the

20   original.

21       A.   No, sir.

22       Q.   Did you give him -- have you ever given

23   Mr. Harvey -- you said you had 120 hours of footage.

24       A.   Uh-huh.

25       Q.   Have you ever given Mr. Harvey 120 hours

Joseph Cooper                                                              114

```
1    of footage?

2         A.   No, sir.  That's not the agreement.

3              MR. PITTMAN:  Objection;

4    nonresponsive.

5         Q.   You haven't give it to him, correct?

6         A.   No, sir.

7         Q.   Okay.  And have you ever given Mr. Harvey

8    all of the footage of the B-roll?

9         A.   No, that's original footage.

10        Q.   Have you ever given Mr. Harvey a copy of

11   the 120 hours you taped?

12        A.   That's not the agreement, no, sir.

13        Q.   So you have not?

14        A.   No, sir, not the agreement.  We never

15   agreed -- he never wanted it.  We never agreed to

16   that.

17        Q.   Sir, I'm just -- I'm just asking you.

18        A.   Oh, okay.  Yes, sir.

19        Q.   That's for a jury to decide.

20        A.   Okay.

21        Q.   Okay.  My -- my question is:  You did

22   not -- you have never given Mr. Harvey 120 hours of

23   video, correct?

24        A.   No, sir.

25        Q.   Is that correct?
```

Joseph Cooper

```
1            A.    Yes, sir.

2            Q.    And you have never given Mr. Harvey all of

3    this B-roll, correct?

4            A.    It's original footage, no, sir.

5            Q.    You have not given it to him?

6            A.    The original footage, no, sir.

7            Q.    Is it correct you have not given it to

8    him?

9            A.    No, sir -- oh, it's correct that I

10   haven't, yes, sir, uh-huh.

11           Q.    Okay.  Now, in -- in the language that's

12   on Exhibit 1, do you see where it says -- okay, it

13   says, The studio reserves the right to use the

14   original tape and/or reproductions for display,

15   publication or other purposes.

16                 Correct?

17           A.    Yes, sir.

18           Q.    And this is not your language --

19           A.    No, sir.

20           Q.    -- is that right?

21                 Did anyone ever explain to you what it

22   meant by "display"?

23           A.    No, sir.

24           Q.    Did anyone ever explain to you what it

25   meant by "publication"?
```

Joseph Cooper

1       A.    Copies.   We would sell -- his introduction

2   of performers that would come on stage, we would use

3   his introduction.   Steve would introduce everybody

4   who came up.   So we would use the clip of his

5   introduction only, not footage of him.

6       Q.    Okay.   So --

7       A.    Yeah, introduction only.

8       Q.    Okay.   So in 1994, you did not sell any

9   footage of Mr. Harvey's performances?

10       A.    Right.

11       Q.    In 1995, did you sell any footage of

12   Mr. Harvey's performance?

13       A.    No, sir.

14       Q.    In 1996 did you prepare and sell any

15   videos of Mr. Harvey's performances?

16       A.    No, sir.

17       Q.    In 1997 did you prepare or sell any videos

18   of Mr. Harvey's performances?

19       A.    No, sir.

20       Q.    And then in 1998, you made contact with

21   the person who was then Mr. Harvey's manager and

22   told him that you were wanting to sell some video of

23   Mr. Harvey's performances, correct?

24       A.    No, sir.

25       Q.    Did -- do you recall in 1998 you contacted

Joseph Cooper

1    received it.

2         Q.   Okay.  Well, let me read you what you

3    wrote.

4         A.   Okay.

5         Q.   On January 16, 1998, Cooper contacted

6    Harvey's manager, Juan Hull, to tell Harvey of the

7    finished product and Cooper's desire to market,

8    promote, and share the earnings and finish the work

9    that Cooper had started.

10             Is that true?

11        A.   Yes.

12        Q.   Okay.  Then your next sentence here says,

13   Harvey called back and asked Cooper to send him the

14   project so he could see, quote, see what we had,

15   close quote.

16             Does that refresh your recollection?

17        A.   Yeah, if that's what I wrote there.   I

18   wrote that back in -- when it happened so...

19        Q.   Well, I'm asking you what happened.

20   Did --

21        A.   Yeah.

22        Q.   Did you talk to Juan Hull first or did you

23   talk to Mr. Harvey first?

24        A.   I'm not sure what I talked to -- I know I

25   sent the package.  That, I know.

```
 1                  So you didn't --

 2          A.    I offered it to him.

 3          Q.    Okay.

 4          A.    Uh-huh.

 5          Q.    So you made an offer to Mr. Harvey in July

 6     of 1998, correct?

 7          A.    Yes.

 8          Q.    And he didn't accept it?

 9          A.    No.

10          Q.    Is that correct?

11          A.    Okay.  This is what Ricky Anderson said.

12     That's what he said.  Mr. Harvey never said that.

13          Q.    Well, that wasn't my question.

14                My -- my question to you is that the --

15     the written agreement of 50/50 that you offered to

16     Mr. Harvey in July of 1998, he did not accept that,

17     did he?

18          A.    I don't have a written agreement --

19          Q.    Well, you --

20          A.    -- for 50/50.

21          Q.    No.  Here your writing --

22          A.    Uh-huh.

23          Q.    -- says, I didn't say I had a written

24     agreement, I offered that to you.

25          A.    Right.
```

Joseph Cooper

```
 1              Do you see that?
 2        A.    Yes.
 3        Q.    That's correct, isn't it?
 4        A.    Yes.
 5        Q.    And in the last paragraph, Mr. Rowe says
 6   that, Mr. Harvey allegedly agreed to purchase the
 7   tapes in October 1998.
 8              Do you see that?
 9        A.    Yes.
10        Q.    Is that when you say it happened?
11        A.    Yes.
12        Q.    And again, you did not file a lawsuit?
13        A.    No.
14        Q.    Four years after 1998, you did not file a
15   lawsuit?
16        A.    No, sir.
17        Q.    Sir, isn't it true that since the very
18   start in 1998 when you made that call, Mr. Harvey
19   and his attorneys and his manager have always told
20   you that -- that Mr. Harvey did not give you
21   authorization to -- for you to sell those tapes?
22        A.    No.
23        Q.    Is there anything in writing where
24   Mr. Harvey, his attorney, or his manager have
25   indicated to you that you have the right to sell
```

Joseph Cooper

```
 1        Q.    Any other breach?

 2        A.    And 2010.

 3        Q.    Any other breach?

 4        A.    Not off the top of my head.

 5        Q.    Okay.  So the -- the breach that you

 6   allege happened in 1998 -- and again, all I'm

 7   speaking of now is breaches of what you consider to

 8   be Exhibit 1.

 9        A.    Uh-huh, yes, sir.

10        Q.    How did Mr. Harvey breach it in 1998?

11        A.    Well, he first told me we were working

12   together and then he went and sneaked and filed

13   the -- a case.

14        Q.    Sir, I'm simply talking about Exhibit 1.

15        A.    Yeah, that's what I mean.

16        Q.    Okay.

17        A.    That's what I'm talking about.

18        Q.    Now, where in Exhibit 1 does it say y'all

19   are going to work together?

20        A.    We were already working together, sir.

21        Q.    Where in Exhibit 1 --

22        A.    It's not in the exhibit.

23        Q.    Okay.  So --

24        A.    Yeah, but we were working together.

25        Q.    So all I'm asking you about now is
```

1          A.    Okay.

2          Q.    Now, at some point you started having

3    conversations with Music Video Distributors,

4    correct?

5          A.    Uh-huh.  Yes, sir.  Yes, sir.

6          Q.    And in paragraph 39, is that what you're

7    referring to --

8          A.    Yes, sir.

9          Q.    -- when you say, The proposed licensing

10   and distribution agreement?

11         A.    Yes, sir.

12         Q.    Now, Music Video Distributors reached out

13   to Mr. Harvey because you told them to, correct?

14         A.    No, sir.

15         Q.    Well, you told them about the litigation,

16   didn't you?

17         A.    Sir?

18         Q.    You told Music Video about your previous

19   litigation with Mr. Harvey about whether you owned

20   the rights, correct?

21         A.    No.

22         Q.    Okay.  Look at the last sentence in

23   paragraph 39.  Can you read that, sir, into the

24   record?

25         A.    Cooper disclosed to Music Distributors his

Joseph Cooper

```
 1    previous litigation with Harvey.
 2         Q.   And -- and you knew that this would lead
 3    to Music Video Distributors having a conversation
 4    with Mr. Harvey's attorney, didn't you?
 5         A.   No.  No, I just disclosed -- when I'm
 6    talking to people about distribution, I disclose
 7    everything to them.
 8         Q.   You -- you disclosed that there's a
 9    dispute as to whether you had the rights, correct?
10         A.   Yes.
11         Q.   And so it didn't surprise you, did it,
12    sir, that Music Videos wanted to talk to a lawyer
13    about this dispute?
14         A.   Well, no, all -- all distributors are
15    going to do due diligence, of course, yeah, I
16    expected that.
17         Q.   Okay.  So -- so it didn't surprise you
18    that there was a conversation between Mr. Anderson
19    and Music Video Distributors' attorney, did it?
20         A.   Yes.
21         Q.   It -- it surprised you that --
22         A.   Yes, it did, that he told them what he
23    told them.
24         Q.   Sir, let me finish my question.
25         A.   Okay.  I'm sorry.  Go ahead.
```

Joseph Cooper

```
 1   telling you what you needed to do.

 2          And you cut off that conversation and did

 3   not produce the rest of it; isn't that true, sir?

 4       A.   I don't know what -- what you're actually

 5   talking about.  I would have to see what you're

 6   talking about, sir.

 7                  (Exhibit 32 marked.)

 8       Q.   Let me give you what I have marked as

 9   Exhibit 32.

10          Do you recognize Exhibit 32?

11       A.   Yes.

12       Q.   What is it?

13       A.   It's a poster display of the videos.

14       Q.   Where was it used?

15       A.   Well, it hadn't been developed.  It hadn't

16   been used yet.  It was to be used in the marketing.

17       Q.   Well, you developed it in 2013?

18       A.   Do what, sir?

19       Q.   You developed it in 2013 or before?

20       A.   I can't remember when it was, but it was

21   developed.

22       Q.   Did you send it to Mr. Harvey and ask for

23   his permission to use that?

24       A.   No.  No, sir.

25                  (Exhibit 33 marked.)
```

Joseph Cooper

1      Q.   Hand you a copy of what's marked as

2  Exhibit 33.

3      A.   Uh-huh.

4      Q.   What is that?

5      A.   That's the Internet -- that's a page from

6  the Internet from their website.

