UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOSEPH COOPER,                    §
                                  §
    Plaintiff,                    §
                                  §
v.                                §    CIVIL ACTION NO. 3:14-CV-4152-B
                                  §
BRODERICK   STEVEN   "STEVE"      §
HARVEY,                           §
                                  §
    Defendant.                    §

## MEMORANDUM OPINION AND ORDER

Before the Court are (1) Plaintiff Joseph Cooper's Motion for Partial Summary Judgment
(Doc. 150) and Defendant Broderick Steven "Steve" Harvey's Motion for Summary Judgment
(Doc. 153). For the following reasons, the Court **DENIES** Plaintiff's Motion and **GRANTS in part**
and **DENIES in part** Defendant's Motion.

## I.

## BACKGROUND[1]

This is a long-standing dispute over who owns the rights to a series of stand-up comedy
performance videos taken at a comedy club over twenty years ago. In 1993, Defendant Broderick
Steven "Steve" Harvey ("Harvey") hired Defendant Joseph Cooper ("Cooper") to tape performances
at Harvey's Dallas, Texas, comedy club—the Steve Harvey Comedy House ("Comedy House").
Doc. 151, Br. in Supp. of Cooper's Mot. Partial Summ. J. 1–2 [hereinafter Cooper MSJ]; Doc. 165,
Def.'s Br. in Supp. of Resp. to Pl.'s Mot. Partial Summ. J. ¶¶ 1–2 [hereinafter Harvey Resp.]. The two

---

[1] The Court takes its factual account from the uncontested facts contained in the summary judgment
record. Any contested fact is identified as the allegation of a particular party.

disagree about the deal's specifics, hence this lawsuit.

For his part, Cooper says he agreed to tape performances at the Comedy House in return for: (1) "$2,000, plus taxes, in installments"; (2) "designation as the exclusive official videographer of the Comedy House"; (3) "the rights to use the original tape and/or reproductions for display, publication or other purposes"; and (4) "ownership of the original videotapes." Doc. 151, Cooper MSJ 1–2 (internal quotation marks omitted). According to him, this agreement is memorialized in a "signed . . . instrument called the Video Contract" ("Video Contract"). *Id.* at 1. Thus, he alleges that he owns the rights to the tapes, and that Harvey improperly prevented him from selling and/or distributing them. *Id.* at 1–3. More specifically, Cooper says, he tried to release the footage in 1998, when Harvey sued to stop him ("the 1998 lawsuit"), *id.* at 2–3,[2] and again in 2013, when Harvey tried to stop him once more. *Id.* at 3. According to Cooper, Harvey sent twelve "take down" notices to Google to try to force the company to remove some of the contested footage from YouTube, *id.* at 19–20, and told Music Video Distributors ("MVD")—a company with whom Cooper was trying to negotiate a distribution deal for the videos—that Cooper had no right to the videos, thereby leading Cooper to file this lawsuit. *Id.* at 3–4.

Harvey's account, not surprisingly, is different. He says he retained Cooper to record performances "as promotional material for internal use, to do some advertising, and for study purposes," and that he "never . . . agreed to release any rights to the footage videoed at his comedy club," since, again, "[i]t was always [his] intent . . . that [Cooper would release] the material . . . to

---

[2] The two disagree about how that suit was resolved, but this is irrelevant for the reasons discussed in Part III, *infra. Compare* Doc. 151, Cooper MSJ 2–3, *with* Doc. 165, Harvey Resp. ¶ 15.

[him] for use as study material." Doc. 165, Harvey Resp. ¶¶ 1, 3.[3] Thus, Harvey denies that he ever entered into the Video Contract—or made any other agreement with Cooper, oral or written—giving him the rights he now claims. *Id.* ¶¶ 4, 7. Instead, Harvey says he always made clear to Cooper that Cooper had neither an ownership stake in the tapes, nor a right to reproduce, sell, or distribute them. *Id.* ¶¶ 18–19. Harvey accordingly characterizes Cooper's behavior as "a campaign to essentially extort, coerce, and embarrass [him]." *Id.* ¶ 11. According to Harvey, "[v]irtually every time [he] was hired for a television show, [Cooper] would contact the owners or principals to inform them . . . [that there was] potentially embarrassing material . . . [on the] tapes," thereby "attempt[ing] to have [the owners and principals] influence Harvey to pay extortion money to [Cooper] for the tapes." *Id.* ¶¶ 12–13. Harvey says Cooper even went so far as to offer to "sell" him back the tapes for five million dollars. *Id.* ¶ 13.

On July 6, 2015, Cooper filed his Second Amended Complaint,[4] now the operative pleading in this case, suing Harvey for: (1) breach of contract, Doc. 29, Second Am. Compl. ¶¶ 46–47;[5] (2) tortious interference with contractual relations, *id.* ¶¶ 48–51; and (3) tortious interference with prospective business relations. *Id.* Cooper also seeks (4) a permanent injunction to prevent Harvey from further infringing upon his alleged copyrights, plus damages, *id.* ¶¶ 52–57; (5) a declaratory judgment establishing Cooper's and Harvey's rights to the contested video footage

---

[3] Harvey says Cooper "never presented [him] with a release of any form or contract by which Harvey agreed to release any rights to the footage videoed at his comedy club," and that Cooper always understood that the footage was only to be used as study material. Doc. 165, Harvey Resp. ¶ 3.

[4] Cooper filed his Original Complaint on November 21, 2014, Doc. 1, Compl., and his Amended Complaint on June 29, 2015. Doc. 26, Am. Compl.

[5] Cooper's complaint contains duplicative numbering for paragraphs forty-five to forty-seven. The Court refers to the numbering on page nine. Doc. 29, Second Am. Compl. 9.

under the purported Video Contract; *id.* ¶ 58, (6) attorneys' fees, *id.* ¶ 59; and (7) exemplary damages, *id.* ¶ 60. Harvey responded by offering a number of affirmative defenses, Doc. 123, Def.'s First Am. Orig. Answer, Defs. and Affirmative Defs., Countercls., and Req. for Perm. Inj. ¶¶ 65–96, the following of which he now moves for summary judgment upon: (1) statute of limitations, *id.* ¶ 75; (2) waiver, *id.* ¶ 83; (3) laches, *id.*, and (4) statute of frauds, *id.* ¶ 68. Harvey also brings a counterclaim for (5) invasion of privacy, *id.* ¶ 97;[6] and (6) requests a permanent injunction, *id.* ¶ 55, as well as (7) attorneys' fees, *id.* ¶ 120.

Both Cooper and Harvey followed-up with a number of dispositive motions: (1) Cooper's (Original) Motion for Partial Summary Judgment (Doc. 62); (2) Cooper's Motion to Dismiss (Doc. 117); (3) Cooper's Motion to Dismiss Harvey's Amended Complaint (counterclaims) (Doc. 124); and (4) Harvey's Motion for Partial Summary Judgment (Doc. 126). Because the motions presented many convoluted and overlapping issues and arguments, this Court struck them and ordered the parties to file one summary judgment motion each. Doc. 136, Order. When it did so, the Court also denied Cooper's requests for a preliminary injunction and declaratory judgment establishing his rights to market, distribute, and sell tapes of the performances in question; denied Cooper's Motion to Dismiss certain paragraphs of Harvey's First Amended Answer; and struck certain language in other paragraphs of that answer. *Id.* at 3–6.

In response to the Court's order, Cooper moved for partial summary judgment, and Harvey responded. Doc. 150, Cooper MSJ; Doc. 165, Harvey Resp.[7] Harvey also moved for summary

---

[6] Though he characterizes this as a misappropriation counterclaim in his summary judgment motion. *See* Doc. 154, Harvey MSJ 22–23.

[7] Harvey also filed objections to some of Cooper's evidence. *See* Doc. 163, Def.'s Objs. to Pl.'s Evid. [hereinafter Def.'s Objs.].

judgment, Cooper responded, and Harvey replied. Doc. 153, Def.'s Mot. Summ. J.; Doc. 162, Pl.'s Resp. to Def.'s Mot. Summ. J. [hereinafter Cooper Resp.]; Doc. 170, Def.'s Reply Br. in Supp. of Def.'s Mot. Summ. J. [hereinafter Harvey Reply].[8] Both summary judgment motions are now ready for review.[9]

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). If the non-movant ultimately bears the burden of proof at trial, however, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). In determining whether a genuine issue exists for trial, the court will view all of the evidence in the

---

[8] Cooper also filed objections to parts of Harvey's affidavit, to which Harvey responded. Doc. 161, Pl.'s Objs. to Harvey Aff. [hereinafter Pl.'s Objs.]; Doc. 169, Def.'s Resp. to Pl.'s Objs. to Def.'s Summ. J. Evid. [hereinafter Def.'s Resp. to Pl.'s Objs.].