7      Q.   And this is something that you were using

8  in 1999, correct?

9      A.   Yes.

10      Q.   And the website address

11  www.steveharveyvideos --

12      A.   Uh-huh.

13      Q.   -- that's a website that you control,

14  isn't it, sir?

15      A.   Yes.

16      Q.   And these pictures are of Mr. Harvey,

17  correct?

18      A.   Sure.

19      Q.   And here you say, Joseph Cooper and Steve

20  Harvey teamed up.

21           Correct?

22      A.   Yes.

23      Q.   Did you ever send this to Mr. Harvey and

24  ask for permission to use his name in the website?

25      A.   I didn't need to.

```
 1          Q.   So you did not?

 2          A.   No, sir.

 3          Q.   Did you ever ask Mr. Harvey for permission

 4     to use his name and pictures in this ad?

 5          A.   I didn't need to.

 6          Q.   So you did not?

 7          A.   No, sir.

 8          Q.   And again, the -- the only place where you

 9     believe it indicates that you have the right to use

10     his name or image is in Exhibit 1?

11          A.   Uh-huh.

12          Q.   Is that true?

13          A.   Yes.  That's the governing document.

14                    (Exhibit 34 marked.)

15          Q.   Let me give you a copy of what I have

16     marked as Exhibit 34.

17               Do you recognize Exhibit 34?

18          A.   Yes.

19          Q.   What is it?

20          A.   That's an order page on the commercials.

21          Q.   And the address that's listed for the

22     payment, whose address is that?

23          A.   That's an old address I had.

24          Q.   Old one of you, correct?

25          A.   Yes.
```

304

1       Q.   And this ad had Mr. Harvey's name,

2  correct?

3       A.   Sure.

4       Q.   Has his picture, correct?

5       A.   Sure.

6       Q.   And you didn't ask for his permission --

7       A.   I didn't need to.

8       Q.   -- to use this?

9       So you didn't ask for it?

10      A.   No, sir.

11      Q.   Sir, at some point you started trying to

12  sell Mr. Harvey's videos to other people, correct?

13      A.   Meaning what?  I don't understand what

14  that question is.

15      Q.   Well, you tried to --

16      A.   You mean to other --

17      Q.   You tried to sell what you thought was

18  damaging and explosive footage to embarrass

19  Mr. Harvey, correct?

20      A.   Yes.

21      Q.   And that was your -- your -- your intent.

22  And the more damaging, salacious and explosive it

23  was, the better for you, correct?

24      A.   I was selling it to the tabloids.  That's

25  their market.

1  STATE OF TEXAS     )

2  COUNTY OF DALLAS )

3      I, Michelle L. Munroe, Certified Shorthand

4  Reporter in and for the State of Texas, certify that

5  the foregoing deposition of JOSEPH COOPER was

6  reported stenographically by me at the time and place

7  indicated, said witness having been placed under oath

8  by me, and that the deposition is a true record of

9  the testimony given by the witness;

10      That the amount of time used by each party at

11  the deposition is as follows:
        Mr. Pittman   -    5 hours, 40 minutes
12

13      I further certify that I am neither counsel for

14  nor related to any party in this cause and am not

15  financially interested in its outcome.

16      Given under my hand on this the 3rd day

17  of November, 2015.

18

19

20
                        _____
21                      Michelle L. Munroe, CSR No. 6011
                        Commission expires 12-31-15
22                      DEPOTEXAS, Registration # 459
                        SUNBELT REPORTING, Registration #301
23                      6500 Greenville Avenue
                        Suite 445
24                      Dallas, Texas  75206
                        214.373.4977  telephone
25                      214.363.7758  fax

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                  DALLAS DIVISION
 3   JOSEPH COOPER                    *
              PLAINTIFF,              *
 4                                    * CA NO. 3:14-CV-04152-B
     VS.                              *
 5                                    *
     BRODERICK STEVEN "STEVE" HARVEY  *
 6            DEFENDANT.              *
                                      *
 7
 8
 9          * * * * * * * * * * * * * * * * * * * * * * * *
10                  ORAL DEPOSITION OF
11           BRODERICK STEVEN "STEVE" HARVEY
12                  OCTOBER 26, 2015
13
            * * * * * * * * * * * * * * * * * * * * * * * *
14
15
16
17          ANSWERS AND DEPOSITION of BRODERICK STEVEN
18   "STEVE" HARVEY, a witness produced on behalf of the
19   Plaintiff, taken in the above styled and numbered cause
20   on the 26th day of October, 2015, before Lisa Simon, a
21   Certified Court Reporter in and for the State of Texas,
22   taken in the offices of Depo Texas, 1201 Elm Street,
23   Suite 5220, City of Dallas, County of Dallas, State of
24   Texas, in accordance with the Federal Rules of Civil
25   Procedure and Stipulations hereinafter set forth.
```

Joseph Cooper vs.
Broderick Steven "Steve" Harvey

Broderick Steven "Steve" Harvey
10/26/2015

```
1              A P P E A R A N C E S
2  MR. J. MICHAEL WESTON
   Bennett, Weston, Lajone & Turner, P.C.
3  1603 LBJ Freeway
   Suite 280
4  Dallas, Texas 75234
   (214)691-1776
5  jmweston@bennettweston.com
6  COUNSEL FOR THE PLAINTIFF
7
   MR. AUBREY "NICK" PITTMAN
8  The Pittman Law Firm, P.C.
   100 Crescent Court
9  Suite 700
   Dallas, Texas 75201-2112
10 (214)459-3454
   pittman@thepittmanlawfirm.com
11
   --AND--
12
   MR. WENDLE VAN SMITH
13 Attorney at Law
   7322 Southwest Freeway
14 Suite 2010
   Houston, Texas 77074
15 (713)621-5522
   wendlelv@flash.net
16
   COUNSEL FOR THE DEFENDANT
17
18
19
20
21 ALSO PRESENT:
22 Mr. Joseph Cooper
23
24
25
```

STEVEN H. GENTRY & ASSOCIATES, INC.   (214) 321.5333
5115 NORTH GALLOWAY AVENUE, SUITE 202, MESQUITE (DALLAS COUNTY) TEXAS 75150

Def.'s APP 041

5

```
 1                    P R O C E E D I N G S:

 2                THE REPORTER:  This the Oral Deposition

 3   of Broderick Steven "Steve" Harvey taken at Depo Texas,

 4   1201 Elm Street, Suite 5220, Dallas, Texas, 75270 on

 5   October 26, 2015.  The time is approximately 10:01 a.m.

 6   My name is Lisa Simon, with the firm of Steven H. Gentry

 7   & Associates, Inc., 5115 North Galloway Avenue, Suite

 8   202, Mesquite, Texas 75105.

 9                If counsel would please state their

10   appearances on the record.

11                MR. WESTON:  My name is Michael Weston.

12   I'm the attorney for Joseph Cooper.

13                MR. PITTMAN:  Aubrey "Nick" Pittman for

14   defendant.

15                MR. SMITH:  Wendle Van Smith for

16   defendant.

17           BRODERICK STEVEN "STEVE" HARVEY,

18   having been first duly sworn, testified as follows:

19                       EXAMINATION

20   BY MR. WESTON:

21        Q.   Please state your full name.

22        A.   Broderick Steven Harvey.

23        Q.   Are you also known as Steve Harvey?

24        A.   Yes, sir.

25        Q.   You're an entertainer?
```

Def.'s APP 042

6

Joseph Cooper vs.
Broderick Steven "Steve" Harvey

Broderick Steven "Steve" Harvey
10/26/2015

```
 1        A.    Yes, sir.
 2        Q.    Have you ever had your deposition taken
 3   before.
 4        A.    I don't think so.  Once in a divorce, yeah.
 5        Q.    The basic rules you know about a deposition,
 6   that the -- I'm going to be asking you questions.  You
 7   are speaking quietly today.  You need to keep in mind
 8   that the person you're really talking to is the court
 9   reporter.  She needs to be able to hear your answers.
10   Do you understand that?
11        A.    Yes.
12        Q.    And you're also doing very well already on one
13   of them.  You always need to answer questions out loud.
14   Huh-uh, huh-uh don't mean anything.  Say yes or no.
15        A.    Yes.
16        Q.    The other thing is, if you don't understand my
17   question, don't answer it.  If you want me to repeat the
18   question or there's something about the question you
19   can't answer, feel free to tell me you can't answer it.
20   Do you understand that?
21        A.    Yes.
22        Q.    The other thing is, sometimes I have a
23   tendency to interrupt.  I try very hard not to
24   interrupt.  I'd like you to do the same thing.  Let me
25   finish my question before you start answering it.  I
```

Def.'s APP 043

EDWARD SEAMAN

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

- - -

JOSEPH COOPER                  :
                               :
      v.                       : Case No. 3:14-cv-04152-B
                               :
BRODERICK STEVEN "STEVE"       :
HARVEY                         :


- - -

Tuesday, November 3, 2015


- - -


Deposition of EDWARD SEAMAN, taken at the

offices of MVD Entertainment Group, 203 Windsor Road,

Pottstown, Pennsylvania 19464, on the above date,

beginning at 2:00 p.m., before Brad Tratenberg, Court

Reporter and Notary Public.


- - -

EDWARD  SEAMAN

```
                                                      Page 2
1    APPEARANCES:

2            CASEY S. ERICK, ESQ. (By telephone)
             of BENNETT, WESTON, LaJONE & TURNER, P.C.
3                1603 LBJ Freeway, Suite 280
                 Dallas, Texas  75234
4                (214)691-1776
                 cerick@bennettweston.com
5                    Counsel for Plaintiff

6
             AUBREY PITTMAN, ESQ.
7            of THE PITTMAN LAW FIRM, P.C.
                 100 Crescent Court, Suite 700
8                Dallas, Texas  75201
                 (214)459-3454
9                pittman@thepittmanlawfirm.com
                     -and-
10           WENDLE VAN SMITH, ESQ.
                 One Arena Place, Suite 2010
11               7322 Southwest Freeway
                 Dallas, Texas  77074
12               (713)621-5522
                 wendle1V@flash.net
13                   Counsel for Defendant

14           MICHAEL H. GOLLAND, ESQ. (By telephone)
             of HAMRICK & EVANS, LLP
15               2600 West Olive Avenue, Suite 1020
                 Burbank, California  91505
16               (818)763-5292
                 mgolland@hamricklaw.com
17                   Counsel for Music Video Distributors,
                     Inc.
18                           - - -

19

20

21

22

23

24
```

ZANARAS  REPORTING  &  VIDEO

Def.'s APP 045

EDWARD SEAMAN

Page 3

1                         I N D E X

2  WITNESS                                          PAGE

3  EDWARD SEAMAN

4      By Mr. Erick  -------------------------------    4

5      By Mr. Pittman  ---------------------------    28

6                          - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ZANARAS  REPORTING  &  VIDEO

Def.'s APP 046

EDWARD SEAMAN

Page 4

1                    MR. ERICK:  This is under the federal

2            rules.  So everyone will agree to use that.

3            Beyond that, I don't believe there are any

4            additional agreements.

5                              - - -

6                    ...EDWARD SEAMAN, having been duly

7            sworn, was examined and testified as follows:

8    BY MR. ERICK:

9    Q        Please state your name for the record.

10   A        Ed Seaman.

11   Q        Hi, Mr. Seaman.  My name is Casey Erick and I

12   represent the plaintiff, Mr. Joseph Cooper, in this

13   lawsuit against Steve Harvey.  Do you understand who I

14   am and who I represent?

15   A        I do.

16   Q        I want to ask some background questions about

17   you, beginning with your current position at Music Video

18   Distributors.  What is your title at the company?

19   A        I am the COO and the general manager.

20   Q        Just generally, what are some of your

21   responsibilities?

22   A        Overseeing the staff, looking out for products

23   acquisition, content.  I do the business and legal

24   affairs.  I oversee the finances.  I run the operation.

EDWARD SEAMAN

Page 18

1   Q       Any other examples that you thought of at the

2   time when you were evaluating this proposal with Mr.

3   Cooper?

4   A       No, not off the top of my head.

5   Q       Now, after this proposed agreement, after you

6   sent the proposed agreement to Mr. Cooper, did you have

7   a conversation with or did Mr. Harvey's attorney contact

8   you?

9   A       There was --

10               MR. GOLLAND:  Just answer yes or no,

11          Ed.

12               THE WITNESS:  I'm trying to understand

13          the question.  I remember that something in

14          the -- I think when we got to the point of

15          doing an advance, I asked for Mr. Cooper's

16          proof of the content and ownership.  And I

17          don't know that I felt great about what I saw

18          in that proof of ownership.  And I asked my

19          attorney to take a look.

20               MR. GOLLAND:  Ed, he just asked you if

21          Mr. Harvey's attorney talked to you.

22               THE WITNESS:  I'm sorry.

23               MR. GOLLAND:  The question was just did

24          you have a conversation with Mr. Harvey's

Def.'s APP 048

EDWARD SEAMAN

Page 19

1           attorney during that period?

2                   THE WITNESS:  No, I did not.

3     BY MR. ERICK:

4     Q       At any point, did Mr. Steve Harvey's attorneys

5     contact you about the proposed agreement with Mr.

6     Cooper?

7     A       Not to me, no.

8     Q       Did Mr. Harvey's attorney contact your

9     attorney?

10    A       I don't think they contacted my attorney, no.

11    Q       Did anybody communicate from your company to

12    Steve Harvey's attorneys?

13    A       Not from my company, no.

14    Q       From what company?

15    A       From Michael Golland.  And our attorney

16    contacted their attorney.

17    Q       I'm sorry.  When I said "you," I'm referring to

18    your company, not personally.  I mean the company's

19    attorney, Mr. Golland.

20    A       Okay.  Then yes.

21    Q       I need to clarify.  Mr. Harvey's attorneys

22    contacted Music Video Distributors' attorney at the

23    time, Mr. Michael Golland, correct?

24                  MR. GOLLAND:  I think the distinction

Def.'s APP 049

EDWARD SEAMAN

Page 20

1           is they didn't contact Music Video

2           Distributors.  Music Video Distributors through

3           my office contacted Mr. Harvey's attorney.  So

4           I think that's where the distinction is.

5                    THE WITNESS:  Correct.

6  BY MR. ERICK:

7  Q       Mr. Seaman, it's your understanding that your

8  attorney, or the company's attorney rather, contacted

9  Mr. Harvey's attorney?  True?

10 A       Correct.

11 Q       Now, why did your attorney contact Mr. Harvey's

12 attorney?

13                   MR. GOLLAND:  Objection.  That calls

14          for him to potentially divulge our

15          communication, which would be privileged.

16                   MR. ERICK:  All right.

17 BY MR. ERICK:

18 Q       Let's try this:  I believe you mentioned that

19 you were uncomfortable with proof of ownership or words

20 to that effect.  Was there something that you saw or

21 heard that made you inquire as to the company's attorney

22 about that issue?

23 A       Yes.  I mean, it's going back a little and I

24 haven't looked at the information again since this

Def.'s APP 050

EDWARD  SEAMAN

Page 21

1    occurred.  But what I saw in terms of Mr. Cooper's

2    paperwork did not seem rock solid to me.

3    Q        And what paperwork are you referring to?

4    A        It was some paperwork between Mr. Cooper and

5    Mr. Harvey for him recording the performance and

6    something about -- and I don't remember what

7    specifically but something gave me pause in terms of,

8    you know, the claimed ownership.

9    Q        Did you ever discuss the lawsuit that Mr.

10   Harvey filed against Joseph Cooper regarding that

11   agreement and enforcing that agreement?

12   A        With whom?

13                    MR. GOLLAND:  Discuss with whom?

14                    MR. ERICK:  Let me strike that.

15   BY MR. ERICK:

16   Q        Did you ever discuss the lawsuit that Mr.

17   Harvey filed against Mr. Cooper based on that agreement,

18   based on that contract?

19                    MR. GOLLAND:  Well, again, I'm going to

20          object.  Discuss with whom?

21                    MR. ERICK:  I'm sorry.

22   BY MR. ERICK:

23   Q        Did you discuss it with Mr. Cooper?

24   A        No, I don't think so.

Def.'s APP 051

EDWARD SEAMAN

Page 23

1    A        You know, as far as common practice, I would

2    think so.  I would think that anybody in this business

3    that wants to protect themselves makes sure that when

4    somebody says they own something, they really do, yes.

5    Q        Did you ever receive a cease and desist letter

6    from Mr. Harvey's attorneys?

7    A        No.

8    Q        Did your attorney contact Mr. Harvey's

9    attorneys?

10   A        Yes.

11   Q        And what did your attorney relate to you about

12   that conversation?

13              MR. GOLLAND:  Obviously he can't answer

14        that.  That's privileged.

15   BY MR. ERICK:

16   Q        Was the reason that was given to you by the

17   company's counsel or was the conversation with the

18   company's counsel the reason why MVD did not move

19   forward with the contract or agreement with Mr. Cooper?

20              MR. PITTMAN:  Objection, form.

21              THE WITNESS:  It was definitely a

22        contributing factor.

23   BY MR. ERICK:

24   Q        Had that conversation not occurred, would the

EDWARD SEAMAN

Page 24

1    company have gone forward with the agreement with Mr.

2    Cooper to market and distribute that footage?

3                   MR. PITTMAN:  Objection, form.

4                   THE WITNESS:  It's hard to say.  I

5            can't really answer that fairly.  I know that I

6            didn't feel good about things.  So, you know,

7            typically if I don't feel good about something,

8            I don't do it.  So I can't answer that question

9            fairly.

10   BY MR. ERICK:

11   Q      You would not send a proposed contract to

12   someone that you did not intend on having an agreement

13   with, is that fair?

14                   MR. PITTMAN:  Objection, form.

15                   THE WITNESS:  I hadn't seen his alleged

16           ownership when I sent that proposal.  So you

17           can do with that information as you wish.

18   BY MR. ERICK:

19   Q      What, if anything, did you hear or were you

20   told by Mr. Harvey's attorneys that --

21                   MR. GOLLAND:  He's not going to reveal

22           communications between him and me.

23   BY MR. ERICK:

24   Q      Are you aware, Mr. Seaman, if Mr. Harvey's

EDWARD SEAMAN

Page 25

1    attorneys threatened litigation if Music Video

2    Distributors entered into and completed that contract

3    with Mr. Cooper?

4                    MR. PITTMAN:  Objection, form.

5                    THE WITNESS:  We did not get a sense

6            and I didn't get a sense that the ownership was

7            secure and that there wouldn't be negative

8            repercussions to releasing the content.

9                    MR. ERICK:  Objection, nonresponsive.

10   BY MR. ERICK:

11   Q       The question is, did Mr. Harvey's attorneys

12   threaten to sue Music Video Distributors if it entered