[9] The Court addresses the parties' evidentiary objections in footnotes throughout its order.

light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But the

non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make

such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## LEGAL ANALYSIS

A.    *Cooper's Motion for Partial Summary Judgment*

As an initial matter, the Court notes its difficulty discerning the precise grounds upon which

Cooper bases his Motion for Partial Summary Judgment. His thirty-five page supporting brief

contains no index to guide the reader; instead he includes a slew of subject headings, along with case

law and argument, with no apparent structure. *See generally* Doc. 151, Cooper MSJ.  In short, it

appears Cooper seeks summary judgment on his claims for (1) breach of contract and (2) tortious

interference with prospective business relations, as well as (3) Harvey's affirmative defenses and (4)

counterclaims. *See generally id.* This Court does not reach the substance of Cooper's arguments,

however, because Cooper fails to comply with the Court's procedural requirements for filing summary

judgment motions, namely that parties must cite to specific pages of their appendices to support their

assertions. *See* N.D. Tex. Civ. R. 7.2(e).[10]

While Cooper filed an appendix to his Motion for Partial Summary Judgment, *see* Doc. 152,

App. to Cooper's Mot. Partial Summ. J. [hereinafter Cooper App.], he chose not to cite any portions

of it in his brief. *See generally* Doc. 151, Cooper MSJ. Instead, and aside from case law, Cooper cites

---

[10] The Court also notes that neither Cooper nor Harvey have complied with Local Rule 7.2(c), which limits the length of supporting briefs to twenty-five pages—and reply briefs to ten pages—absent express permission of the Court. *See* N.D. Tex. Civ. R. 7.2(c).

only (1) his own Original Complaint (Doc. 1); (2) Harvey's original (and now moot) Motion to Dismiss (Doc. 9); (3) the Court's order granting in part and denying in part Harvey's original and now moot Motion to Dismiss (Doc. 14); (4) his own Second Motion to Compel (Doc. 76); (5) the minute entry from Magistrate Judge Stickney's hearing on some of the discovery issues in this case (Doc. 84); (6) the Court's order granting Harvey's Motion to Extend Time to Designate Experts (Doc. 111); (7) Harvey's First Amended Answer to Cooper's Second Amended Complaint (Doc. 123); and (8) Harvey's supporting brief for his original (and now moot) partial summary judgment motion (Doc. 127). *See generally* Doc. 151, Cooper MSJ.  Nowhere does he cite his appendix. *See generally id.*

Presented with his substandard briefing, this Court is under no obligation to sift through Cooper's 276-page appendix to find evidence that supports his various assertions. *See Nat'l Architectural Products Co. v. Atlas-Telecom Services–USA, Inc.*, CIV.A. 3:06-CV-0751, 2007 WL 2051125, at *3 (N.D. Tex. July 13, 2007) ("There is no affirmative duty on this court to sift through . . . [hundreds of] pages of appendices in search of facts that support the plaintiff's legal argument. . . . [t]hus, in the absence of citations to the appendix necessary to comply with Rule 7.2(e), the court will not consider the information included in the appendices."). Accordingly, Cooper is left with nothing more than his unsupported allegations and conclusions that are insufficient to support his Motion. Having effectively put forth no evidence to support summary judgment on any of his claims——for which he clearly bears the burden[11]——this Court **DENIES** Cooper's Motion for Partial

---

[11] If the movant on summary judgment bears the burden of proof on a claim or defense, he must produce evidence that establishes "beyond peradventure" the elements of that claim or defense. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Summary Judgment in its entirety.[12]

B.  *Harvey's Motion for Summary Judgment*

    1.  Cooper's Breach of Contract Claim

        i.  *Texas's four-year statute of limitations on breach of contract claims*

Moving on to Harvey's Motion, the Court first turns to Cooper's claim that Harvey breached their contract when he contacted MVD[13] to inform them that Cooper did not own the rights to the tapes in question. As a preliminary matter, Harvey argues that Texas's four-year statute of limitations bars this cause of action entirely. *See* Doc. 154, Harvey MSJ 12–13 (citing Tex. Civ. Prac. & Rem. Code § 16.051).[14] This, Harvey says, is because the purported breach occurred in 1998 at the latest, when he sued to prevent Cooper from releasing the videos. *Id.* at 13 (citing Doc. 62-2, Aff. of Joseph Cooper ¶¶ 17, 20–21 [hereinafter Orig. Cooper Aff.]).[15] So, according to Harvey, Cooper's claim is barred because he brought it more than four years later, in November 2014. *Id.* at 13 (citing Tex. Civ. Prac. & Rem. Code § 16.051).

---

[12]  As a side note, the Court notes that Cooper moves for (1) "a permanent injunction pursuant to Fed. R. Civ. P. 65(d)(1)(C) to enjoin Harvey from preventing Cooper from exercising his rights granted to him by the Contract" and (2) "a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 defining his rights under the Contract." Doc. 151, Cooper MSJ 8. This Court already denied both and explicitly instructed the parties to not raise these issues again. Doc. 136, Order 3, 6. Insofar as Cooper insists that he asked for a temporary injunction then and asks for a permanent one now, it makes no difference. He has put forth no relevant summary judgment evidence.

[13]  And possibly YouTube, as well.

[14]  Cooper says Tex. Civ. Prac. & Rem. Code § 16.003 governs, but it applies only to "specific performance of a contract for the conveyance of real property." *See* Doc. 162, Cooper Resp. ¶ 28; Tex. Civ. Prac. & Rem. Code § 16.003. Instead, section 16.501 applies. Tex. Civ. Prac. & Rem. Code § 16.501. But because both sections impose a four year limitations period, this distinction has no effect. *Compare* Tex. Civ. Prac. & Rem. Code § 16.003, *with id.* § 16.501.

[15]  Harvey moves to exclude paragraph twenty of Cooper's affidavit because it is hearsay, conclusory, and/or an improper legal conclusion. Doc. 163, Def.'s Objs. 3. This portion is not relevant to the Court's analysis here, however, so it need not make an evidentiary finding.

But Cooper makes clear that he is not suing Harvey for anything that occurred before 2013. Rather, Cooper's suit is based on a 2013 event, where, according to Cooper, Harvey's attorney, Ricky Anderson ("Anderson"), (1) took steps to have the contested video footage that Cooper posted to YouTube removed, and (2) contacted MVD—the company with whom Cooper had been negotiating a video distribution deal—to inform it that Harvey, not Cooper, held the rights to the footage, and that Harvey would sue if it released the videos. *See* Doc. 162, Cooper Resp. ¶ 29 (citing Doc. 152-1, Cooper App. 7, Aff. of Joseph Cooper ¶¶ 24–33 [hereinafter Cooper Aff.]).[16] Harvey, for his part, does not mention the YouTube incident in his Motion, but concedes that Anderson spoke to MVD's counsel, Michael Golland ("Golland")—though Harvey insists Anderson never threatened legal action.[17] *See* Doc. 154, Harvey MSJ 19 (citing Doc. 156, Harvey MSJ App. 53–54 [hereinafter Harvey App.], Dep. of Ed Seaman 24:24–25:23 [hereinafter Seaman Dep.]).

Cooper's breach claim is not barred. Cooper alleges that the behavior that supposedly constitutes breach—Anderson's comments to Seaman—occurred in 2013, thus Texas's four-year statute of limitations on breach claims does preclude Cooper's cause of action here, and the Court turns to the claim's elements.[18]

      *ii.*    *Cooper's breach of contract claim*

Harvey alleges that Cooper's breach of contract claim fails for two reasons. First, he never signed the agreement, therefore a valid contract never existed. Second, even if he did, the language

---

[16] Puzzlingly, Cooper cites his appendix in his Response to Harvey's summary judgment motion, but not in support of his own summary judgment motion.

[17] Seaman later spoke with Golland. Doc. 152-2, Cooper App. 111, Seaman Dep. 23:8–22.

[18] Harvey moved to exclude paragraphs twenty-four to thirty-three of Cooper's affidavit, *see* Doc. 163, Def.'s Objs., but because the Court's analysis does not depend upon these portions, it need not weigh in on these objections.

in the document did not grant Cooper rights to the tapes. The Court examines each argument in turn.

In Texas, the elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance or tendered performance on the part of the plaintiff; (3) breach on the part of the defendant; and (4) damages suffered by the plaintiff as a result of the defendant's breach. *Mullins v. TestAmerica Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citations omitted).

To prevail on his Motion for Summary Judgment on Cooper's breach claim, Harvey need only show the absence of a genuine issue of material fact in his favor, as to one of the four elements. If Harvey can show no reasonable jury could find for Cooper on one of these elements, then Cooper, by definition, cannot establish his claim, and the Court must rule in Harvey's favor.

      a.      Element 1: Whether a Valid, Enforceable Contract Exists[19]

Harvey says there is no valid contract because he never signed it. "Under Texas law, a valid contract requires an offer, acceptance, mutual assent, execution and delivery of the contract with the intent that it be mutual and binding, and consideration." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 609 (N.D. Tex. 2014) (internal citations and quotation marks omitted). In support of his position, Harvey cites only a portion of his affidavit, where he swore he never signed the agreement. *See* Doc. 154, Harvey MSJ 7 (citing Doc. 156, Harvey App. 2, Aff. of Broderick Steven Harvey ¶ 6 [hereinafter Harvey Aff.]) ("I did not sign this

---

[19] As preliminary matter, Harvey alleges that the Video Contract Cooper refers to is just an invoice for taping performances at the Comedy House, not "a valid contract to convey performance, derivative, and distribution rights." Doc. 154, Harvey MSJ 7. As Cooper correctly notes in his own summary judgment motion, Doc. 151, Cooper MSJ 5, an invoice, depending on the context, may constitute a contract. *See One Beacon Ins. Co. v. Crowley Marine Servs.*, 648 F.3d 258, 264, 271–72 (5th Cir. 2011).

document and my signature is not affixed to the instrument beneath the alleged terms of the invoice, where one would normally sign a legal document.").[20] Cooper says the Court cannot consider this evidence. Doc. 161, Pl.'s Objs. ¶ 3. Thus, before the Court turns to the parties' substantive arguments on this element, it first determines whether it can examine this portion of Harvey's affidavit.

Cooper offers a number of arguments for why the Court cannot consider this evidence. First, he says this portion of Harvey's affidavit contradicts Harvey's judicial admission in his Original Petition in the 1998 lawsuit—that the Video Contract is a valid agreement. *Id.* But Cooper overlooks the fact that "judicial admissions are not conclusive and binding in a separate case from the one in which the admissions were made," so this argument fails. *See Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1142 (5th Cir. 1991). Second, Cooper contends that "Harvey failed to provide documents containing his signature in response to discovery [requests,] and has testified that he does not have such documents[,] . . . [thus he] prevented Cooper from obtaining evidence to refute Harvey's assertion that he did not sign the . . . Video Contract." Doc. 161, Pl.'s Objs. ¶ 3. Cooper has not attached a copy of this discovery request to his objections, nor has he cited any other relevant evidence. *See generally id.* Rather, he only mentions this incident in his Motion for Partial Summary Judgment, where he stated that "Harvey agreed to provide 'five exemplars if found,'" and that "[n]o exemplars were found or produced." Doc. 151, Cooper MSJ 14. If Cooper's allegations are, indeed, true, the proper remedy would have been for him to move to compel Harvey to provide

---

[20] Harvey also argues, somewhat vaguely, that Cooper has not pointed to "any evidence that Harvey breached this clear objective of the videotaping 'services,'" or that "[t]here was [any] consideration or assent for anything else." Doc. 154, Harvey MSJ 7. The Court is not sure what this means, so it cannot consider this argument.

signatures, not to object here now. Thus, Cooper's second argument fails, too.