13   into a contract to sell footage of Steve Harvey?

14                    MR. PITTMAN:  Same objection.

15                    THE WITNESS:  I don't know that they

16           threatened to sue us.

17   BY MR. ERICK:

18   Q       Did they say they're going to file a lawsuit if

19   you entered into a contract with Mr. Cooper?

20                    MR. PITTMAN:  Same objection.

21                    THE WITNESS:  I don't know if they

22           threatened to sue us or enter or start a

23           lawsuit.

24   BY MR. ERICK:

Def.'s APP 054

EDWARD SEAMAN

Page 28

1    BY MR. PITTMAN:

2    Q        Mr. Seaman, I'm here on behalf of Mr. Harvey

3    along with Attorney Wendle Smith.  And I just have a few

4    questions.  Some are follow-ups and some are just basic

5    questions.  Does your company own any copyrights?

6    A        Very small amount of copyrights we own.  We

7    mostly are licensing content.

8    Q        So you've dealt with contracts where it

9    involves somebody's copyright?

10   A        Yes.

11   Q        And you understand sort of the philosophy

12   behind protecting copyrights?

13   A        To some degree.

14   Q        And in your business, I think you said you were

15   also responsible for business and legal affairs.  Have

16   you dealt with situations where someone has questioned

17   whether either someone owns a copyright license or

18   someone is infringing someone's copyright?

19   A        Yes.

20   Q        So that's not unusual for your business,

21   correct?

22   A        No.

23   Q        Now, in terms of when someone approaches you

24   about a deal, and you've given us some, a little bit of

EDWARD SEAMAN

Page 29

1   the due diligence that you all do, but do you all do any

2   more due diligence in terms of looking to see whether a

3   copyright is registered?

4   A        Sometimes.  I can't say I do it all that often,

5   no.

6   Q        But you know that there is a process by which a

7   copyright owner can register a copyright?

8   A        Yes.

9   Q        And as it relates to Mr. Cooper, did he ever

10  present to you any registered copyright?

11  A        I don't think so.  Just thinking about the

12  paperwork I got and how I felt about it, I don't think

13  so.

14  Q        And I believe you said that at some point prior

15  to you even having a conversation with Mr. Golland about

16  him contacting Mr. Harvey's attorney, you had some

17  question about Mr. Cooper's rights of ownership?

18  A        Yes.

19  Q        And I believe you testified that Mr. Cooper

20  presented you with something.  Do you recall whether

21  that was some type of video recording invoice?

22  A        Yes, something like that.  That sounds correct.

23  And what I remember about it was that it definitely

24  wasn't like a smoking gun, assignment of rights or

EDWARD SEAMAN

Page 30

1    multiple usages.  And an invoice, that sounds like it

2    could be correct.

3    Q        And I believe you said you've been in this

4    business over 20 years?

5    A        Yes.

6    Q        You're able to make an assessment whether

7    there's something that gives a person a clear right to

8    do what he's asking you to do?

9    A        Yes.

10   Q        And when Mr. Cooper approached you, did he

11   actually send you one of the videos he had or did he

12   send you a snippet?  You don't recall?

13   A        I just don't remember.  I'm sure I saw

14   something.  I think the footage was older.  I think the

15   quality wasn't great.  I'm almost sure it was standard

16   def and not high def.  But I don't recall if it was the

17   whole thing or partial.

18   Q        And your recollection is that Mr. Cooper sent

19   you something, you were uncomfortable with it and you

20   sent it, you promptly sent it to your attorney to have

21   your attorney look at it?

22   A        Please repeat that for me.

23   Q        Mr. Cooper presented something to you where he

24   said, this evidences my ownership.  You were

Def.'s APP 057

EDWARD SEAMAN

Page 31

1   uncomfortable with it, so you presented it to your

2   attorney?

3   A        Correct.

4   Q        And that's sort of your standard process, if

5   you have questions about whether you have a right,

6   whether your company has a right to distribute

7   something?

8   A        Truthfully, most things I handle on my own.

9   And I wasn't sure about this one.  It didn't seem right.

10   So I sent it to our attorney.

11   Q        Now, when Mr. Cooper presented to you with this

12   opportunity, did you or anyone from your company look at

13   his financials to see what kind of business --

14   A        No.

15   Q        So you have no idea about his financial

16   situation?

17   A        No.

18   Q        And you had no idea about whether he had any

19   marketing or sales ability to assist in this project?

20   A        I didn't anticipate any marketing support.

21   From what I recall, I felt that that would need to come

22   from us, that I recall.

23   Q        Your company did not present a budget to Mr.

24   Cooper, did it?

EDWARD SEAMAN

Page 34

1   don't remember.

2   Q        Did you ever provide Mr. Cooper with any idea

3   of your company's annual revenue?

4   A        I don't think I would have disclosed that, no.

5   Q        And you wouldn't have disclosed to him your

6   annual revenue from product sales?

7   A        I don't think I would have disclosed that.

8   Q        You wouldn't have disclosed any revenue

9   generated from any type of streaming services?

10  A        I don't think I would have disclosed it.  I

11  could be mistaken on that.  But I don't think I would

12  have disclosed that.

13  Q        Now, as it relates to Mr. Golland having a

14  conversation with Mr. Harvey's attorney, is it your

15  understanding that Mr. Golland initiated the call to Mr.

16  Harvey's attorney?

17  A        That is my understanding.

18  Q        And do you know how Mr. Golland came to find

19  out the identity of Mr. Harvey's attorney?

20  A        I'm not sure.  I mean, probably through some

21  sort of web search.  I don't know.

22  Q        Mr. Cooper told us that he is the one who

23  provided the information to you or your attorney about

24  Mr. Harvey having a dispute about ownership.  Do you

EDWARD SEAMAN

Page 35

1    recall that?

2    A       There's a glimmer of something, like I said

3    earlier.  But I don't recall.

4    Q       But, needless to say, you did not receive a

5    call from Mr. Harvey's attorney, correct?

6    A       Correct.

7    Q       And you did not receive a letter or anything

8    from Mr. Harvey's attorney, correct?

9    A       Correct.

10   Q       And as far as you know, your attorney, Mr.

11   Golland, your company's attorney, Mr. Golland, did not

12   receive a call from Mr. Harvey's attorney?

13   A       I mean, it may have been a return call.  But

14   from my understanding, it was initiated by my attorney.

15   Q       Now, do you as a businessman, someone who is

16   sort of in this realm of copyright protection and

17   distribution of work such as this, do you have an issue

18   with an attorney who is contacting someone about what he

19   believes to be protecting his client's copyright

20   interests?

21   A       Do I have a philosophical problem with --

22   Q       Yes.

23   A       No.

24   Q       And do you think there was anything wrong with

ZANARAS REPORTING & VIDEO

Def.'s APP 060

EDWARD SEAMAN

Page 36

1    Mr. Harvey's attorney speaking to your attorney about

2    the rights that Mr. Cooper claimed to have?

3    A        I don't see anything wrong with that at all,

4    no.

5                     MR. PITTMAN:  I'll pass the witness.

6                     MR. ERICK:  The defense has rested.

7                     MR. GOLLAND:  I have no questions.

8                     (Deposition concluded at 2:50 p.m.)

9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

EDWARD  SEAMAN

Page 40

C E R T I F I C A T I O N

I HEREBY CERTIFY that the foregoing is
a true and correct transcript of the proceedings held in
this matter, as transcribed from the stenographic notes
taken by me on November 3, 2015.

_____

BRAD TRATENBERG

Court Reporter - Notary Public

(This certification does not apply to

any reproduction of this transcript, unless under the

direct supervision of the certifying reporter.)

Def.'s APP 062





DEFENDANT'S
EXHIBIT
32

Steve Harvey                                                    wysiwyg://10/http://www.dallasblack.com/steve/



Steve Harvey
**"LIVE, RAW & UNCENSORED"**
produced by Joseph Cooper

Joseph Cooper and Steve Harvey teamed up to capture these hilarious and
historical performances for the whole world to see!  The TV deals have Steve locked
down and totally forbidden to riff the truth and speak about things he says and does here.
The people have spoken.  They want the Real STEVE HARVEY!
True neckbone comedy...straight from the pot!!!!

**YOU'LL LAUGH & LAUGH**...*The Best Medicine*

Order online or Pick it Up at your Major Grocery,
Video and Major Mart Stores
A 5 Volume Set!
Volume I
**AVAILABLE NOW**

**Not Red Buttons, Not Red Skelton, Not Jonathan Winters, Not Jackie Gleason, & Not Jerry Lewis**



1 of 1                                                                    11/7/99 9:54 AM

COOPER.INITIAL.000245

DEFENDANT'S
EXHIBIT
33

DEFENDANT'S
EXHIBIT
34
Def.'s APP 065

CAUSE NO. 3:14-CV-04152-B

| | | |
|---|---|---|
| JOSEPH COOPER | § | IN THE UNITED DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | NORTHERN DISTRICT OF TEXAS |
| vs. | § | |
| | § | |
| | § | |
| BRODERICK STEVEN "STEVE" | § | DALLAS DIVISION |
| HARVEY | § | |
| | § | |
| | § | |
| Defendant. | § | |

§ § § § § § § § § § § § § § § § § § § § § § § § § § § § § § §

**EXPERT REPORT OF SCOTT A. BARNES, CPA, CFF, CGMA**
**DECEMBER 3, 2015**

Case 3:14-cv-04152-B   Document 156   Filed 02/01/16   Page 67 of 93   PageID 2851

## SUMMARY OF OPINIONS

1.      Based on my independent review and analysis of the documents produced in this matter, as well as, my review of the authoritative literature generally relied upon by financial and economic damages experts, I have reached the following opinions regarding the expert report and opinions of Michael A. Einhorn, Ph.D, ("Einhorn") dated July 10, 2015:

> A.  Mr. Einhorn's opinions and report are based on a material misapplication of the Yardstick[1] Methodology to quantifying lost sales and economic damages. The failure to properly apply the Yardstick Methodology results in his analysis being wholly unreliable and fatally flawed.

> B.  Mr. Einhorn's opinions with respect to any alleged lost sales, lost royalties and/or lost profits are speculative, erroneously derived and not based on any objective facts, figures or data.

Also, I have been requested to review the damage claims made by Defendant Steve Harvey in this matter related to the alleged claims of (1) invasion of privacy, (2) violation of right of publicity and (3) conversion.  If the trier of fact makes a finding of liability against the Plaintiff related to one or more of these claims, the defendant would generally be allowed an accounting of any sales of any DVDs or other products sold by the Plaintiff to assess the unjust enrichment received by the Plaintiff and/or other reasonable compensation for the use of Mr. Harvey's name, likeness or other personal attributes as a comedic artist.  Based on the documents produced in this matter an estimated fair market value of Mr. Harvey's services is $350,000.

---

[1] The Einhorn report dated July 10, 2015 refers to the methodology as a "Benchmark" approach, which is a term commonly used interchangeably with "Yardstick."  For purposes of my report, I have used the term "Yardstick," which is the terminology used within the authoritative and professional literature discussing the proper methodologies in assessing and quantifying lost sales and economic damages. See **Attachment 2** for a listing of certain professional and authoritative literature generally relied upon by financial experts.

## QUALIFICATIONS

2.         I am the Chairman of the Board and Chief Executive Officer of Barnes & Company and its affiliates.   In that capacity, I specialize in providing complex and sophisticated commercial litigation consulting services with respect to accounting, economic damages, forensic analyses and business valuation.   From June 2002 to March 2005, I was a Director with AlixPartners, LLC in Dallas, Texas where I also specialized in complex and sophisticated commercial litigation consulting.   Prior to joining AlixPartners, I was a shareholder with Jackson & Rhodes P.C. for a period of nine years where I also specialized in complex and sophisticated commercial litigation consulting services, general management consulting services and the audit of financial statements. From 1985 to 1990, I was an employee in the audit department of the international accounting firm of KPMG where I planned, conducted and supervised the audits of numerous multi-national privately held and publicly traded business entities.

3.         I am a Certified Public Accountant licensed in the State of Texas. Additionally, I have been awarded the Certified in Financial Forensics ("CFF") and Chartered Global Management Accountant ("CGMA") credentials by the American Institute of Certified Public Accountants.   From 2000 to 2005, I was also an Associate Editor of the *National Litigation Consultant's Review*, a national publication focused on peer discussions, reviews and publication of economic damage issues and methodologies within litigation and alternative dispute resolution matters.   Likewise, I am a member of the American Institute of Certified Public Accountants ("AICPA"), the Texas Society of Certified Public Accountants, the Association of Certified Fraud Examiners and the AICPA Forensic and Valuation Services practice section.   I have been performing consulting services assisting lawyers in accounting, fraud, finance, valuation and

Def.'s APP 068

economic damages related issues for the last 20 years.  I am fully aware of the methods and procedures utilized in the measurement of economic damages and the professional standards associated with the AICPA.  I have published numerous articles on the subject of economic damages, business valuation and professional standards in the performance of litigation services.  Additionally, I have written manuscripts utilized in training courses to educate both legal and accounting professionals in the methods and procedures to be utilized in the measurement of economic damages and the valuation of business enterprises.  Included as **Attachment 1** (attached hereto and incorporated herein by reference) are my curriculum vitae and litigation history.  I am being compensated at the rate of $400 per hour.  Other professionals who have supported my analysis in this matter are being compensated at $100 to $400 per hour.

4.        This report summarizes my findings and conclusions regarding the work performed in the above-styled case.  The services performed are consulting in nature.  The procedures applied in this case do not constitute an examination of any financial statements or financial data in accordance with generally accepted auditing standards, and as such, I am not issuing any opinions based on an audit or examination of any financial statements in accordance with generally accepted auditing standards.  I have formulated the opinions contained in this report based on an independent third party perspective, utilizing generally accepted approaches and methodologies for accounting, business valuation, economic damages, and financial analysis and the professional standards promulgated by the AICPA with respect to litigation consulting and valuation services.  Document discovery in this matter is ongoing and I may supplement my report.  Our efforts are also ongoing with respect to certain documentation procedures related to the analyses performed to date to identify any errors or omissions.  If these

Def.'s APP 069

documentation procedures identify any errors or omissions, I will supplement accordingly. I intend to review any supplemental expert reports and/or work product produced by the Plaintiff's expert.

5.      Note that throughout this report I have used the terms "we," "us," and "our" to refer to the work that was performed by me, at and/or under my direction.

6.      This report is prepared solely for Defendant counsel for their use in the above-described litigation. Neither this report nor any portion thereof may be used for any other purpose or distributed to any third party not associated with the above described litigation without the express written consent of Scott A. Barnes, individually, except as required by court order.

## SCOPE OF ENGAGEMENT

7.      In connection with the above styled litigation, I have been asked to independently review the documents produced to me in this matter, including the Einhorn expert report dated July 10, 2015. The purpose of my analysis was to review the methodologies applied and opinions reached by Mr. Einhorn.

8.      Additionally, I have been asked to independently review the alleged counterclaims made by the Defendant Steve Harvey related to his claims of (1) invasion of privacy, (2) violation of right of publicity and (3) conversion and the possible damages applicable to those claims assuming the trier of fact makes a finding of liability against the Plaintiff.

9.      My review has not included any assessment or opinions related to the alleged agreements at issue in this matter or the intellectual property rights inherent in the assignment and transfer of rights to develop and market derivative entertainment products in the media industry.

## DOCUMENTS CONSIDERED

10.      **Attachment 2** represents the specific documents produced to me or that were independently obtained and on which I have relied for purposes of my overall analysis.

11.      It is our understanding that discovery in this matter is ongoing and we may receive additional documents and deposition testimony.   Accordingly, I may supplement my report based on the production of additional documents.

## BACKGROUND SUMMARY

### Alleged Breach of Contract and Alleged Tortious Interference with Business Relationships

12.      Plaintiff alleges that on or about March 20, 1993, Joseph Cooper d/b/a Close Up Video Productions (collectively "Cooper") entered into a contractual arrangement with Steve Harvey Comedy House and Broderick Steven "Steve" Harvey (collectively "Harvey") for the performance of certain video recording and production of marketing materials of live comedic performances of Mr. Harvey and others.  Plaintiff also alleges that the contractual arrangement also included the alleged assignment and transfer of certain copyright and other intellectual property rights of Mr. Harvey, allowing Mr. Cooper the exclusive right to develop, produce, distribute and sell derivative video works from the live performances recorded.  The documents and legal filings produced in this matter indicated that the Defendant, Mr. Harvey, disputes such allegations.

13.      Plaintiff also allege that Mr. Harvey and his representatives tortiously interfered with Mr. Coopers prospective business relations, specifically related to an

Def.'s APP 071

**Edward Seaman Deposition Dated November 3, 2015 Pages 30 and 31(Lines 23 to 24 and Lines 1 to 10)**

Q. **Mr. Cooper presented something to you where he said, this evidences my ownership. You were uncomfortable with it,** so you presented it to your attorney?
A. **Correc**t.

Q. And that's sort of your standard process, if you have questions about whether you have a right, whether your company has a right to distribute something?
A. **Truthfully, most things I handle on my own. And I wasn't sure about this one. It didn't seem right.** So I sent it to our attorney.

38.        Mr. Seaman's deposition testimony indicates that the alleged License and Distribution agreement was at best a proposal dependent upon verifying, among other things, that Mr. Cooper possessed the rights to the video.   Mr. Coopers documentation presented to MVD appears to have raised concern among MVD management and therefore creating a significant barrier to the finalization of any discussions regarding a distribution agreement.   The failure of Mr. Cooper's documentation to satisfy MVD as to the rights of distribution results in no foundation, foreseeability and/or reasonable certainty with respect to any alleged economic damages.