Cooper's next three arguments pertain to Harvey's statement that he "did not sign th[e] [Video Contract] and [that his] signature is not affixed to the instrument beneath the alleged terms of the invoice, where one would normally sign a legal document." Doc. 161, Pl.'s Objs. ¶ 3 (discussing Doc. 156, Harvey App. 2, Harvey Aff. ¶ 6). These arguments are somewhat difficult to follow, but Cooper seems to suggest there is a "[l]ack of foundation for [Harvey's] offered opinion as to where [one would] normally sign a legal document"; a "[l]ack of expertise for [Harvey's] offered opinion as to where [one would] normally sign a legal document"; and, further, that Harvey's opinion constitutes "[an] [i]nadmissible opinion as to where [one would] normally sign a legal document," given it is outside of his "designated expertise." *Id.* None of these arguments have merit. As Harvey points out, testimony regarding where one would normally sign a legal document is permissible lay witness testimony. *See* Fed. R. Evid. 701. Thus, the Court will consider this portion of Harvey's affidavit.

As to Cooper's substantive arguments, he contends that he and Harvey did, indeed, have a valid contract. He supports his argument with (1) his own affidavit, where he indicates that he personally saw Harvey sign the document, and (2) Harvey's answer in the 1998 lawsuit, where Harvey admitted he "engaged . . . Cooper . . . to video shows that were being performed at the . . . Comedy House [and] . . . [paid][him] to prepare promotional materials from the presentations"—as demonstrated by the "copy of the contract" Harvey indicated was "attached [to his answer in that suit] as exhibit 'A.'" *See* Doc. 162, Cooper Resp. ¶¶ 5–6 (citing Doc. 152-1, Cooper App. 3, Cooper

Aff. ¶ 5; Doc. 152-3, Cooper App. 163–65, Pl.'s Original Pet. & App. for Injunctive Relief ¶ 3).[21]

These competing offers of proof create a genuine issue of material fact. Looking at the Video Contract,[22] the Court sees writing in the upper right hand corner, styled as a signature, appearing to read "Steve Harvey." Doc. 152-1, Cooper App. 1, Video Contract. Whether that signature belongs to Harvey is an issue of fact for a jury to decide. For this reason, there exists a genuine issue of material fact as to whether Harvey signed the document, and thus whether there is actually a valid, enforceable contract.[23]

b.      Element #3: Whether Harvey Breached[24]

Next, Harvey says that Cooper cannot prove breach because he never granted Cooper ownership rights to the tapes, meaning he could not have breached the contract. Under the

---

[21] Harvey objects to the Court considering his Original Petition and Application for Injunctive Relief from the state court lawsuit. Doc. 163, Def.'s Objs. 7. While this document is, indeed, an unsworn pleading, inadmissible for summary judgment purposes, the Court's analysis turns on the Video Contract and Harvey's statements. So, it need not consider the petition, nor rule on its admissibility at this time.

[22] Harvey objects to the Court considering the purported contract because it is (1) hearsay under Federal Rule of Evidence 802 and (2) unduly prejudicial under Rule 403. See Doc. 163, Def.'s Objs. Neither objections have merit. The contract is not hearsay because it is a party admission. See Fed. R. Evid. 801(d)(2). And Harvey has made no argument as to *why* it is unduly prejudicial. See Fed. R. Evid. 403. Thus, the Court will consider it.

[23] As a side note, the Court notes that Harvey seems to believe Cooper is bringing a separate breach claim for Harvey's purported failure to abide by the 1998 state court agreement. Doc. 154, Harvey MSJ 7–8. Yet nothing in Cooper's Second Amended Complaint indicates that he is bringing a separate breach claim on this basis. See Doc. 29, Second Am. Compl. ¶¶ 46–47. Rather, Cooper seems to offer the agreement only to demonstrate that Harvey signed the 1993 Video Contract and later breached it. See Doc. 151, Cooper MSJ 22–23.

[24] This depends largely on whether Harvey conveyed ownership rights in the tapes to Cooper. Thus, the Court's analysis focuses primarily on this issue. Further, the Court notes that Harvey does not seem to contest the second element of a breach of contract claim—whether Cooper performed or tendered performance— thus it does not analyze it.

- 13 -

Copyright Act, "[a] transfer of copyright ownership"[25]—which includes granting an exclusive license—"is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a); 17 U.S.C. § 101.

To support his argument that he never conveyed rights in the tapes to Cooper, Harvey cites (1) Cooper's deposition, where he says Cooper conceded that "he has never negotiated a contract where someone gave him their copyrightable works," Doc. 154, Harvey MSJ 9 (citing Doc. 156, Harvey App. 13, Cooper Dep. 59:7–9), as well as (2) the actual contract, which, according to Harvey, merely indicates Cooper would *"record 'promotional material' that would be used 'for continuous play before, during, and after show performances,'"* and contains "no provisions . . . that discuss that [Cooper] has the right to commercially exploit Harvey's rights through selling and distribution." Doc. 154, Harvey MSJ 9–10 (citing Doc. 62-2, Orig. Cooper Aff. 10; Doc. 156-1, Harvey App. 2, Harvey Aff. ¶ 5).[26]

Harvey maintains that, because a court can consider "surrounding facts and circumstances, . . . in order to find out the intention with which words are used," this Court may examine the circumstances surrounding the purported contract. *Id.* at 11 (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996)). Here, Harvey says these include: (1) "the specific terminology used in the agreements"; (2) "the lack of discussion of selling or distributing the recordings in the Video Invoice"; and (3) "the roles of the parties - performer and videographer - at

---

[25] Other than by operation of law. *See* 17 U.S.C. § 204(a).

[26] Cooper objects to the Court considering this portion of Harvey's affidavit, but since it does nothing to aid Harvey, the Court need not weigh in on its admissibility. Doc. 161, Pl.'s Objs. ¶ 1.

the time the services under the Video Invoice were performed." *Id.* at 11–12. He says these all make it clear that "Harvey would never agree to give away all of his exclusive rights to prepare and sell his derivative works - for free." *Id.* at 11. Rather, this was a "work for hire" arrangement: Cooper produced videos, but Harvey owned all rights to the underlying performances, demonstrated, he says, by the fact that Cooper himself "testified that he negotiated a price with Harvey for the videotaping services . . . and that Harvey paid him in full for his services." *Id.* (citing Doc 156-1, Harvey App. 14–15, 17, Cooper Dep. 78:2–79:1 & 99:9–20).

Cooper, however, refutes ambiguity, and instead suggests Harvey did convey rights in the videotapes to him, and therefore breached their contract when he contacted YouTube and MVD. Doc. 162, Cooper Resp. ¶¶ 13, 15, 29. For support, he points to the contract's language,[27] arguing that, because it is unambiguous, the Court may not consider parol evidence such as Cooper's deposition or any of the surrounding discussions between the parties. *See* Doc. 162, Cooper Resp. ¶¶ 12–14. So, from Cooper's point of view, "[because he] owns the original video tapes[,] . . . Harvey's breach has been preventing [him] from exercising the rights given to him by the [c]ontract." *Id.* ¶ 15.

Again, there is a genuine issue of material fact here. As a preliminary matter—and contrary to Cooper's assertion—the Court finds that the contract is ambiguous. *See Matter of Pirani*, No. 15-40538, 2016 WL 3063261, at *5 (5th Cir. May 27, 2016) (determining ambiguity is a question of law for the court). Generally, "[i]f [a] contract can be given a 'certain or definite legal

---

[27] (1) "It is understood [Cooper] is the exclusive videographer, and other taking videos [sic] will be permitted at our discretion" and (2) "[Cooper] reserves the right to use the original tape and/or reproductions for display, publication or other purposes. Original videotapes remain the exclusive property of [Cooper]." *See* Doc. 162, Cooper Resp. ¶ 13 (citing Doc. 152-1. Cooper App. 1, Video Contract). The Court notes, however, that while the second provision appears in the Video Contract, the first does not. *See* Doc. 152- 1, Cooper App. 1, Video Contract.

meaning or interpretation, then it is not ambiguous.'" *Id.* (quoting *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996)). "Nor is a contract ambiguous 'merely because the parties disagree on its meaning.'" *Id.* (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)). "Rather, ambiguity exists only if the contract's 'meaning is uncertain,'" or if the language is 'susceptible to two or more reasonable interpretations.'" *Id.* (first quoting *Lenape*, 925 S.W.2d at 574, then quoting *Seagull Energy*, 207 S.W.3d at 345).

Here, that is precisely the case. The handwritten portion of the purported contract, appearing after the words "Services Included," reads:

> Produce videotapes of *promotional material* from the facility including interior shots, audience, stage performances, and graphics with official logos. Tape will also include names, dates and music sound tracks. *Tapes will be looped for continuous play before, during and after show performances.*

Doc. 152-1, Cooper App.  1, Video Contract (emphasis added). But the circled, written portion in the lower left hand corner reads:

> The studio reserves the right to use the original tape and/or reproductions for display, publication or other purposes. Original videotapes remain the exclusive property of the studio.

These two provisions raise the question of whether the parties intended for the videos Cooper made to be used as promotional materials for the Comedy House, for Cooper to be able release and sell the tapes himself, or, perhaps, both. All three are reasonable interpretations, but Court cannot say which, if any, the parties intended. This makes the contract ambiguous.[28] Accordingly, "parol evidence

---

[28] And, contrary to Harvey's argument, *see* Doc. 170, Def.'s Reply 2, the provisions do not actually conflict. It is easy to envision a scenario where Harvey has the right to "loop[] the tapes for continuous play before, during and after show performances" and Cooper has the right to "use the original tape and/or reproductions for display, publication, or other purposes." The fact that the "[o]riginal videotapes remain the exclusive property of [Cooper]" would not necessarily deprive Harvey of his right to screen them in his club.

[may] be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract." *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996) (citation omitted).