**Defendant Steve Harvey Counterclaim**

39.        Mr. Harvey has made certain counterclaims against the Plaintiff in this matter for (1) invasion of privacy, (2) violation of right of publicity and (3) conversion. Generally, economic damages for invasion of privacy can include economic damages for harm to reputation and standing in the community, as well as, disgorgement of any profits realized by the Plaintiff for any unjust enrichment from the invasion of privacy. Likewise, economic damages for a violation of the right of publicity can generally include compensation for the value of the commercial use of one's identity and likeness and disgorgement of any profits realized by the Plaintiff from any unjust enrichment

Def.'s APP 072

received.  With regard to the claim of conversion, the general economic damage is the fair market value of the property improperly converted.

40.  It is my understanding from reviewing the documents and deposition testimony in this matter that the Plaintiff has attempted to sell DVDs based on the 1993 video at issue in this matter.  If the trier of fact makes a finding of liability against the Plaintiff related to one or more of the counterclaims, the Defendant would generally be allowed an accounting of any sales of any DVDs or other products sold by the Plaintiff to assess the unjust enrichment received by the Plaintiff and/or other reasonable compensation for the use of Mr. Harvey's name, likeness or other personal attributes as a comedic artist.  Based on the documents produced in this matter an estimated fair market value of Mr. Harvey's services is $350,000.

Respectfully submitted,

*Scott A. Barnes*

Scott A. Barnes, CPA, CFF, GCMA

# Attachment 1

Def.'s APP 074

## MR. SCOTT A. BARNES, CPA, CFF, CGMA

**EDUCATION**    M.B.A – A.B. Freeman School of Business, Tulane University, New Orleans, Louisiana – concentrations in finance, strategic management and economics

B.B.A. – Texas State University, San Marcos, Texas – concentration in accounting

**PROFESSIONAL CERTIFICATIONS/ BUSINESS AFFILIATIONS**

Certified Public Accountant, Texas
Certified in Financial Forensics, AICPA
Chartered Global Management Accountant, AICPA
American Institute of Certified Public Accountants (AICPA)
Texas Society of Certified Public Accountants
Association of Certified Fraud Examiners
Member of the AICPA Forensic and Valuation Services Practice Section
Former Associate Editor of *National Litigation Consultants' Review*

**PROFESSIONAL EXPERIENCE**

Mr. Barnes is a Certified Public Accountant who during the past 25 years has assisted corporations, investors and attorneys in assessing the financial issues surrounding complex and sophisticated accounting issues, merger and acquisition transactions, business valuation and industry and competitor analyses. He has extensive experience providing sophisticated commercial damage analyses and expert testimony for clients in a diverse range of industries, especially with respect to forensic analyses, intellectual property infringement, antitrust, lost profits, business interruption, contract disputes, business valuation, fraud, accounting, accounting malpractice and other complex commercial damage issues. In addition to commercial damage issues, Mr. Barnes has served on several boards of directors with an emphasis on newly emerging technologies. Mr. Barnes has served as the Chief Financial Officer for firms in several industries, including telecommunications and Internet access, software development, biotechnology, professional services and international fine art. Mr. Barnes' industry experience includes telecommunications, manufacturing, brokerage and securities, soft drink beverages, hospitality, airline maintenance and parts distribution, healthcare, software development, explosives, commercial construction, construction materials, venture capital,

Scott A. Barnes
Page 2

investment banking, cable television, Internet, transportation, fine art and government.

**RANGE OF EXPERIENCE**

**Intellectual Property Consulting Engagements**

Mr. Barnes has been retained as a consultant on numerous intellectual property engagements involving patents, trademarks/ trade dress, copyrights and trade secrets.

- Damage assessment for patent infringement with respect to the international telecommunications equipment market

- Valuation of the patents/technology of a semiconductor manufacturer concerning products in the telecommunication industry

- Valuation of patents and related royalty agreements in the medical equipment industry

- Assessment of the relevant market for consumer products in the medical equipment industry

- Analysis of patent infringement damages and reasonable royalty rates related to oil field equipment

- Assessment of copyright infringement damages with respect to computer software

- Assessment of lost profits and commercial damages related to trademark infringement in the hand-held computer game industry

- Relevant market analysis and lost profits analysis for a major manufacturer in the golf industry

- Assessment of lost profits and reasonable royalty rate with respect to the scientific equipment testing industry

- Assessment of copyright infringement damages with respect to the entertainment industry and screenplays

- Assessment of theft of trade secret damages related to lost profits and reasonable royalty

Def.'s APP 076

**Anti-Trust Consulting Engagements**

- Assessment of defendant's distribution costs and pricing strategy with respect to alleged market allocation behavior in the consumer products industry
- Analysis of plaintiff's lost profits for refusal to license and unfair competitive practices in the telecommunications industry

- Analysis of defendant's pricing strategy and analysis of average variable costs with respect to predatory pricing behavior in the explosive manufacturing industry

- Analysis of plaintiff's relevant market share and lost profits related to restraint of trade behavior in the golf equipment industry

- Analysis of relevant market and lost profits associated with the used automobile auction market.

**Other Commercial Litigation Consulting Engagements**

- Assessment of lost profits and commercial damages related to numerous breaches of contract disputes

- Assessment of lost profits and commercial damages related to numerous business interruption matters

- Assessment and analyses of reasonable discount rates to apply in lost profits and commercial damages matters

- Assessment of construction damages related to delays and breach of contract

- Assisted in the development of facts to defend against the U.S. Attorney claim of false claims violations and developed counter-claim damages

- Assessment of compliance with generally accepted accounting principles and generally accepted auditing standards

Def.'s APP 077

- Assessment of auditor and accountant compliance with professional standards of due care and compliance with AICPA Code of Professional Conduct

- Assisted a major class action plaintiff firm in the development of the facts concerning fraud allegations made against the firm
- Analysis of alter ego and single business enterprise claims

- Valuation of numerous businesses and business interests in litigation

- Analysis of lending practices and fees and interest charged to lenders in usury claims

**Forensic Analyses & Fraud Investigations**

- Performed forensic analyses and fraud investigations in over 300 matters involving tracing of transactions, analyses of transactions in conjunction with contractual terms, fraud investigations, Sarbanes-Oxley investigations and forensic reconstruction of financial statements.

**Business Valuation/Bankruptcy**

- The valuation of privately held business interests of over 500 legal entities, including corporations, partnerships, LLCs, family limited partnerships and special purpose entities.

- Valuation of distressed companies

- Preparation of solvency analyses in both bankruptcy and litigation

- Valuations in merger and acquisition scenarios

**SPEECHES/ PUBLICATIONS**    Author:

"The Supercomputer Industry, U.S. and Japanese Competitive Advantages"

"The Supercomputer Industry, The Birth of a Global Industry"

Def.'s APP 078

Scott A. Barnes
Page 5

"Patent Infringement Damage Theories and Practices"

"Corporate Value Creation–Corporate Management Approaches to Increasing Shareholder Value"

"Disaster Recovery – a Case Study in High-Tech Failure"

"Price Erosion Considerations in Patent Infringement Damage Calculations"

"Marketing and Staff Development"

"Tips for Addressing and Withstanding Daubert"

"A Review of the Business Valuation Bluebook"

"Appellate Court Guidance in the Determination of Price Erosion Damages in Intellectual Property Infringement Matters – *Crystal Semiconductor v. Tritech*"

"Considerations in the Valuation of Royalties and License Agreements Associated with Intellectual Property"

"Grain Processing Case Denies Lost Profit Damage Claims Despite Non Existence of Non-infringing Substitute"

"Trends in Challenging the Admissibility of Financial and Economic Expert Testimony"

"Consideration Leads to Credibility"

"Trademark Infringement Damages – Overview and Recent Case Developments"

A Review of *On-Trial – Lessons from a Lifetime in the Courtroom*

"Do Companies with Negative Earnings have Value?"

"Marketing Litigation Services"

"*Trigon Insurance Company v. United States of America*: A Review of the Interactions Between Consulting Experts and Testifying Experts"

Def.'s APP 079

Scott A. Barnes
Page 6

"A Review of *Effective Expert Testimony*"

"The Valuation of Trade Secrets in Litigation"

"Increased Use of Financial Experts in Mediation and Arbitration"

"Seven Tips for Quality Control in the Expert Report Process"

A Review of *Intellectual Property Law Damages and Remedies*

"Sarbanes-Oxley: A Forensic Accountants Best Friend"

AICPA Practice Aid 06-01 – "Calculating Intellectual Property Infringement Damages"

Presentations:

"Commercial Damages" 1997 AICPA Advanced Litigation Conference"

**LITIGATION SERVICES AND TESTIMONY**

Mr. Barnes has provided assistance in numerous litigation engagements, including expert testimony. A recent list of some of his litigation cases include:

Cobra Golf Incorporated vs. Cliff Cook Golf Company et al, United States District Court Southern District of California CA-95-1161 J (LSP)

Tesina S. Painter formerly d/b/a Fort Worth Leche Express vs. Medela, Inc., Beyond Conception, Inc. Scott Landow, Individually, Dallas County Civil Court CC-95-04403-A