Looking at the two pieces of parol evidence Harvey has put forward, the Court finds that they do little to clarify Cooper's intent. As to the first, Harvey alleges Cooper conceded, in his deposition, that "he has never negotiated a contract where someone gave him their copyrightable works." *See* Doc. 154, Harvey MSJ 9 (citing Doc. 156, Harvey App. 13, Cooper Dep. 59:7–9). At face value, one might interpret this as a concession from Cooper that Harvey never gave him any rights to the tape. But this leaves out some important context. Cooper, when asked, "Have you ever negotiated a contract where somebody was giving up their copyrightable works," did indeed reply, "Not to my knowledge." Doc. 156, Harvey App. 13, Cooper Dep. 59:7–9. But this exchange came immediately after Cooper was asked whether he "had any *other* type of experience[,] besides [the] experience [he] sa[id] [he] ha[d] in negotiating recording contracts[,] . . . in negotiating any type of entertainment contracts." *Id.* at 59:1–6 (emphasis added). In context, then, it is entirely plausible that Cooper understood the question about copyrightable works as asking whether he had ever negotiated a contract, *other than the one in question*, in which someone gave up their copyrightable works.

Harvey's second piece of evidence, his own affidavit, offers little more. According to Harvey, this affidavit shows that he never conveyed ownership rights to Cooper:

> During the time [Cooper] was videoing my shows, [he] never presented me with a release of any other form or contract by which I agreed to release any rights to the footage video at my comedy club. It was always my intent and it was understood that the material would be released to me for use as study material to develop future acts. To a certain extent I would also use it as promotion in-house, looping excerpts of my performances before and after shows at Steve Harvey's Comedy Club.

- 17 -

Doc. 156, Harvey App. 2, Harvey Aff. ¶ 5.[29] These words pertain only to Harvey's own intent and are therefore not dispositive of the *parties'* intent. Thus, Harvey's evidence does nothing to relieve any ambiguity about Cooper's intent, and, in turn, whether he conveyed rights to Cooper.[30]

All said, Harvey's evidence has not alleviated the contract's ambiguity, therefore summary judgment is inappropriate. *See Liszt v. Karen Kane, Inc.*, CIV.A.3:97-CV-3200, 2001 WL 739076, at *10 (N.D. Tex. June 26, 2001) ("[T]he existence of a fact question as to an ambiguous contract precludes summary judgment." (citations omitted)). Therefore, the Court **DENIES** Harvey's Motion for Summary Judgment on Cooper's breach of contract claim.[31]

### 2.    Tortious Interference with Contractual Relations

Next, Harvey moves for summary judgment on Cooper's claim that Harvey committed tortious interference with contractual relations when he contacted MVD to tell it that Cooper did not actually have rights to the tapes. Specifically, Harvey argues that Cooper has not pointed to an

---

[29] Cooper objects to the Court considering this portion of Harvey's affidavit, but since it does nothing to aid Harvey, the Court need not weigh in on its admissibility. Doc. 161, Pl.'s Objs. ¶ 1.

[30] Cooper's own parol evidence seems to cut against Harvey's characterization of Cooper's deposition. According to Cooper, Harvey's venue, the Comedy House, was struggling in early 1993, so he approached Cooper to tape performances there to help promote the venue. Doc 162, Cooper Resp. ¶ 26 (citing Doc. 152-1, Cooper App. 2, Cooper Aff. ¶ 3). So, Cooper says, the two then agreed to a contract where Cooper would video live performances and Harvey would pay him $2,000.00. *Id.* (citing Doc. 152-1, Cooper App. 2, Cooper Aff. ¶ 6). But this amount was lower than Cooper's customary rate, in part because Cooper knew that he would own the rights to the potentially-lucrative videotapes he created. *Id.* (citing Doc. 152-1, Cooper App. 2, Cooper Aff. ¶ 11). Harvey argues that Cooper's affidavit is a "sham affidavit," though, and is therefore not competent summary judgment evidence. Doc. 170, Def.'s Reply 4–5. He also moves to exclude paragraphs 3, 4, 6, 9, 11–16, 18–19, 20, 27, 29, 31, 33–34, and 39–41. *See* Doc. 163, Defs.' Objs. 2–5. Because a genuine issue of material fact would exist whether or not the Court considered Cooper's affidavit, it need not weigh in on Harvey's argument here. The Court does not consider Cooper's affidavit, nor need it do so to determine that summary judgment is inappropriate here.

[31] Harvey does not address the fourth element of a breach of contract claim—Plaintiff's damages—therefore the Court does not consider it.

actual contract with which Harvey could have interfered. To prevail on a claim for tortious interference with an existing contract, a plaintiff must show "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). The alleged interference generally must have induced a breach of the contract to be actionable. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) ("Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." (citations omitted)). The fact that a contract is terminable at will, however, "is no defense to an action for tortious interference with its performance." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989).

Harvey says Cooper has no contract with MVD, or any other entity for that matter, meaning no agreement exists with which he could have actually interfered. Doc. 154, Harvey MSJ 14. Indeed, nowhere in Cooper's Response does he allege that he had any sort of contract to distribute or sell the videos. *See generally* Doc. 162, Cooper Resp. ¶¶ 30– 48. Rather, the tortious interference section of his brief addresses only his claim that Harvey interfered with his *prospective* business relations. *See id.*

Harvey is right: nothing suggests Cooper has a contract with MVD (or any other entity) to distribute the videos, so there is no agreement with which Harvey could have interfered. MVD CEO Ed Seaman's deposition is clear on this point:

> Q Did [Harvey and Anderson] claim that Mr. Cooper did not have any right to enter into an agreement with Music Video Distributors?
> . . .
> A I know that they had a problem with it. And my sense was that entering into a content distribution deal where there would be a probable problem with the artist would serve against our common core and belief. So we walked away.
> Q And that's *the reason why this agreement was not made*, correct?

A *Yes.*
Q Following that point in time, have you ever spoken with Mr. Cooper again about trying to sell that footage?
A I think he reached out to me once or twice again. *And I did not want to move forward.*

Doc. 152-1, Cooper App. 112, Seaman Dep. 112:1–18 (emphasis added). Further, Cooper has not offered a contract with MVD or any other evidence that would contradict Seaman's account. In fact, Cooper does not even respond to Harvey's argument on this point in his Response. Accordingly, the Court **GRANTS** Harvey's Motion for Summary Judgment on Cooper's tortious interference with contractual relations claim and **DISMISSES** that claim.

### 3.    Tortious Interference with Prospective Business Relations

Harvey also moves for summary judgment on Cooper's claim that Harvey engaged in tortious interference with prospective business relations when Harvey contacted MVD to tell it that Cooper did not actually have rights to the tapes. Harvey offers five separate grounds in support of his Motion. He says no reasonable jury could find Cooper demonstrated: (1) there was a reasonable probability that he would have entered into a business relationship with MVD absent Harvey's interference; or that (2) Harvey contacted MVD with a conscious desire to prevent a business relationship between MVD and Cooper (or with knowledge that his conduct was certain or substantially certain to result in interference); (3) Harvey engaged in independently tortious conduct (business disparagement and/or defamation); (4) Harvey's contact with MVD proximately caused Cooper's damages; or (5) Cooper suffered damages at all.[32]

"To prevail on a claim for tortious interference with prospective business relations, the

---

[32] It is somewhat ambiguous as to whether Harvey argues that no genuine issue of material fact exists regarding damages. *See infra* Part III(B)(3)(v).

plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) (citations omitted); *see also Sanger Ins. Agency v. HUB Int'l., Ltd.*, 802 F.3d 732, 748 (5th Cir. 2015).

  i.    *Element 1: Reasonable probability of a business relationship*

To establish tortious interference with prospective business relations, one must first show more than speculation or the bare possibility that a plaintiff would have entered into a future business relationship. *See Flying Crown Land Grp. v. Reed*, No. 3:15-CV-1225, 2015 WL 4750786, at *2 (N.D. Tex. Aug. 11, 2015). While "mere negotiations" are not enough, a pre-existing business relationship can suffice to show a reasonable probability of prospective contractual relations. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Gallagher Benefit Servs., Inc.*, No. 11-CV-0685, 2012 WL 2870639, at *7 (S.D. Tex. July 11, 2012) (quoting *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)).

Harvey says Cooper cannot demonstrate a reasonable probability, under the attending circumstances, that he would have entered into an agreement with MVD but for Harvey's alleged interference. Doc. 154, Harvey MSJ 14–15. To show it is likely that Cooper would not, in fact, have entered into such an agreement, Harvey offers two portions from MVD CEO Edward Seaman's deposition, where Seaman testified that: (1) when he sent Cooper a working draft potential

agreement, he had not yet seen proof that Cooper owned the tapes, *id.* at 15 (citing Doc. 162, Harvey App. 53, Seaman Dep. 24:11–17), and (2) when Cooper *did* present proof that he owned the tapes (i.e. the Video Contract), Seaman felt it "did not seem rock solid," said it "didn't seem right" and had "pause in terms of [Cooper's] 'claimed ownership,'" *id.* at 15 (citing Doc. 162, Harvey App. 48–51, 57–58, Seaman Dep. 18:1-19, 20:18–21:8, 30:23–31:10).

Cooper rebuts this characterization and suggests it was Anderson's interference, not any sort of independent trepidation regarding Cooper's ownership rights, that caused MVD to forgo the agreement. Doc. 162, Cooper Resp. ¶ 31. By implication, then, he suggests that there was a reasonable probability he and MVD would have entered into a business relationship but for the interference. In support, he offers another portion of Seaman's deposition testimony, reproduced below:

> Q Was the reason that was given to you by [MVD]'s counsel or was the conversation with [MVD]'s counsel the reason why MVD did not move forward with the contract or agreement with Mr. Cooper ?
> . . .
> A. It was definitely a contributing factor.

*Id.* ¶ 30 (citing Doc. 152-2, Cooper App. 111, Seaman Dep. 23:16–19, 21–22).

> Q Do you know what [Harvey's attorney and/or representatives] said whatsoever?
> A I know that they had a problem with it. And my sense was that entering into a content distribution deal where there would be a probable problem with the artist would serve against our common core and belief. So we walked away.
> Q And that's the reason why this agreement was not made, correct?
> A Yes.

*Id.* (citing Doc. 152-2, Cooper App. 112, Seaman Dep. 26:5–13). He also offers testimony from Michael Golland, MVD's attorney:

> Q In the course of your conversation with Ricky Anderson what was said about Joseph Cooper by Ricky Anderson?