Bridgeport Cable and Communications, Inc. vs. Deborah McCratic, Individually, Aaron Cable and Communications, Inc., In the 166th Judicial District Court of Dallas County, Texas 94-2181

Hubert, Hunt & Nichols, Inc. vs. H&G Heard, J.V. and Angiel Electrical Construction Corp, In the 298th Judicial District Court of Dallas County, Texas 95-11284M

Def.'s APP 080

Scott A. Barnes
Page 7

Archives of America vs. A&B Transfer & Storage Co., Inc. d/b/a
Armstrong Archives, In the 298th Judicial District Court of
Dallas County, Texas 96-04714

CBI Laboratories vs. United Chester Industries, In the 68th
Judicial District Court of Dallas, County, Texas 96-02342-C

Terry L. Schaffer vs. Tower Marketing, Inc., In the 134th Judicial
District Court of Dallas, Texas 97-07325-A

Aerotek, Inc. vs. Comat Software, Inc. et al, In the 134th Judicial
District Court of Dallas County, Texas 97-05323-G

Estate of Jewel Kimberlin vs. David S. Crockett & Company and
David S. Crocket, Individually, Probate Court No. 1 of Dallas
County, Texas

Ericsson, Inc. and Telefonaktiebolaget LM Ericsson vs.
Qualcomm Incorporated, In the United States District Court for
the Eastern District of Texas Marshall Division 2-96-CV183

Rodney Hand d/b/a Western & English Today vs. Equestrian
Retailer et al, In the 95th Judicial District Court of Dallas County,
Texas 97-09661

Chemd, Inc. d/b/a Texas Drug Warehouse vs. KPMG Peat
Marwick, L.L.P., In the 160th Judicial District Court of Dallas
County, Texas NO-34926-S

C.F.C. Reclamation and Recycling Services, Inc. vs. CompUSA,
Inc., In the 104th District Court Taylor County, Texas 21882-B

Collins Sales, Inc. and Roger Collins vs. Financial Security
Services, Inc., In the 139th Judicial District Court Hidalgo
County, Texas C-584-98-C

Funimation Productions, Inc. vs. ABC International Traders, Inc.
d/b/a MGA Entertainment, Arbitration, 71-133-00559-99

Century Products Company vs. Cosco, Inc., In the United States
District Court for the Northern District of Texas Dallas Division,
3:00-CV-0800-G

Scott A. Barnes
Page 8

R.O. Evans Pontiac-GMC vs. Winstar Communications, Inc., In
the U.S. District Court for the Northern District Dallas Division,
3-99-CV1150-P

MCI WorldCom vs. USA Connect, Inc., In the 160th Judicial
Court Dallas County, Texas 98-08096-H

C.A.R. Transport, Inc. vs. ADT Automotive Holdings, Inc., ADT
Automotive, Inc. Auction Transport, Inc., In the U.S. District
Court Northern District of Texas Dallas Division, 3-00CV0426-
M

Sunshine Mining & Refining Company vs. Ernst & Young, LLP,
In the County Court of Law No. 1 Dallas County, Texas, CC-00-
06081-A

Credit Suisse First Boston vs. Arthur Andersen, L.L.P. et al, In
the 162nd Judicial District Court Dallas County, Texas, 00-8654

North Dallas Enviroscape, Inc. vs. Rainforest Creations, Inc.,
U.S. District Court Eastern District of Texas Sherman Division,
4-00CV-388

Tom Cabe vs. EYE America, Inc. and INVICTA, Corp, United
States District Court Northern District Dallas Division, 3:CV-
010552

Mobile Data Solutions, Inc. v. Citizens Telcom Services Co.
L.L.C., In the District Court Collin County, Texas 366th Judicial
District, 366-01914-00

Control Components Corporation v. Gary Britt and Britt Power
Devices, L.L.C., In the District Court Dallas County, Texas 14th
Judicial District, 02-01264

Craig Franklin, Individually and as Executor for the Estate of
Joan Franklin, Deceased, Dan Franklin, and Kim Marth v.
Michael Lewis Gibson, M.D., Pinnacle Anesthesia Consultants,
P.A., and Tenet Health System Hospitals, Inc. d/b/a/ Doctors
Hospital, In the District Court Dallas County, Texas 134th
Judicial District

Phillip Bridges et al v. Jolly Chef Express, Inc. and Industrial
Catering, Inc., In the District Court of Dallas County, Texas 68th
Judicial District

Felix Rather III, et al v. Dallas Automotive Sales & Services, et al, In the District Court Dallas County, Texas 192nd Judicial District 02-11041K

NRI Investors, L.P. v. Net Related, Inc., Steve Simpson and Ronald Devin Jones, In the District Court of Dallas County, Texas 192nd Judicial District 02-6971

GATT Trading, Inc. v. Sears, Roebuck and Co., In the United States District Court For the Northern District of Texas Dallas Division 3-02-CV-1573D

Alliance Payroll Services, Inc. v. Paychex, Inc. and Rapid Pay, Inc., in the United States District Court – Southern District of Texas Houston Division H-02-2183

Barry Williams, Inc. v. Marvin Myers, Norma Myers, Dana Myers and M. Myers Development, Inc., In the County Court at Law No. 5, Dallas County, Texas 02-01843-E

Risk Technologies, Inc. v. Tennessee Municipal League, Risk Management Pool, Inc., In the United States District Court for the Northern District of Texas, Dallas Division 3-02CV2324-H

Paul G. Broughton et al v. Discount Motors a/k/a Mortitz Cadillac, Inc. et al, In the District Court of Tarrant County, Texas 352nd Judicial District 352-192430-02

Daniel J. Bollner et al v. Plastic Solutions of Texas, Inc. et al, In the District Court 380th Judicial District Collin County, Texas 380-1399-04 and 380-2143-04

Renaissance Private Equity Partners, et al v. Reed Walters, An Arbitration Matter in Dallas, Texas 71-180-00205-05

Terlingua, Ltd. v. eOriginal et al, A matter in Arbitration in Dallas County, Texas

Plastic Solutions Molding, Inc. v. Colormatrix Corporation, In the District Court of Collin County, Texas 416th Judicial District 416-387205

Wirenix, Inc. v. Ericsson, Inc., A matter in Arbitration in Dallas, County, Texas 71 117 Y 00586 06

Brian K. Chadwick, individually and Derivatively on Behalf of
TLC Equipment, Inc. v. Colleen Ward, In the District Court
Dallas County, Texas, 162nd Judicial District DC-06-07309-I

The Securities and Exchange Commission v. Mark David
Shapiro et al, In the United States District Court For the Eastern
District of Texas, Sherman Division, Civil Action No.
4:05CV364

Bizzy Bees Pest Control Company et al v. Leland Morris et al, In
the District Court of Dallas County, Texas 95th Judicial District
06-05662

Marathon Financial Insurance Co., Inc. RRG v. Ford Motor
Company et al, In the United Sates District Court For the Eastern
District of Texas, Texarkana Division, Civil Action No. 5:05-
CV-0016-DF

Andra Group, L.P. and the Topsytail Company v. J. David
Joiner, CPA, In the District Court Dallas County, Texas, 14th
Judicial District

In Re:  United States Brass Corporation, Debtor, E.I. DuPont de
Nemours, Inc v. The Brass Trust et al, In The United States
Bankruptcy Court for The Eastern District Of Texas Sherman
Division Case No. 94-40823-S

Verascom, LLC v. John Mateo and G.W. Communications,
L.L.C., In the District Court Collin County, Texas 296th Judicial
District Cause No.296-2405-07

Classic Industries, LP v. Mitsubishi Chemical FP America, Inc.
and Michael Zavo, In the District Court of Kaufman County,
Texas 422nd Judicial District Cause No. 73397-422

Monitronics International, Inc. v. Charley Johnson, In the
District Court Dallas County, Texas 68th Judicial District Cause
No. 07-6289

Value-Added Communications, Inc. v. T-NETIX, Inc., In the
District Court Dallas County, Texas 68th Judicial District Cause
No. 03-11399-C

Scott A. Barnes
Page 11

Donna West v. Tyler Perry et al, In the United States Court for
the Eastern District of Texas Marshall Division Case No. 1-
07CV-200-LED

MP Weight Loss Management, LLC v. U.S. Medical Care
Holdings, LLC, In the United Sates District Court For the
Northeastern District of Texas, Dallas Division, Civil Action No.
3-08CV1410-K

Scientific Weight Loss, LLC v. U.S. Medical Care Holdings,
LLC, In the United States District Court For the Central District
of California, Civil Action No. CV08-02852

Bruce and Teresa Badget v. Advocare International, LP, In the
District Court Dallas County, Texas 191st Judicial District Cause
No. DC-07-02297

Sherry T. Bradshaw et al v. Advocare International, LP, In the
District Court Dallas County, Texas 298th Judicial District Cause
No. 06-11122

Michael Baisden v. I'm Ready Productions, Inc. et al, In the
United States District Court For the Southern District of Texas,
Houston Division, Civil Action No. 4:08-CV-00451

Brandt Blanken and Craig Sheftell v. Robert H. Turner and
Wentwood Capital Advisers, L.P., In the District Court Travis
County, Texas 250th Judicial District, Cause No. D-1-GN-08-
000886

J&V Communication Services, Inc. v. Merle L. "Butch" Abbott
and Weaver and Tidwell, L.L.P., In the District Court Kaufman
County, Texas 86th Judicial District, Cause No. 76928-86

Caryn Campbell, Individually and as Next Friend of Aslan
Campbell, Minor Child v. Auntie Bambino, Inc. d/b/a Preston
Kiddie Kollege, Maria Seifi, Solyman Ashrafi, Sarah Flores, Erin
Smith, Erica Bernal and Leslie Carlton; In the District Court of
Collin County, Texas 416th Judicial District, Cause No. 416-
02042-2008

Jeff Cunningham and Larry Rios v. Donna K. Greer, Gary Greer,
and UHP Process Piping, Inc., In the District Court 162nd Judicial
District Dallas County, Texas, Cause No. 08-05864

Scott A. Barnes
Page 12

Brian Addy and Ad-Venture Capital Management, LLC v.
William Addy and ISN Software Corporation, In the District
Court 191st Judicial District Dallas County, Texas, Cause No. 08-
12618

In the Estate of Duane A. Harris Deceased – CLA Management,
Ltd. v. Deidre D. Harris et al, In the Probate Court of Collin
County, Texas, Cause No. PB1-647-2008

Peticure, LLC v. Telebrands Corporation et al, In the United
States District Court For the Eastern District of Texas, Sherman
Division, Civil Action No. 4:08-CV-00345

Progressive Concepts, Inc. v. New Cingular Wireless PCS, LLC
and AT&T Mobility Texas LLC, A matter in Arbitration

Walco International, Inc. v. Warburton Technology, Ltd and
Multimin USA, Inc., A matter in Arbitration Case No. 50 122 T
00207 09

Advocare International, L.P. v. Richard Paul Scheckenbach et al,
In the United States District Court For the Western District of
Washington, Civil Action No. C08-5332RBL

David Kiger v. Ray A. Balestri, In the District Court 116th
Judicial District Dallas County, Texas, Cause No. 09-12251

Daryl K. Washington and Sunday Players, Inc. v. Kellwood
Company, In the United States District Court For the Southern
District of New York, Civil Action No. 05-CV-10034

Dealer Computer Services, Inc. v. Ford Motor Company, In the
District Court 186th Judicial District Harris County, Texas, Cause
No. 2007-46364

Melissa A. Herman, David A. Russo and Herman & Russo, P.C.
v. Xcentric Ventures, LLC, Edward Magedson and John or Jane