A Mostly that Mr. Cooper did not own the material. I can't recall anything else specific about what was said by Mr. Anderson about Mr. Cooper.

*Id.* ¶ 32 (citing Doc. 152-2, Cooper App. 96, Dep. of Michael Golland 7:4–10 [hereinafter Golland Dep.]).[33]

There is a genuine issue of material fact here. The record suggests that Seaman's hesitance to enter into an agreement with Cooper stemmed from *both* his skepticism of Cooper's ownership rights—present before any declaration from Anderson—*and* from Anderson's purported "problem" with the distribution deal. This Court cannot say whether either predominated and, in turn, how likely a deal between Cooper and MVD would have been absent Anderson's comments to Golland or Seaman.

As a side note, Harvey argues that any potential agreement between MVD and Cooper would have constituted an unenforceable, void agreement to commit copyright infringement. Doc. 154, Harvey MSJ 17. Therefore, it could not serve as the basis for a tortious interference with prospective business relations claim. *Id.* This is misleading. "A contract may be the subject of an interference action even though it is unenforceable between the contracting parties. Unless the contract is illegal or otherwise against public policy, the defendant may not raise unenforceability of the contract as a defense." *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 654–55 (Tex. App.—Corpus Christi 1991, writ denied) (citations omitted); *see also Aurora Nat. Gas, L.L.C. v. Cont'l Nat. Gas, Inc.*, No. CA

---

[33] Harvey objects to Golland's deposition, arguing that portions of it include hearsay and/or are irrelevant, in addition to the fact that the deposition was taken in violation of the Federal Rules of Civil Procedure's ("FRCP") rules on cross questions. Doc. 163, Def.'s Objs. 6 (citing Fed. R. Evid. 802 & 402). Harvey does not elaborate, however, as to *what* portions of Golland's deposition constitute hearsay and/or irrelevant material. *See id.* The Court will not analyze the document, line-by-line, to determine which, if any, do. Thus, it will not consider this objection. As to Harvey's point that the deposition was taken in violation of FRCP's rules on cross questions, again, he does little to elaborate, so, again, the Court will not consider this objection.

3:98-CV-1348, 1999 WL 304561, at *8 (N.D. Tex. May 10, 1999). Enforceable or not, nothing suggests that a potential deal between MVD and Cooper would be illegal or against public policy. Therefore, this defense fails, and the Court moves on to the next element of the claim.

> ii.        *Element 2: Conscious desire to prevent a relationship or knowledge that conduct was certain/substantially certain to result in interference*

Next, Harvey argues that, even if there was a reasonable probability that Cooper and MVD were going to enter into a business relationship—and even if Harvey interfered with that process, he did not do so with a conscious desire to prevent the relationship, or with knowledge that such conduct was certain or substantially certain to result in interference—meaning Cooper cannot establish this element. Doc. 154, Harvey MSJ 18. This, he says, is because he and Cooper "hotly dispute[]" whether Harvey conveyed contractual rights, thereby implying the two had a good-faith disagreement that would preclude a finding on this element. *Id.* To support this position, Harvey points to his own affidavit, where (1) he indicated that MVD initiated all contact with him and his representatives, who, in response, only notified MVD that they had no relationship with Cooper, nothing more, *id.* (citing Doc. 162, Harvey App. 4, Harvey Aff. ¶ 22),[34] as well as Seaman's deposition, where (2) Seaman also indicated that it was MVD that reached out to Harvey and/or his representatives, not vice versa, *id.* (citing Doc. 162, Harvey App. 49–50, Seaman Dep. 19:21–20:10),[35] and (3) made clear that Harvey's counsel never threatened to sue MVD, despite

---

[34] Cooper objects to the Court considering this part of Harvey's affidavit, but because the Court's analysis depends only upon Golland and Seaman's testimony, Harvey's affidavit has no effect, and the Court need not rule on its admissibility. Doc. 161, Pl.'s Objs. ¶ 17.

[35] Harvey also points to Cooper's deposition, arguing Cooper's own statements to MVD were what spurred the company to contact Harvey's counsel. Doc. 154, Harvey MSJ 18 (citing Doc. 162, Harvey App. 33–34, Cooper Dep. 223:22–224:10).

Cooper's allegations to the contrary, *id.* at 19 (citing Doc. 162, Harvey App. 53–54, Seaman Dep. 24:24–25:23). Harvey also argues that, even if he *did* threaten to sue MVD, this is permissible because it is "merely 'sharp' or unfair" dealing, inactionable under this particular tort, *id.*, and evidently inoffensive toward Seaman. *Id.* (citing Doc. 162, Harvey App. 60–61, Seaman Dep. 35:15–36:4).

Cooper, on the other hand, argues that Harvey *did* act with a conscious desire to prevent a relationship, or knowledge that his conduct was certain or substantially certain to result in interference. In support, he offers three pieces of evidence. First, he points to MVD counsel Golland's deposition, where Golland said Harvey not only intimated that Cooper did not own the rights to the videos, but told him that he would likely take action to stop MVD from distributing them if the company pursued an agreement with Cooper. Doc. 162, Cooper Resp. ¶ 32 (citing Doc. 152-2, Cooper App. 95–96, Golland Dep. 6:21–7:1).[36] Second, he offers Harvey's deposition, where Harvey evidently admitted that he never contested Cooper's ownership of the videos until this lawsuit:

> Q. Did you ever discuss with Mr. Cooper who owned videos taken of performances at the Steve Harvey Comedy House?
> A. Not until this all occurred.

*Id.* ¶ 35 (citing Doc. 152-1, Cooper App. 57, 66–68, Harvey Dep. 52:12–15); *see also id.* (citing Doc. 152-2, Cooper App. 122–123, Def.'s Am. Answers to Pl.'s Req. For Admissions and Interrog. ("You do not intend to prevent Cooper from asserting his rights to own the Videos. RESPONSE: Objection, improper procedure, subject to said objection, Admit." (emphasis omitted)).[37] Third, finally, and

---

[36] Cooper only cites page ninety-six, but the excerpt is found on part of page ninety-five, as well.

[37] Harvey objects to the Court considering portions of Harvey's First Amended Response to Requests for Admission and Interrogatory, based on the fact that these responses are hearsay and, alternatively, irrelevant. Doc. 163, Def.'s Objs. 6 (citing Fed. R. Evid. 802 & 402). Harvey's responses are admissible as a

somewhat nonsensically, Cooper references "[Harvey's] reliance upon and acceptance of injunctive language in [the 1998 lawsuit]" and Harvey's 1999 letter to KKDA radio, demanding the station not assist Cooper in selling or marketing the video. *Id.* ¶ 38 (citing Doc. 152-2, Cooper App. 6, Cooper Aff. ¶ 19).[38] According to Cooper, all three pieces of evidence evince a conscious desire to prevent a relationship, or knowledge that conduct was certain/substantially certain to result in interference.

Again, there is a genuine issue of material fact as to this element. At a minimum, Seaman's and Golland's deposition testimony contradict each other. Golland says Harvey's representatives told him that Harvey would likely take action to stop MVD from distributing the tapes should it partner with Cooper. Doc. 152-2, Cooper App. 95–96, Golland Dep. 6:21–7:1. But Seaman says he "d[id] [not] know if [Harvey's counsel] threatened to sue." Doc. 156-1, Harvey App. 53–54, Seaman Dep. 24:24–25:23. To choose one version over the other would require a credibility determination by the Court which is prohibited at the summary judgment phase. Accordingly, a genuine issue of material fact exists as to this element.

    *iii..    Element 3: Whether Harvey's conduct was independently tortious or unlawful*

Next, Harvey argues that his conduct was not independently tortious or unlawful. A plaintiff seeking recovery for tortious interference with prospective business relations must "prove that the defendant's conduct was independently tortious or wrongful as an element of the cause of action." *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 705 (Tex. 2015) (quoting *Wal-Mart Stores, Inc.*

---

party-admission. Fed. R. Evid. 801(d)(2). They are relevant as they pertain to the contract at issue in this suit. Fed. R. Evid. 402.

[38] Harvey moves to exclude paragraph nineteen of Cooper's affidavit. Doc. 163, Def.'s Objs. 3. The Court does not rely upon this portion of Cooper's affidavit, however, so it need not weigh in on this evidentiary objection.

*v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)). "'Independently tortious' does 'not mean that the plaintiff must be able to prove an independent tort'"; rather, a plaintiff must "prove that the defendant's conduct would be actionable under a recognized tort." *N. Cypress Med. Ctr. Operating Co. Ltd. v. Gallagher Ben. Servs., Inc.,* 4:11-CV-0685, 2012 WL 2870639, at *7 (S.D. Tex. July 11, 2012) (quoting *Sturges*, 52 S.W.3d at 726).

While Harvey contests most of this tort's other elements, he does not address this one. *See* Doc. 154, Harvey MSJ 13–20. Cooper, for his part, argues that Harvey—through his statements to third parties that Cooper has no right to sell or distribute the videos—effectively "accuse[d] [him] of attempting to defraud [such] pe[ople]. Doc. 162, Cooper Resp. ¶ 40. This, he says, "constitutes the torts of defamation and business disparagement." *Id.* (citing *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015)). Thus, the Court must determine whether Cooper has stated either an actionable defamation or business disparagement claim.

        a.    The First Basis for Independently Tortious Conduct: Business Disparagement

A plaintiff must establish the following elements to prevail on a business disparagement claim: "(1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff." *Forbes v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003). "To prove special damages, a plaintiff must provide evidence of direct, pecuniary loss attributable to the false communications of the defendants." *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 391 (5th Cir.1996) (citing *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex.1988)); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 692 (N.D. Tex. 2008).