Doe, In the United States District Court For the Northern District
of Georgia, Civil Action No. 1:10-CV-0398

Larry Townes v. Travis Wolff & Company, LLP et al, In the
District Court 116th Judicial District Dallas County, Texas, Cause
No. 040964-F

Scott A. Barnes
Page 13

External Technologies, Inc. v. Panda Distribution, Inc. et al, In
the United States District Court For the Eastern District of Texas,
Sherman Division, Civil Action No. 4:10-CV-25

Terra Renewal Services, Inc. v. John H. Heilman et al, In the
District Court Hopkins County, Texas 62nd Judicial District,
Cause No. CV 39560

In Re: WN Truck Stop, LLC, In the United States Bankruptcy
Court Northern District of Texas Dallas Division, Case No. 10-
33156-11

Michael N. Kohrs v. JC Bowling & Company, LLC et al, In the
District Court 14th Judicial District Dallas County, Texas, Cause
No. 10-00159

The Estate of German Pablo Clouet et al v. Escapade Club
Corporation et al, In the District Court 68th Judicial District
Dallas County, Texas, Cause No. 08-13181-C

Kurt Steigerwald v. Stephen Cade et al, In the District Court 96th
Judicial District Tarrant County, Texas, Cause No. 96-236919-09

Dealer Computer Services, Inc. v. Ford Motor Company, In the
District Court 215th Judicial District Harris County, Texas, Cause
No. 2008-71227

In Re:  Kirk Franceschini, In the United States Bankruptcy Court
Southern District of Texas Houston Division, Case No. 10-30550

Revenue Technology Services Corp. v. Martinair Holland N.V.,
In the District Court 14th Judicial District Dallas County, Texas,
Cause No. 09-02903

Universal Forest Products Western Division, Inc. v. Holigan
Investment Group et al, In the District Court 393rd Judicial
District Denton County, Texas Cause No. 2009-60065-393

Pension Resources Corporation v. Sovereign International
Pension Services, LLC et al, In the District Court 134th Judicial
District Dallas County, Texas Cause No. DC-09-15393

Arguello, et al v. TSOSB, Inc. d/b/a Escapade Plaza, et al In the
District Court 68th Judicial District Dallas County, Texas, Cause
No.

Scott A. Barnes
Page 14

Scott D. Miller v. Lutz & Lutz Properties, Inc. et al; In the
District Court 101st Judicial District Dallas County, Texas, Cause
No. DC-11-08126-E

Pittsburgh SNF LLC et al v. PharMerica East, Inc.; In the United
States District Court For the Eastern District of Texas Marshall
Division, Civil Action No. 2:10-CV-363

Dealer Computer Services, Inc. v. Ford Motor Company, In the
District Court 152nd Judicial District Harris County, Texas,
Cause No. 2009-78534

Hispano USA, LLC v. Azteca Milling, LP and Gruma
Corporation; In United Sates District Court of Bexar county,
Texas 288th Judicial District, Cause No. 2011-CI-01313

Forest Park Medical Center at Frisco, LLC v. Michael Segura
and Cix+Caylyx Investments, LLC, In the District Court 193rd
Judicial District Dallas County, Texas, Cause No. 11-10428

Blue Sky Golden FPS, Ltd. v. Fulcrum Energy, LLC et al, In the
District Court 234th Judicial District Harris County, Texas, Cause
No. 2010-39531

International Oncology Network Solutions, Inc. et al v. Alan
Eagle et al, In the District Court 401st Judicial District Collin
Count, Texas, Cause No. 401-03043-2011

S.L. Sibert Management & Construction, Inc. v. Daniel Prescott,
et al., District Court, Dallas County, Texas, 160th Judicial
District, Cause No. DC-11-03625-H

Protegga, LLC v. Charles Bennett et al, District Court, Collin
County, Texas, 429th Judicial District, Cause No. 42901374-
2010

Marsh USA, Inc. et al v. Rex Cook et al, District Court, Dallas
County, Texas, 68th Judicial District, Cause No. D08-02906-C

StoneEagle Services, Inc. v. David Gillman et al, In United Sates
District Court of Northern Texas Dallas Division, Civil Action
No. 3-11CV2408-P

Def.'s APP 088

Scott A. Barnes
Page 15

HomeVestors of America, Inc. v. Duane LeGate et al, In United
Sates District Court of Northern Texas Dallas Division, Civil
Action No. 3-12-CV-01850-P

Radiant Financial, Inc. v. Faye Bagby et al, In the District Court
191st Judicial District Dallas County, Texas, Cause No. DC08-
2906

U.S. Commodity Futures Trading Commission v. RFF GP, KGW
Capital Management and Kevin G. White & Securities and
Exchange Commission v. Kevin G. White et al, In United Sates
District Court of Eastern District of Texas Sherman Division,
Civil Action No. 4:13-CV-0382 and 4:13-CV-0283

In Re: Ductile Pipe Fittings ("DIPF") Direct Purchaser and
Indirect Purchaser Antitrust Litigation, In the United States
District Court for the District of New Jersey, Civil Action No.
12-711 and Civil Action No. 12-169.

NBH Bank, N.A. f/k/a Bank of Midwest, N.A. v. Marlin Atlantis
White, Ltd. et al In United Sates District Court of Northern
District of Texas Dallas Division, Civil Action No. 3:13-CV-
0347-L

L.W. Hunt Resources, LLC and Richard Raughton (Intervenors),
Tiburon Land and Cattle, LP and Trek Resources, Inc. v. Thomas
S. Taylor et al In the District Court Fischer County, Texas 32nd
Judicial District, Cause No. DC-2013-0016

Talon Transaction Technologies, Inc. et al v. StoneEagle
Services, Inc. et al In the United States District Court for the
Northern District of Texas Dallas Division, Case No. 3:13-CV-
00902-D

Joseph Cooper v. Broderick Steven "Steve" Harvey, In the
United States District Court for the Northern District of Texas
Dallas Division, Case No. 3:14-CV-04152-B

Def.'s APP 089

# Attachment 2

Def.'s APP 090

## Joseph Cooper v. Broderick Steven "Steve" Harvey
## Documents Considered List

| | Document Description | Bates Reference Start | Bates Reference End | Location |
|---|---|---|---|---|
| 1. | Second Amended Complaint and Jury Demand | None | None | Backup Book |
| 2. | Defendant's Original Answer, Defenses and Counterclaim | None | None | Backup Book |
| 3. | Plaintiff's Second Supplementary Initial Disclosures | None | None | Backup Book |
| 4. | Deposition of Edward Seaman dated November 3, 2015 | None | None | Backup Book |
| 5. | Deposition of Joseph Cooper dated October 23, 2015 | None | None | Backup Book |
| 6. | Deposition of Steve Harvey dated October 26, 2015 | None | None | Backup Book |
| 7. | Expert Report of Michael A. Einhorn, Ph.D. dated July 10, 2015 | None | None | Backup Book |
| 8. | Deposition of Micahel A. Einhorn, Ph.D. dated November 20, 2015 | None | None | Backup Book |
| 9. | Plaintiff's Designation of Expert Witnesses | None | None | Electronic |
| 10. | Stand-Up Comedy Concert theatrical releases 1982 to 2015 (Box Office Mojo) and Box Office Mojo Website ██████████████████ | None | None | Electronic |
| 11. | Box Office Statistics – Steve Harvey's *Don't Trip...He Ain't Through with Me Yet!* | None | None | Electronic |
| 12. | Music Video Distributors (MVD) Filmography as reported by IMDbPro | None | None | Electronic |
| 13. | Can you tell me how many copies of a book has been sold by Amazon Rank? (Quora.com blog) | None | None | Electronic |
| 14. | Amzaon.com Sales Rank – How Does it Work? (chrismcmullen.wordpress.com blog) | None | None | Electronic |
| 15. | 2014_-DEG-Home-Entertainment-Spending-Final-External_1-5-2015.pdf | None | None | Electronic |
| 16. | DEG-Q3-2011_Grid_FINAL.pdf | None | None | Electronic |
| 17. | Q3-2015-DEG-Home-Entertainment-External.pdf | None | None | Electronic |
| 18. | Home Video Sales Fell In 2014 As Disc Decline Outpaced Digital Growth \| Deadline.pdf | None | None | Electronic |

| | | | | |
|---|---|---|---|---|
| 19. | Bye-bye, Blu-ray/ Video-on-demand and streaming options are gaining on you \| Computerworld.pdf | None | None | Electronic |
| 20. | Six Reasons Why DVDs Still Make Money -- And Won't Die Anytime Soon.pdf | None | None | Electronic |
| 21. | Hollywood in turmoil as DVD sales drop and downloads steal the show \| Film \| The Guardian.pdf | None | None | Electronic |
| 22. | DEG f_Q408.pdf | None | None | Electronic |
| 23. | DEG f_3Q09-release.pdf | None | None | Electronic |
| 24. | DEG f_Q410.pdf | None | None | Electronic |
| 25. | DEG_year_end_2011.pdf | None | None | Electronic |
| 26. | DEG-2012-Home-Entertainment-Spending-Final-Ext.pdf | None | None | Electronic |
| 27. | DEG-Year-End-2013-Home-Entertainment-Report.pdf | None | None | Electronic |
| 28. | DEG-2Q15-Cover-Note.pdf | None | None | Electronic |
| 29. | DEG-Home-Entertainment-Spending-Q2-2015.pdf | None | None | Electronic |
| 30. | DEG-2014-YE-cover-note2.pdf | None | None | Electronic |
| 31. | Home Video Sales Fell In 2014 As Disc Decline Outpaced Digital Growth \| Deadline.pdf | None | None | Electronic |
| 32. | Bye-bye, Blu-ray/ Video-on-demand and streaming options are gaining on you \| Computerworld.pdf | None | None | Electronic |
| 33. | | None | None | Electronic |
| 34. | IMDbPro database | None | None | Electronic |
| 35. | website | None | None | Electronic |
| 36. | Document Production of Statements of Net Proceeds related to Steve Harvey – *Still Trippin* [**Attorney's Eyes Only**] | HFD 0001 | HFD 0492 | Backup Book |
| 37. | AICPA Practice Aid -6-04 Calculating Lost Profits | None | None | Backup Book |
| 38. | Damages for Loss of Business or Business Opportunity by Nancy Fannon | None | None | Backup Book |
| 39. | AICPA FVS Practice Aid – Discount Rates, Risk and Uncertainty in Economic Damages Calculations | None | None | Backup Book |
| 40. | Journal of Forensic Economics – Key Issues in Measuring Lost Profits | None | None | Library |
| 41. | Litigation Services Handbook: The Role of the Financial Expert, 3rd and 4th Edition | None | None | Library |
| 42. | Recovery of Damages for Lost Profits, Robert L. Dunn 6th Edition | None | None | Library |

Def.'s APP 092

| 43. | Considerations in the Valuation of Royalties and License Agreements Associated with Intellectual Property, by Scott A. Barnes | None | None | Backup Book |
|-----|----------------------------------------------------------------------------------------------------------------------------------|------|------|-------------|
| 44. | Intellectual Property Valuation, Exploitation and Infringement Damages by Gordan V. Smith and Russell L. Parr | None | None | Library |
| 45. | The Feature Film Distribution Deal by John W. Cones | None | None | Library |
| 46. | How Hollywood Works by Janet Wasko | None | None | Library |
| 47. | Dictionary of Film Finance and Distribution: A Guide to Independent Filmmakers by John W. Cones | None | None | Electronic |
| 48. | The Insider's Guide to Film Finance by Philip Aberstat | None | None | Electronic |

Def.'s APP 093