Examining the record—namely Golland's and Seaman's deposition testimony—the Court finds Cooper's business disparagement claim is not actionable. It is true that he has adequately pled that (1) Anderson's statements to Golland constitute a published statement, and that (2) Golland could have understood Anderson's statements—which directly contradicted Cooper's—to imply that Cooper was lying to and/or trying to defraud MVD. (3) But Anderson's comments to Golland were made under qualified privilege, negating the third element of this tort and rendering Cooper's business disparagement claim inactionable. *See Korndorffer v. Autumn Hills Convalescent Ctrs., Inc.*, No. 01-91-00840-CV, 1994 WL 525819, at *5 (Tex. App.—Houston [1st Dist.] Sept. 29, 1994, writ dism'd w.o.j.) ("The existence or nonexistence of a privilege, either absolute or qualified, is a question of law.") (citing *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942); *Houston v. Grocers Supply Co., Inc.*, 625 S.W.2d 798, 800 (Tex. App.–Houston [14th Dist.] 1981, no writ); *Bergman v. Oshman's Sporting Goods*, 594 S.W.2d 814, 816 (Tex. Civ. App.–Tyler 1980, no writ)).  Under the Restatement (Second) of Torts:

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> > (a) there is information that affects a sufficiently important interest of the publisher, and
> > (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.

Restatement (Second) of Torts § 594 (1977). From the nature of this lawsuit, it is evident that Harvey maintains a reasonable belief that there is information that "affects a sufficiently important interest of the publisher [Harvey]"—the information being that Cooper does not own rights to the tapes, and the interest being Harvey's own purported ownership in the tapes. Further, it is clear that "the recipient's knowledge of the defamatory matter," i.e., Golland and MVD learning that Cooper

does not own the tapes, "will be of service in the lawful protection of [Harvey's] interest" of not having his copyright infringed. Accordingly, qualified privilege exists, so Cooper cannot satisfy business disparagement's third element. Therefore, business disparagement cannot in turn serve as the independently tortious conduct necessary to satisfy the third element of his tortious interference with business relations claim. This means the Court need not turn to business disparagement's fourth element, damages, and moves on to determine whether Cooper can establish an actionable defamation claim instead.

> b.    The Second Basis for Independently Tortious Conduct: Defamation

Under Texas law, a defamation claim requires the plaintiff to prove the defendant: "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with . . . negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). A statement is published if it is communicated to a "third person who is capable of understanding its defamatory meaning and in such a way that the person did understand its defamatory meaning." *Thomas-Smith v. Mackin*, 238 S.W.3d 503, 507 (Tex. App.—Houston [14th Dist.] 2007, no. pet.).

For the reasons discussed above, *see* Part III(B)(3)(iii)(a), the Court finds Cooper has adequately pled that (1) Harvey published a statement that was (2) defamatory to Cooper. Because Cooper is a private citizen, the third and last element the Court must examine is whether Harvey acted with negligence regarding the truth of his statement. In other words, the question is whether Harvey "knew or should have known [his] defamatory statement was false." *Neely v. Wilson*, 418 S.W.3d 52, 72 (Tex. 2013). If true, Cooper's allegation—that Harvey signed the contract and therefore conveyed rights in the tapes to Cooper—would establish that Harvey "knew or should have

known" that his "defamatory statement"—that Cooper did not own the tapes—was false. Accordingly, Cooper has stated an actionable defamation claim, and, in turn, pointed to the sort of independently tortious conduct necessary to establish tortious interference with business relations.

### iv.    Element 4: Proximate cause

It is not entirely clear whether Harvey argues that Cooper cannot show Harvey's actions proximately caused his damages. But, assuming he does make this argument, he cannot prevail. A plaintiff bringing a tortious interference with prospective business relations claim must—in addition to all of the above—show that he suffered an actual loss, and that the defendant's tortious interference proximately caused it.[39]

Here, Harvey argues that Cooper "has no evidence with which to establish that any conduct from Harvey's counsel "'prevented the [business] relationship [with MVD] from occurring,'" Doc. 154, Harvey MSJ 16, meaning that "the interference [could not have] proximately caused [Cooper's] injury." *Coinmach Corp.*, 417 S.W.3d at 923. In support, Harvey cites Seaman's deposition, where Seaman, when asked if he would have entered into the agreement if his company's counsel had not talked to Anderson, said, "It's hard to say. I can't really answer that fairly. I know that I didn't feel good about things. So, you know, typically if I don't feel good about something, I don't do it. So I can't answer that question fairly." *Id.* (quoting Doc. 156-1, Harvey App. 52–53, Seaman Dep. 23:24–24:9). From this, Harvey concludes that, "as a matter of law[,] . . . no

---

[39] Harvey cites COC *Services, Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex.App.–Dallas 2004, pet. filed), which articulates the test for tortious interference with prospective business relations slightly differently than the more-recent *Coinmach Corp.*, 417 S.W.3d 909, which this Court cites. Accordingly, Harvey's argument on this element is framed under the *COC Services* test, which seems to combine the "proximate cause of injury" element with the "independently tortious or wrongful act" element to form a single element: "that the independently tortious or wrongful act prevented the relationship from occurring." *COC Services, Ltd.*, 150 S.W.3d at 679 (internal citations and quotation marks omitted).

reasonable probability exists that, without the one telephone call between Harvey's attorney and MVD's attorney, MVD would have agreed to proceed to do business with [Cooper]." *Id.*

Cooper's brief as to the tortious interference with business relations claim is not organized by element. As far as this Court can tell, though, he offers no new evidence on the causation element. Thus, the only relevant evidence he presents is Seaman's deposition excerpts, discussed earlier, where Seaman indicated Anderson's comments were a "contributing factor" to his decision to not pursue an agreement with Cooper. *See* Part III(B)(3)(i).

The Court's conclusion here is guided largely by its earlier analysis in Part III(B)(3)(i), where it concluded that there was a genuine issue of material fact about whether there was a reasonable probability that Cooper and MVD would have entered into an agreement, absent Harvey's alleged interference. In reaching that conclusion, the Court noted that the record seems to indicate that Seaman's hesitance to enter into the agreement with Cooper stemmed from *both* his skepticism of Cooper's ownership rights—which existed before he had any discussion with Anderson—*and* from Anderson's purported "problem" with the distribution deal. That evidence has the same effect here. The Court cannot say whether Harvey's alleged interference proximately caused Cooper's damages. Therefore, there exists a genuine issue of material fact as to this element.

v.      *Element 5: Actual damages/harm*

The last element of tortious interference with prospective business relations is actual damages. Such a loss must be ascertainable at the time of the litigation. *See Impala African Safaris, LLC v. Dall. Safari Club, Inc.*, No. 13-CV-2175, 2014 WL 4555659, at *8 (N.D. Tex. Sept. 9, 2014) (dismissing a tortious interference with prospective relations claim where the harm to the plaintiff, if any, would not occur until after the complaint, amended complaint, and opposition to the motion

to dismiss had been filed).

Neither Cooper nor Harvey make any specific arguments as to the damages element, but, examining evidence the parties presented regarding the first element, the Court finds that there is a genuine issue of material fact as to damages, as well. The question before the Court is whether Harvey has demonstrated that no reasonable jury, looking at the evidence, could find Cooper suffered damages because of Harvey's purported interference. He has not shown this. Seaman's deposition indicates that Cooper and MVD were engaged in negotiations to enter into a video distribution deal, which, if consummated, would have resulted in profit for Cooper:

> Q And do you recall the terms of that contract or that agreement?
> A I don't remember the percentages or the material deal points. It's something I could look up. I'm not so good at multi-tasking. But it was probably our standard type of distribution terms. I do recall that after discussing for a while, he wanted an advance against future sales, which I think I agreed to something modest, modest by our standards, which, you know, off the top of my head I'm thinking was a $5,000 advance we offered because we're pretty conservative.

Doc. 152-1, Cooper App. 106, Seaman Dep. 7:13–23. Thus, Harvey cannot demonstrate that Cooper is unable to prove damages here. Therefore, there exists a genuine issue of material fact as to this final element.

### vii.    *Affirmative Defense: Justification*

Harvey argues that, even if Cooper can establish all elements of his tortious interference with prospective business relations claim, that claim would still fail in light of Harvey's affirmative defense of justification. Doc. 154, Harvey MSJ 19–20. In short, Harvey suggests he had an exclusive copyright interest in the tapes—and, thus, either a legal right or a good-faith claim to a legal right—that permitted him to contact MVD.

"Justification is an affirmative defense to . . . tortious interference with prospective business

relations." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000) (citation omitted). "[T]he justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Id.*; *see also Boundy v. Dolenz*, CIV.A.3:96-CV-03010, 2002 WL 31415998, at *6 (N.D. Tex. Oct. 21, 2002), *aff'd sub nom. U.S. ex rel. Boundy v. Dolenz*, 87 F. App'x 992 (5th Cir. 2004) (unpublished) (per curiam).

To show he was justified in interfering with Cooper's negotiations, Harvey points to his own affidavit, arguing that any contact with MVD was "merely to protect his exclusive copyright interests" in the tapes, and that Cooper cannot show that Harvey did not have a legal right to assert these purported rights. Doc. 154, Harvey MSJ 20 (citing Doc. 156, Harvey App. 4, Harvey Aff. ¶ 22).[40]

Cooper's response is somewhat cursory—he simply notes that Harvey is "choosing to ignore the March 20, 1993 Video Contract, and the Original Petition and the Agreed Order in *Harvey v. Cooper*." Doc. 162, Cooper Resp. ¶ 41. Cooper cites neither the contract nor order, but, because the Court has already examined both documents elsewhere in its analysis, it examines them here anyway. In any event, it finds Harvey's justification defense succeeds. As a preliminary issue, the Court notes that Harvey did not cede his copyrights in the tapes to Cooper in the Agreed Order. Rather, he entered into a *temporary* restraining order, in which he agreed not to:

> Contact[] any of . . . [Cooper]'s business associates or anyone with whom [Cooper] has entered into negotiations with regarding the sale, production, distribution,

---

[40] Though Cooper objects to a portion of paragraph twenty-two of Harvey's affidavit, he does not object to the relevant language—"Any arrangement that [MVD] had with . . . Cooper or decisions [it] made as to whether to do business with Cooper [wa]s not based on any representations made by [Harvey] or [his] representatives." *See* Doc. 161, Pl.'s Objs. ¶ 17; Doc. 156, Harvey App. 4, Harvey Aff. ¶ 22.

advertising, or licensing of certain video tape which is the subject matter of the above referenced suit for the purpose of threatening them with legal action, any other negative action in the event they do business with [Cooper] or for the purpose of intimidating them into refraining from doing business with [Cooper] regarding certain video tape[s] of . . . Harvey, Respondent, which is the subject matter of the above referenced suit, and from disparaging [Cooper] or any of his employees, agents, assigns, companies or attorneys to any third parties.

Doc. 152-1, Cooper App. 151, Def.'s First Supp. to Def.'s Orig. Answer, Countersuit for Decl. J., and Req. for Disclosure, Mot. for Temp. Restraining Order and Order Setting Hr'g (from 1998 lawsuit).[41] The Court will not speculate as to why Harvey entered into this agreement, but from the face of the document, he did not explicitly cede his claims to the tapes. Accordingly, the Agreed Order does little to bolster Cooper's argument that Harvey's justification defense is flawed. Nor does the purported Video Contract itself, as this Court already found that document ambiguous. *See* Part III(B)(1)(ii)(b). Thus, in light of that ambiguity, Harvey did have a "good-faith claim to a colorable legal right." Accordingly, the Court **GRANTS** summary judgment in Harvey's favor on Cooper's tortious interference with prospective business relations claim and **DISMISSES** it.

> 4.  Cooper's Declaratory Judgment Request

Moving on, the Court examines whether summary judgment is appropriate on Cooper's request for a declaratory judgment. Specifically, Cooper seeks a declaratory judgment establishing he and Harvey's rights to the contested video footage under the purported Video Contract. Harvey moves for summary judgment upon Cooper's request on grounds that Cooper is not entitled to such relief because he already sought it, and the Court already denied it. Doc. 154, Harvey MSJ 20 (citing Doc. 136, Order 3). Cooper acknowledges that this occurred, but says the Court's order was not a

---

[41] Harvey objects to the Court considering this evidence based on the fact that it is hearsay, irrelevant, and unduly prejudicial. S*ee* Doc. 163, Def.'s Objs. 6 (citing Fed. R. Evid. 802, 402 & 403). This evidence does not harm Harvey, however, so the Court will disregard his objection.

final judgment, so it should reconsider its ruling. Doc. 162, Cooper Resp. ¶ 42 (citing Doc. 136, Order 3).

Indeed, the Court already denied Cooper's declaratory judgment request. *See* Doc. 136, Order 3. Thus, there is no claim for Harvey to move for summary judgment upon, and the Court finds his motion **MOOT** on this point.[42]

### 5.    Cooper's Injunctive Relief Request

Harvey marshals the same argument to urge this Court to grant summary judgment in his favor upon Cooper's request for a permanent injunction to prevent Harvey from further infringing upon his alleged copyrights. *See* Doc. 154, Harvey MSJ 20 (citing Doc. 136, Order). Again, Cooper concedes that this Court previously denied his injunctive relief claim. Doc. 162, Cooper Resp. ¶ 42 (citing Doc. 136, Order). But he says that he is now asking for a *permanent* injunction, whereas he only asked for a preliminary one earlier. *Id.* Though Cooper identifies this distinction, he gives no reason for why it matters, and provides no evidence as to why he is entitled to such relief. *See id.*

The Court previously denied Cooper's injunctive relief request, and it will do so here again. *See* Doc. 136, Order 3. The Court sees no relevant distinction between a permanent and preliminary injunction, and Cooper does nothing to identify one. Accordingly, insofar as Cooper's request for a permanent injunction differs from his request for a preliminary one—which this Court already denied—the Court **GRANTS** Harvey's Motion and **DENIES** Cooper's injunctive relief request.

### 6.    Waiver and Laches

In addition to moving for summary judgment upon all of Cooper's claims, Harvey also moves

---

[42] Insofar as Cooper's Response can be construed as a motion for the Court to reconsider its ruling, the Court notes that Cooper has provided no reason for why it ought to do so. Therefore, it will not.

for summary judgment upon his own affirmative defenses, starting with waiver and laches. "Under Texas law, the elements of waiver are: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Martin v. Fed. Nat'l Mortg. Ass'n*, 814 F.3d 315, 318 n.3 (5th Cir. 2016) (internal citations and quotation marks omitted). "Waiver . . . can occur either expressly, through a clear repudiation of the right, or impliedly, through conduct inconsistent with a claim to the right. Waiver is a question of law when the facts that are relevant to a party's relinquishment of an existing right are undisputed." *Boren v. U.S. Nat'l Bank Ass'n*, 807 F.3d 99, 106 (5th Cir. 2015) (internal citations and quotation marks omitted).

"Laches is an affirmative defense based on a plaintiff's inexcusable delay that results in prejudice to the defendant." *New Century Fin., Inc. v. New Century Fin. Corp.*, No. C-04-437, 2005 WL 2453204, at *10 (S.D. Tex. Oct. 4, 2005) (citation omitted). The laches period begins to run "when the plaintiff knew or should have known of the infringement." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) (citation omitted). The laches inquiry is fact-intensive, and is often inappropriately disposed of on summary judgment. *New Century Fin.*, 2005 WL 2453204, at *11 ("[A] finding of laches seems inappropriate on summary judgment where the parties contest several key facts."); *Dumdei v. Certified Fin. Planner Bd. of Standards, Inc.*, CIV. 398-CV-1938, 1999 WL 787402, at *7 (N.D. Tex. Oct. 1, 1999) (declining to rule on laches claim as a matter of law because of fact issues). "Under Texas law, the defense of laches rests on two elements: (1) an unreasonable delay in bringing a claim although otherwise one has the legal or equitable right to do so, and (2) a good faith change of position by another, to his detriment, because of this delay." *Nautilus Ins. Co. v. S. Vanguard Ins. Co.*, 899 F. Supp. 2d 538, 549 (N.D. Tex. 2012) (internal

citations and quotation marks omitted).

Harvey argues that Cooper's decision not to market, sell, or distribute the tapes in question constitutes waiver and/or laches. In support, he points to Cooper's deposition, where he says Cooper admits that he did not try to commercially exploit the videos between 1994 and 1997. Doc. 154, Harvey MSJ 21 (citing Doc. 156, Harvey App. 28, Cooper Dep. 130:8–10). Harvey also says that Cooper conceded that, though he believes Harvey allegedly breached their contract in 1998, he decided not to sue at that time. *Id.* (citing Doc. 62-2, Orig. Cooper Aff. ¶ 20).

Conversely, Cooper says the evidence shows that he has always asserted his ownership and publication rights to the videos. Doc. 162, Cooper Resp. ¶ 45 (citing Doc. 29, Second Am. Compl. 2–9; Doc. 152-1, Cooper App. 3–9, Cooper Aff.).[43] Specifically, he points to the 1998 lawsuit, where Harvey admitted that Cooper did assert his purported right to sell, advertise, and mass produce videos from the contested footage. *Id.* (citing Doc. 152-1, Cooper App. 164, Original Pet. and Appl. for Injunctive Relief ¶ 5).[44]

Neither waiver nor laches is present here. With respect to Cooper's rights to sell, market, distribute, and/or publish the videotapes, Harvey has not demonstrated that Cooper possessed either the "actual intent to relinquish . . . [his] right[s]," or engaged in "intentional conduct inconsistent with . . . [his] right[s]." Looking at Cooper's deposition, it does appear that, between 1994 and 1997,

---

[43]  Harvey objects to the Court considering portions of Cooper's affidavit. Doc. 163, Def.'s Objs. 3. The Court does not rely upon them here, however, so it need not weigh in on this evidentiary objection.

[44] Cooper points to Harvey's Original Petition and Application for Injunctive Relief in the 1998 lawsuit to support his argument. Doc. 152-3, Cooper App. 164, Original Pet. and Appl. for Injunctive Relief ¶ 5. Harvey objects to the Court considering this, however, because his answer constitutes an unsworn pleading, and is therefore not competent summary judgment evidence. *See* Doc. 163, Def.'s Objs. 7. Harvey is right, therefore the Court does not consider this document.

he did not try to exercise any right he may have had to sell the videos. Doc. 156, Harvey App. 28, Cooper Dep. 130:8–19. And when Harvey evidently violated the 1998 restraining order, Cooper did not sue. *See* Doc. 62-2, Orig. Cooper Aff. ¶ 20. But simply waiting to exercise a right, so long as that right is not time-limited by contract or law, does not necessarily mean that one intends to waive a right. Further, Cooper's failure to fully prosecute Harvey's purported breach of the temporary restraining order does not prevent him from suing here now, as this suit relates to an entirely different breach. Thus, neither his decision to wait to sell and/or distribute the tapes, nor his decision to not try to enforce the temporary restraining order, manifest an "actual intent to relinquish . . . [his] right[s]" or constitute "intentional conduct inconsistent with . . . [his] right[s]." Thus, waiver does not bar his claim.

Harvey's laches defense fails, too.[45] Cooper argues that Harvey ignores the "undue prejudice to the defendant" element here—specifically, he says that Harvey offered no evidence of undue hardship when he responded to Cooper's interrogatory on this point. Doc. 162, Cooper Resp. ¶ 44. (citing Doc.152-3, Def.'s Objs. and Resps. to Pl.'s Second Set of Interrogs. 218). Indeed, examining Harvey's interrogatory response, the Court sees nothing to suggest he suffered undue hardship. Nor does Harvey point to any evidence to suggest otherwise. *See* Doc. 154, Harvey MSJ 21. Accordingly, the Court cannot conclude that Harvey suffered undue hardship, so his laches defense fails, as well.

7.     Statute of Frauds

Last up is Harvey's statute of frauds affirmative defense—that Texas law requires he and Cooper's purported agreement be memorialized by a writing—which he moves for summary judgment upon, based on the fact that Cooper cannot produce such a writing.

---

[45] Harvey uses the same evidence to support both his waiver and laches claims.

Under Texas law, "an agreement which is not to be performed within one year from the date of making the agreement" must be in writing and signed by the party against whom enforcement is sought. Tex. Bus. & Com. Code § 26.01.

Harvey's argument here is difficult to follow. In short, he contends that none of the agreements Cooper alleges he had with him gave Cooper copyrights in Harvey's works, nor do they give Cooper any right to market, distribute, or sell the tapes, or to use Harvey's name, image, or likeness. Doc. 154, Harvey MSJ 22. Thus, according to Harvey, "[t]o the extent [Cooper] alleges that some other promise was made, the statute of frauds doctrine precludes this argument" because "none of the alleged agreements at issue was performable in a year." *Id.* Cutting through this murky language, the essence of Harvey's argument goes something like this. If Harvey promised to convey copyrights to Cooper, the statute of frauds would cover this promise. So, the promise would need to be in writing. But the writings that Cooper has presented—i.e. the purported Video Contract—do not actually convey copyrights to Cooper. Thus, if Cooper wants to prove that Harvey conveyed copyrights, he must come up with another agreement, in writing, to show that this occurred. Cooper cannot do that. Therefore, his claim must fail.

Cooper, on the other hand, contends that the statute of frauds does not affect the outcome here because he can present a written agreement showing that Harvey conveyed those rights to him. To prove his point, Cooper cites (1) his own affidavit, Doc. 162, Cooper Resp. ¶ 19 (citing Doc. 152-1, Cooper App. 3, Cooper Aff.); (2) the Agreed Order from the 1998 lawsuit, *id.* (citing Doc. 152-3, Cooper App. 157–60, Letters Re: Agreed Order to Extend Temp. Restraining Order and Temp. Restraining Order); and (3) Harvey's Original Petition and Application for Injunctive Relief,

*id.* (citing Doc. 152-3, Cooper App. 163–85, Pl.'s Original Pet. and Appl. for Injunctive Relief).[46] He

also points to (4) the original contract, *id.* (citing Doc. 152-1, Cooper App. 1, Video Contract), and

(5) Harvey's response to an interrogatory in that case, where Harvey indicated that he did not intend

to prevent Cooper from asserting his rights to the footage, *id.* (citing Doc. 152–2, Cooper App. 123,

Def.'s Am. Answers to Pl.'s Req. for Admissions and Interrogs.)).

    The issue here is simpler than either party makes it out to be. The agreement Cooper asks

this Court to enforce is one where he videotaped shows at Harvey's club, and, in return, Harvey

conveyed rights in the footage to him, along with a sum of money. Thus, the issue is whether this is

"an agreement which is not to be performed within one year from the date of making the agreement."

In other words, if it would take more than a year for Cooper to videotape the shows required under

the contract,[47] then the agreement is subject to the statute of frauds. Harvey must establish each

element of his statute of frauds affirmative defense in order to prevail. *Williams v. Davis*,

No. 3:09-CV-0296, 2009 WL 3450952, at *4 (N.D. Tex. Oct. 26, 2009) (citing *Crescent Towing &*

*Salvage Co., Inc. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994)). Nothing in the record suggests that

any of the alleged agreements were "not to be performed within one year from the date of making

the agreement," however. Thus, Harvey's defense fails. Further, even if the statute of frauds *did* cover

the purported agreement, Cooper has put forth a written document memorializing it, albeit one

accompanied by genuine issues of material fact. *See* Part III(B)(1)(ii)(a). Thus, Harvey's defense

---

[46] Harvey objects to the Court considering portions of Cooper's affidavit, as well as his own Original Petition and Application for Injunctive Relief from the 1998 lawsuit. Doc. 163, Def.'s Objs. 3, 6–7. As to the first, the Court does not rely upon these portions, so it need not weigh in on this evidentiary objection. As to the second, the Court already found such inadmissible, and therefore will not consider it. *See* Note 40.

[47] Harvey's purported transfer of copyrights would, of course, occur instantaneously.

would fail on this ground, as well.

8.      Harvey's Misappropriation Counterclaim

In addition to moving for summary judgment on Cooper's claims and his own affirmative defenses, Harvey asks this Court to grant summary judgment in his favor on his misappropriation counterclaim.

"Under Texas law, [o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 638 (5th Cir. 2007) (internal quotation marks and citations omitted). "A misappropriation claim includes the following three elements: (i) that the defendant appropriated the plaintiff's name or likeness for the value associated with it, and not in an incidental manner or for a newsworthy purpose; (ii) that the plaintiff can be identified from the publication; and (iii) that there was some advantage or benefit to the defendant." *Id.* (internal quotation marks and citations omitted); *see also Watkins v. Cornell Cos., Inc.*, 3:11-CV-0260, 2013 WL 1914713, at *7 (N.D. Tex. Mar. 15, 2013), *rep't and rec. adopted*, 2013 WL 1926375 (N.D. Tex. May 8, 2013).

Harvey says that Cooper featured his name, image, and likeness in several internet advertisements to market the footage in question, thereby satisfying misappropriation's first two elements. Doc. 154, Harvey MSJ 23 (citing Doc. 156, Harvey App. 2–3, Harvey Aff. ¶¶ 11, 16;[48] *id.* at 35–38, Cooper Dep. 301:8–304:10; *id.* at 63–65, Exs. 32–34, Examples of Ads). Harvey also says he has suffered damages, pointing to an expert opinion that the fair market value for use of his

---

[48] Cooper objects to the Court considering paragraphs eleven and sixteen of Harvey's affidavit. Doc. 161, Pl.'s Objs. ¶¶ 6, 11. But the Court's analysis as to Harvey's misappropriation claim turns upon Cooper's defense under section 29 of the Restatement (Third) of Unfair Competition. Thus, the Court need not determine whether Harvey's affidavit is admissible.

likeness, name, and personal attributes is approximately $350,000. *Id.* (citing Doc. 156, Harvey App. 66–93, Expert Rep't of Scott A. Varnes, CPA, CFF, CGMA, Dec. 3, 2015).

Cooper does not deny any of the above, but points to section 29 of the Restatement (Third) of Unfair Competition, which states that:

> In an action for infringement of a trademark, trade name, collective mark, or certification mark, it is a defense that the actor's use is within the scope of the owner's consent as manifested by an agreement between the parties or by other conduct from which the owner's consent can reasonably be inferred.

Doc. 162, Cooper Resp. ¶ 46 (citing Restatement (Third) of Unfair Competition § 29 (1995) [hereinafter Restatement]).[49]

There is a genuine issue of material fact here. The Restatement shields an individual from liability on a misappropriation claim if he can show an agreement demonstrating that the owner of the likeness consented to its use. Restatement (Third) of Unfair Competition § 29 (1995). For the reasons set forth in Part III(B)(1)(ii)(a), the Court finds that the scope of the purported Video Contract, and whether Harvey signed it, are ambiguous. Accordingly, it would be inappropriate for the Court to grant summary judgment in Harvey's favor on his misappropriation claim, given Cooper's defense. Therefore, Harvey's Motion as to his misappropriation claim is **DENIED**.

9.      Harvey's Injunctive Relief Claim

Harvey next argues that he is entitled to a permanent injunction. He does not, however, specify what conduct he wants this Court to enjoin. *See* Doc. 154, Harvey MSJ 24. From the rest of his brief, however, the Court assumes he wants it to enjoin Cooper from publishing, selling, or otherwise distributing the tapes in question.

--------

[49] The Court cites a greater portion of the Restatement here than Cooper does.

To be entitled to a permanent injunction, one must establish "(1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that the injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,* No. 15-CV-20030, 2016 WL 3063302, at *16 (5th Cir. May 27, 2016) (quoting *VRC LLC v. City of Dall.,* 460 F.3d 607, 611 (5th Cir. 2006)). Here, Harvey has not prevailed on his misappropriation claim, therefore he cannot demonstrate the requisite success on the merits to warrant a permanent injunction. Accordingly, the Court **DENIES** his Motion for one.

10.    Harvey's Claim for Attorneys' Fees

Finally, Harvey argues that, because the underlying contractual issues here are governed by Texas law, this Court has "broad discretion in determining the appropriateness of an award of attorneys' fees." Doc. 154, Harvey MSJ 25 (citations omitted). Thus, he asks this Court "take judicial notice of the usual and customary attorney[s'] fees in this district" and permit him to submit supporting documentation within thirty days of judgment. *Id.*

Cooper responds by pointing out that Harvey has cited (1) Tex. Civ. Prac. & Rem. Code § 38.001(8), which, according to Cooper, permits attorneys' fees for oral contract claims, inapplicable here; (2) *DP Solutions, Inc. v. Rollins, Inc.,* 353 F.3d 421, 433 (5th Cir. 2003) and *World Help v. Leisure Lifestyles, Inc.,* 977 S.W.2d 662, 683 (Tex. App.–Fort Worth 1998, pet. denied), which, according to Cooper, deal with attorneys' fees claims based on breach of contract; and (3) *Gibbs v. Gibbs,* 210 F.3d 491, 500 (5th Cir. 2000), which addresses attorneys' fees under the Employee Retirement Income Security Act (ERISA). Doc. 162, Cooper Resp. ¶ 48. From this, Cooper argues that Harvey has sued him in tort, but Texas law limits attorneys' fees to breach of contract awards.

*Id.*

At this juncture, Harvey has failed to show that he is entitled to attorneys' fees. The Court will therefore address all attorneys' fees issues, if necessary, at a later stage in this litigation.

## IV.

## CONCLUSION

For the reasons discussed above, the Court **DENIES** Cooper's Motion for Summary Judgment in its entirety. As to Harvey's Motion, the Court:

(1)     **DENIES** summary judgment as to Cooper's breach of contract claim;

(2)     **GRANTS** summary judgment in Harvey's favor on Cooper's tortious interference with contractual relations claim and **DISMISSES** that claim;

(3)     **GRANTS** summary judgment in Harvey's favor on Cooper's tortious interference with prospective business relations claim and **DISMISSES** that claim;

(4)     **FINDS** Harvey's Motion is **MOOT** as to Cooper's declaratory judgment claim, which this Court already dismissed;

(5)     **GRANTS** summary judgment in Harvey's favor as to Cooper's request for a permanent injunction and **DISMISSES** that claim;

(6)     **DENIES** Harvey's Motion for Summary Judgment as to all three of his affirmative defenses—waiver, laches, and statute of frauds;

(7)     **DENIES** Harvey's Motion for Summary Judgment on his misappropriation claim;

(7)     **DENIES** Harvey's Motion for Summary Judgment on his own injunctive relief claim;

(8)     **DENIES** Harvey's Motion for Summary Judgment on his attorneys' fees claim.


**SO ORDERED**.

**SIGNED: August 21, 2016.**

- 44 -

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE